UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.:3:15-00037-002 |
| | ) | Judge Campbell |
| BENJAMIN BRADLEY | ) | |

### MOTION AND MEMORANDUM OF LAW
### IN SUPPORT OF MOTION TO SUPPRESS
### EVIDENCE OBTAINED PURSUANT TO
### UNLAWFUL WIRETAPS: TT3, TT7, TT8, TT9

**COMES NOW** the Defendant **Benjamin Bradley**, by and through his undersigned counsel, pursuant to 18 U.S.C. § 2515, and files this Motion to Suppress Evidence and Memorandum of Law. As set forth more fully below, the affidavit, application and order for electronic interception of Mr. Bradley's phones, TT3, TT7, TT8, and TT9 did not meet the "necessity" requirement contained in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520Title III ("Title III").

### LAW AND ARGUMENT

Each motion to suppress is, of course, designed to protect the constitutional and statutory rights of the defendants. However, as a preliminary matter, it is crucial to observe that the protection of the defendants' rights is derivative to the greater purpose, enacted by Congress and recognized by our highest courts, of protecting the right to free and unfettered communication. That is, Title III and the suppression remedy of 18 U.S.C. § 2515 serve not only to protect the Fourth Amendment rights of all citizens from unwarranted invasion, but also to protect the First Amendment rights of all citizens to speak freely without being deterred by fear of clandestine surveillance.

In enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Congress cautioned:

> "[T]remendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance.... No longer is it possible...for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage."

*S.Rep. No. 1097, 90th Cong., 2d Sess., 67* (1968); Bartnicki v. Vopper, 532 U.S. 514, 542-43, 121 S.Ct. 1753, 1769 (2001)(*Dissent* of C.J. Rehnquist, J. Scalia, J. Thomas).

In establishing the protections found in Title III, Congress expressed the desire "that personal conversations be frank and uninhibited, not cramped by fears of clandestine surveillance and purposeful disclosure: 'In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas.'"

<u>President's Commission on Law Enforcement and Administration of Justice</u>, *The Challenge of Crime in a Free Society* 202 (1967); *Bartnicki v. Vopper*, 532 U.S. at 543, 121 S.Ct. at 1769-70 (2001) (*Dissent* of C.J. Rehnquist, J. Scalia, J. Thomas). That is, while 18 U.S.C. § 2515.

In a spirited dissent some 80 years ago, two titans of the Supreme Court cautioned future generations about the dangers of electronic interception; Justice Brandeis observed:

> The evil incident to invasion of the privacy of the telephone is far greater than that involved in tampering with the mails. Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded, and all conversations

between them upon any subject, and although proper, confidential, and privileged, may be overheard. Moreover, the tapping of one man's telephone line involves the tapping of the telephone of every other person whom he may call, or who may call him. As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire tapping.
*Olmstead v. U.S.,* 277 U.S. 438, 475-76, 48 S.Ct. 564, 571 (1928)(*Dissent* of J. Brandeis).

In his dissent, Justice Holmes more succinctly observed that wiretapping is a "dirty business." *Olmstead*, 277 U.S. at 470, 48 S.Ct. 564 (*Dissent* of J. Holmes). Moreover, repeating a basic dictum of our criminal law, Justice Holmes observed: "I think it a less evil that some criminals should escape than that the government should play an ignoble part."

The concerns of Brandeis, Holmes and the Congressional enactors of Title III all find their clearest expression in 18 U.S.C. § 2515, which mandates the suppression of evidence obtained in violation of the explicit provisions of Title III. "[T]he protection of privacy was an overriding congressional concern" when Title III was enacted. *Gelbard v. U.S*., 408 U.S. 41, 48, 92 S.Ct. 2357 (1972). "[T]he unequivocal language of § 2515 expresses the fundamental policy adopted by Congress on the subject of wiretapping and electronic surveillance." *Gelbard*, 408 U.S. at 47. "It is the broad exclusionary rule of § 2515 that provides the teeth to these prohibitions." *U.S. v. Crabtree*, 565 F.3d 887, 889 (4th Cir. 2009).

The 4th Circuit in *Crabtree* quoted from the relevant Congressional findings supporting the act: "In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings,... it is necessary for Congress to define on a uniform basis the circumstances under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings." *Pub.L. No.*

90–351, § 801(b), 82 *Stat.* 197, 211 (1968), *Crabtree*, 565 F.3d at 890. (emphasis added).

The D.C. Circuit observed:

"[T]he suppression provisions of Title III have a broader purpose [than the judicial exclusionary rule]. 18 U.S.C. s 2515...serves a deterrent function: 'to compel compliance with the other prohibitions of the chapter.' ... In addition, its broad scope protects the privacy of communications, a function not necessarily served by the judicial exclusionary rule, and preserves judicial integrity...Congressional concern with the protection of the privacy of communications is evident also in the specification of what is to be protected. 'The proposed legislation is intended to protect the privacy of the communication itself . . . .'"

*United States v. Ford*, 553 F.2d 146, 171 fn. 68 (D.C. Cir. 1977)(internal citations deleted).

Under Title III, a court may authorize a wiretap "on the basis of the facts submitted by the applicant that":

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2616 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in thename of, or commonly used by such person.

18 U.S.C. § 2518(3)(a)-(d).

Title III allows an "aggrieved person" to move to suppress the contents of intercepted oral or wire communications, or evidence derived from such communications, obtained in violation

of the statute. An "aggrieved person," for purpose of 18 U.S.C. § 2518(10)(a), is a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Mr. Bradley was a target and was alleged to be a party to intercepted communications on the above referenced target telephones. Due to a technical error, no communications were intercepted on TT3 but extensive conversations were intercepted on TT7, TT8, and TT9.

The affidavit in support of the TT3 interceptions is attached as Exhibit 1 (Doc. 7-2, ID # 147-247). The affidavit for TT7 through TT9 is attached as Exhibit 2 (Doc 19-2, ID # 321 – 439)

## The Necessity Requirement

Title III wiretap applications must include a statement explaining the "necessity" for the extreme invasion of privacy inherent in eavesdropping on telephone calls:

> Each application shall contain ... a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous....

18 U.S.C. § 2518(1)(c).

The Supreme Court stated in *United States v. Kahn*, 415 U.S. 143, 153, fn.12 (1974) that electronic interception should not be authorized unless "traditional investigative techniques would not suffice to expose the crime." In *United States v. Alfano*, 838 F.2d 158 (6th Cir. 1988), the Sixth Circuit summarized the "necessity" requirement as follows:

> [W]iretaps are not to be used thoughtlessly or in a dragnet fashion. As our court has said, what is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigations.' However, the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted. *Alfano*, 838 F.2d at 163 (citation omitted).

In *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), the court analyzed an affidavit in support of a wiretap application that expressed broad investigative objectives similar to the goals here, specifically, to "identify all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals for their full involvement in this criminal enterprise." *Id.* at 1210. The court found that the government failed to make a full and complete statement of necessity in part due to the "boilerplate" nature of the affidavit, stating as follows:

> [T]he government must strictly adhere to the requirements of § 2518. That pen registers do not reveal the identity of callers; that drug dealers know it is in their best interest to reveal as little as possible; that witnesses cannot lead to the prosecution of an entire drug organization; and that traditional investigative methods do not reveal all are generic problems of police investigation. Their generic nature does not dissipate simply because the government claims a vast investigative purpose. Wiretaps themselves could little achieve the investigative goals stated in the government's application. *The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances. Doing so would render the requirements of § 2518 nullities*.

*Id.* at 1211 (emphasis added).

In the case before this Court, the affidavit discusses various "traditional investigative techniques" and attempts to explain why they are allegedly insufficient. The fatal flaw in the affidavit and application is two-fold: (1) the application is invalid on its face, due in part because the affiant's "boilerplate assertions are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations," *Blackmon* at 1210; and (2) the application contains incomplete statements regarding the actual fruits or alleged impracticality of traditional investigative techniques.

Defendant's facial challenge regarding necessity finds support in *Blackmon's* condemnation of boilerplate assertions regarding the limitations of pen registers, witness interviews, informants, and cooperators. See *United States v. Blackmon*, 273 F.3d at 1210, 1211. The crux of this challenge lies in the affidavits' failure to particularize the futility or failure of certain investigative techniques to the target subjects of the wiretap applications: "'Generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and *they must specifically relate to the individuals targeted by the wiretap.*'" *United States v. Fletcher*, 635 F.Supp.2d 1253, 1259 (W.D. Okla. 2009) *quoting United States v. Castillo-Garcia*, 117 F.3d 1179, 1188 (10th Cir. 1997) (emphasis added in *Fletcher*). In *Fletcher*, the court suppressed evidence obtained from one of the three wiretap applications at issue because it "failed to show that any investigative procedures were ever attempted against any of the named interceptees other than Wright and failed to explain why these procedures were not attempted in terms adequately particularized to the facts of [the] case." *Fletcher*, 635 F.Supp.2d at 1259. In other words, when the government claims that certain methods of investigation would be impractical or had been tried and failed, it must particularize those claims to *each of the named Target Subjects and the facts concerning each Target Subject*. Failure to do so is a failure to provide a full and complete statement of necessity as required for Title III wiretaps.

Even claims that physical surveillance would be futile need not be accepted at face value. In *United States v. Gonzalez, Inc.,* 412 F.3d 1102 (9th Cir. 2005), the court found unpersuasive an averment that neither physical nor video surveillance would likely yield useful information because the business "'headquarters are housed in a building that has large darkened windows that do not allow either physical or video visual surveillance of the activities inside.'" *Id*. at 1114. The court noted that surveillance should not be deemed "reasonably unlikely to bear fruit"

just because "it does not decipher what an individual is writing while she sits at her desk" because physical surveillance "could have identified individuals...coming and going from the Blake Avenue office" which "certainly would have assisted law enforcement in discovering the identities of 'members of the criminal enterprise and aiders and abettors,' a stated purpose of the Blake Avenue wiretap." *Id.* at 1114.

Other traditional investigative techniques shrouded in claims of futility to justify a Title III have similarly failed in the full light of judicial scrutiny. For example, in *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), the court noted that the assertion that pen registers "'...only provide evidence that the telephone was used, without showing the identity of the callers or the nature or purpose of those communications'" is "nothing more than a description of the inherent limitations of these devices." *Id.* at 1210. The court found an insufficient statement of necessity, in part due to the description of a generic, not a particularized, problem with pen registers, and, similar to the facts in this case, in part because the record demonstrated that the pen registers nevertheless provided useful information, including "numbers of individuals in contact with *Blackmon* who had previously been identified during the Miller wiretap." Id. The court in *Blackmon* also considered the affidavit's attempt to justify a wiretap by describing the expected futility of using informants and found that aspect of "necessity" similarly lacking:

> In discussing informants, the affidavit states that despite the successful employment of four informants during the Miller pre-wiretap investigation, these informants are insufficient to meet the broad investigative purpose here because they typically only possess limited knowledge concerning the scope of the criminal enterprise. The affidavit further states that subjects like Blackmon know that it is their best interest to reveal as little as possible to others concerning how their business is conducted ... Therefore, without the evidence sought by the

application, cooperating source information is insufficient to identify the entire criminal enterprise. These statements would be true of most or all drug conspiracy investigations, and the limitations on the usefulness of informants, no matter how successful or potentially successful to the particular operation, would support the necessity of a wiretap.

*United States v. Blackmon*, 273 F.3d at 1210.

The Sixth Circuit has also rejected broad, unparticularized claims of futility of traditional investigative techniques:

the Wenther Affidavit contained generalized and uncorroborated information about why grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful. J.A. at 443 (Jan. 17, 2006 Order at 4) ("There was insufficient credible evidence to support or even confirm those assertions....)
*United States v. Rice*, 478 F.3d at 711.

An examination of the wiretap affidavits in this case reveal allegations of the futility of certain investigative techniques which are strikingly similar to those rejected in *Blackmon* and in *Rice*. Under the *Rice* and *Blackmon* analyses, such allegations fall well short of the requirements for Title III wiretaps. Simply put, if the affidavit in this case sets the standard for a "full and complete statement" of the need for a wiretap, every drug investigation would justify the extreme invasion of privacy–of the innocent conversant as well as the guilty--that results from intercepting telephone calls. Clearly, Congress did not intend so low a bar for the interception of private conversations.

The defendant submits that a close examination of the four corners of the affidavit against the backdrop of *Rice*, *Blackmon*, *Fletcher*, *and Gonzalez* reveals that the affidavit is fatally flawed as to its claim of "necessity" as it relates to the authorization to monitor Benjamin Bradley's phones.

During the course of an investigation beginning in 2012, Drug Enforcement Agents formed the belief that Donald Buchanan, Jr. ("DJ") was a source of diverted narcotics. Through the use of wire taps and surveillance, agents claim to have identified Benjamin Bradley as a source of supply for Mr. Buchanon. (Doc. 7-2, ID # 169). Mr. Buchanan lives and operates in the Middle District of Tennessee. Mr. Bradley lives and works in the Detroit area. Agents intercepted multiple conversations between Mr. Bradley and Mr. Buchanan while monitoring Mr. Buchanan's phone.

In paragraph 67 of Doc. 7-2, the agent states:

Agents have used controlled purchases, surveillances, pole cameras, GPS trackers, Grand Jury subpoenas, telephone analysis and telephone pings of the targets of this investigation in an effort to penetrate the organization and identify the sources of supply, identify all of the financial aspects of the organization and effectively dismantle this organization. Through these investigative techniques, Agents have at this point exhausted all investigative possibilities except for the interception of telephones.

This boilerplate statement overstates and mischaracterizes the extent and effectiveness of the agent's attempts to use traditional law enforcement techniques prior to requesting electronic surveillance of Mr. Bradley's phones. As the following analysis demonstrates, the affidavits are nearly entirely void of attempts directed at Mr. Bradley or examples of why traditional law enforcement techniques would be ineffective *against Mr. Bradley in particular.*

*1. Physical Surveillance*

In Paragraph 70 of Doc. 7-2 and Paragraph 69 of Doc. 19-2, the affiant states that "[p]hysical surveillance of subjects of this investigation has been conducted only with limited success." This would lead the issuing judge to believe that Mr. Bradley had been under surveillance and that such surveillance had been thwarted. The affidavits, however, *do not list a single instance of failed physical surveillance* of Mr. Bradley. To the contrary, agents conducted a successful surveillance operation detailed in Doc. 19-2, Paragraph 69(b). They

identified and followed Mr. Bradley's vehicle and used video surveillance from a casino. This certainly does not constitute the use of surveillance "with limited success".

In paragraph 72 of Doc. 7-2 and paragraph 71 of Doc. 19-2 the affiant asserts that "based on the locations of the target subjects' residences, agents have limited opportunity and ability to conduct successful physical surveillance." There is no support for this claim nor is it clear whether the agent is including Benjamin Bradley in the statement. The affiant describes specific difficulties with conducting surveillance at the residences of Buchanan and Robertson (paragraph 69(d) of Doc. 19-2) but the affidavit is devoid of any information about Mr. Bradley's residence that would suggest any particular obstacle to surveillance. To the contrary, agents were able to establish effective surveillance at a residence associated with Mr. Bradley's as described in paragraph 69(b)(xiv) of Doc. 19-2.

Most of the affidavit's language concerning physical surveillance is boilerplate that applies to all drug trafficking cases. "Physical surveillance of those engaged in high level drug trafficking is *anticipated* to be extremely difficult . . ." and "[Handlers] of drugs and/or drug proceeds often engage in short and disguised meetings to exchange their drugs and drug proceeds, leaving them *difficult* to observe." (Doc. 7-2, Paragraph 73 and Doc. 19-2, Paragraph 72, *emphasis added*.) The Court will note that the legal standard for necessity is a showing that other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous it is not that other procedures are anticipated to be "difficult."

   *2. Pen Registers and Historic Phone Calls*

The affiant claims that the stated objective of the investigation includes determining the nature and extent of the drug trafficking operation, the identity of participants, and key locations. (Doc. 7-2, Paragraph 8). The affiant then deemphasizes these goals in the "necessity" section of

the affidavit. He claims that, although the pen registers "provided and will provide valuable information regarding contact between the subjects of the investigation" their usefulness is thwarted when suspects use fictitious subscriber information. (Doc. 7-2, Paragraph 74). He notes that a telephone identified as being used by Bradley was not subscribed in his name. (Doc. 19-2, pagraph 74). The fact that agents were able to identify Mr. Bradley despite the incorrect subscriber information demonstrates that they were, in fact, able to effectively use the pen register.

In addition, the affiant understates the usefulness of pen registers by pointing out they do not record the content of communications. This is, of course, always true. The agent does not make any effort to account for the usefulness of pen register data used in combination with geolocation data, traditional surveillance, and other less invasive investigative techniques. The fact that pen registers alone rarely succeed alone in supporting a successful prosecution is a generic fact true to all investigations.

In *Rice*, the Sixth Circuit found that the district court did not err when it concluded that "general language about the usefulness of pen registers in general" did not support a finding of necessity. The only information specific to [the target] in that case was that "within the limitations of the technology, the pen register has been as useful as it possibly can be—linking [the target] with other individuals with known drug histories." *United States v. Rice*, 478 F.3d at 708.

*3. Use of Grand Jury and Administrative Subpoenas*

This section of affidavit is devoid of evidence that other investigative procedures have been tried and failed and seems to focus instead on the generic difficulties of using subpoenas as part of a criminal case. The assertions, however, are no more than boilerplate. The affiant claims, based on his experience and conversations with the prosecutor, that subpoenas "would

not be successful in achieving the goals of the investigation at this time." (Doc. 7-2, Paragraph 60 and Doc. 19-2, paragraph 76). "More specifically," claims the affiant, "not all members of [the organization] have been identified, and their whereabouts are unknown." *Id.* There is no explanation as to why law enforcement needs to identify and locate "all of the members" before it can begin serving subpoenas. Logically, agents could use the subpoena power on known individuals and use any testimony obtained to work further along the chain. If subpoenas could only be used after all members were identified, they would never be used at all.

The affiant goes on to hazard a guess that the identified members would "most likely be uncooperative" if called to testify. *Id.* He does not claim to have met with such resistance or to have even made an attempt. He dismisses the possibility of leveraging cooperation through the grant of immunity speculating that immunity "*might* foreclose prosecution of the most culpable members and . . . would not ensure truthful testimony". *Id.* Again, this is not an example of an attempt that has tried and failed. It is a guess as to future results. Finally, he argues that the use of subpoenas would "alert them to the existence of this investigation." *Id.* The risks of untruthful testimony, uncooperative witnesses, and exposure of the existence of an investigation are all inherent in the use of subpoenas. If these risks alone were sufficient to foreclose the use of this investigative technique and create the necessity for a wiretap, subpoenas would never be a viable alternative. The affiant fails to show how any of these risks are unique to the facts of this investigation and make them reasonably unlikely to proceed in this case.

*4. Confidential Sources*

The affiant argues that the use of confidential sources "has not proven to be an effective alternative" to the interception of wire communications. (Doc. 7-2, Paragraph 62 and Doc. 19-2, Paragraph 78). Once again, the agent has misapprehended the legal standard and has made the investigatory goals so broad as to bootstrap the need for a wiretap. Even if it is true that the use

of sources alone is unlikely to reveal "the interior workings" or identify "all of the sources" does not make the use of a wiretap necessary. (*Id.*) The question for the court is whether the use informants has been tried and failed or reasonably appears to be unlikely to succeed.

The entire discussion in this section deals with Buchanan and the Middle-Tennessee based organization, not Benjamin Bradley. There is no discussion at all of any attempts to cultivate or use informants in the Detroit area to target Mr. Bradley. Again, the reader is left to assume that a Nashville based agent simply finds it inconvenient to cultivate sources in Detroit preferring instead to monitor phone calls while staying close to home.

*5. Undercover Agents*

The portion of the affidavit addressing the alternative use of undercover agents is defined by its reliance on guesses and assumptions, not failed attempts or facts specific to this case. For example, the affiant states undercover agents would be of limited use due to the "close knit nature" of the organization. (Doc. 7-2, Paragraph 66 and Doc. 19-2, Paragraph 82). The affiant continues, stating that members of narcotics organizations *generally* only deal with long term associates. (*Id.*) He goes on to proclaim that the members of the "Middle Tennessee-based organization appear to utilize counter-surveillance techniques and operate in remote areas . . ." *Id.* Even if true as to the Middle Tennessee group, the affidavit makes no claims whatsoever about the Detroit based group or why undercover agents might have particular difficulty with that group. This section, like the others, omits any information that would support a finding of necessity as to Benjamin Bradley's phone.

While most affidavits would, at this point, provide specific examples of instances in which targets attempted to avoid surveillance, only one example is provided here. This is the claim that Buchanan did not want to engage in drug deal at his residence. (Doc. 7-2, Paragraph 27). There is no evidence that counter-surveillance techniques and safety concerns render the

use of undercover agents impractical. Evidence of suspects attempting to elude physical surveillance through erratic driving and the use of lookouts, or evidence of violence directed against undercover officers. There is absolutely nothing to support an inference that undercover agents would generally face a greater risk in this case than in any other drug trafficking case or specifically face particular difficulties investigating Mr. Bradely.

      *6.     Consensual Recordings.*

The affiant claims that consensual recordings are merely recorded conversations of an undercover or confidential source and therefore, "are subject to the same limitations described above and could not meet the objective of this investigation." (Doc. 7-2, Paragraph 68 and Doc. 19-2, Paragraph 84). Those limitations, however, are not specific to this investigation or to Benjamin Bradley. Again, the affiant has not given any example of failed attempts at using consensual recordings or why they would be ineffective in the context of this particular case.

      *7.     Interviews of Witnesses and/or Subjects and Arrest Warrants*

The affiant predicts that the "likelihood of success in using interviews of independent witnesses, cooperating individuals, target subjects, or their known associates as an alternative . . . is minimal." (Doc. 7-2, Paragraph 69 and Doc. 19-2, paragraph 85). Continuing the pattern of his exclusive focus on Middle-Tennessee organization, the affiant asserts that contact with active members of that group would compromise the investigation "absent some degree of confidentiality." *Id.* There is no explanation as to why confidentiality is not an option or why the court should believe that the Detroit organization behaves in the same manner as the local group.

      *8.     Search Warrants*

The affiant discounts the use of search warrants because they, first, would not "determine the full nature and scope of the criminal conspiracy," and, second, "would 'tip-off' targets, causing them to curtail or conceal their activities." (Doc. 7-2, Paragraph 71, Doc. 19-2,

paragraph 87). Although no single investigative technique can be counted on to determine the full nature and scope of a criminal conspiracy, a search warrant might have uncovered drug sale ledgers, contact information, photographs, and other useful information. There is no way to know because this method was not tried. There are no examples in the affidavit of members changing their activities in response to the execution of search warrants. In fact, there is no suggestion that the investigation was in any way harmed when a search warrant was executed on Buchanan's residence in January 2014.

*9. Pole Cameras*

Agents set up pole camera outside of the residence of one person's barber shop but, because of the distance, could not identify individuals or vehicle tags. (Doc. 7-2, Paragraph 72 and Doc. 19-2, Paragraph 88). The affiant explained why pole cameras were not likely to be effective at Buchanan's or Ramos' residence. As with much of the affidavit, the evidence relates to other defendants, not Mr. Bradley.

The affiant claims that "agents have not positively identified where Benjamin Bradley is currently living" and were "unable to install a covert pole camera." (Doc. 19-2, paragraph 90). This claim is disingenuous. To the contrary, the available evidence suggests that, in fact, agents did know, or could have easily confirmed, where Mr. Bradley lived. Detroit police had previously conducted a traffic stop of Mr. Bradly at which time they would have obtained his identification. (Doc. 19-2, Paragraph 36(c)). Also, DEA agents from the Detroit office had conducted surveillance at two residences that they believed were "associated with Mr. Bradley" and observed cars registered to him at those addresses. (Doc. 19-2, Paragraph 69(b) (xii) and (xiv)). There is nothing to suggest that these locations would be unsuitable for pole cameras.

*10. Tracking Devices and Tracking GPS Telephone Data*

Although it is true that such data only give "approximate locations" and, absent interception, do not identify details regarding individuals or modes of operation, they could be a valuable tool when used in conjunction with other traditional techniques. The agents, however, did not make any attempt to use GPS Ping data against Mr. Bradley. Likewise, the affiant did not explain why GPS phone data would not be a useful tool to investigate Mr. Bradley. For example, as shown, in paragraph 76, GPS ping data can, and did, help agents locate a suspect in order to install a vehicle tracking device.

Agents were able to identify several vehicles registered to Mr. Bradley but the affiant did not articulate why it would not be practical to use GPS trackers on these vehicles. (Doc. 19-2, paragraph 94). Rather, the affiant asserted that, because Mr. Bradley was, on a single occasion, pulled over while driving a rental vehicle, he "possibly frequently uses rental vehicles in an effort to thwart law enforcement." *Id.* A vehicle tracking device, combined with surveillance, pen registers, and other traditional techniques, could have painted a very complete picture of Mr. Bradley's activities.

   *11. Trash Searches*

The affidavit describes several circumstances particular to Mr. Buchanan that made trash searches difficult. For example, he lived in a gated community and his trash pick-up was close to his front door. While it is arguable whether those were truly impediments to trash searches, the argument is irrelevant as to Mr. Bradley. As already explained, agents knew (or could have easily confirmed) the exact location of Mr. Bradley's residence. They had identified to residences "associated with" Mr. Bradley. The affiant has given no information whatsoever about the feasibility of trash searches at the two identified locations – a search which likely would have confirmed the fact that Mr. Bradley resided at one of the two identified locations.

**E. Derivative Use**

Pursuant to 18 U.S.C. § 2515 "no evidence derived [from intercepted wire or oral communication] may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of [Title III]."

This is a codification of the rule first pronounced by the United States Supreme Court in *Nardone v. United States,* which prohibited the government from using "knowledge gained" from an illegal wiretap. 308 U.S. 338, 340, 60 S.Ct. 266 (1939). The Supreme Court has made clear that the remedy for an improperly authorized wiretap is the suppression of both "primary and derivative evidence." *United States v. Giordano*, 416 U.S. 505, 508, 94 S.Ct. 1820 (1974). In Giordano, the Supreme Court ordered the suppression of the fruits of two additional wiretaps, and the fruits of a pen register search, as they were based on evidence obtained through an illegal wiretap. *Id*. at 533, fn. 19.

The derivative use prohibition also extends to all other types of derivative evidence. *United States v. Wac*, 498 F.2d 1227, 1231-32 (6th Cir. 1974). In *Wac*, the Sixth Circuit held that § 2515 and, "[t]he words 'derived therefrom' clearly extend the right of exclusion beyond evidence directly obtained as a result of a surveillance order." Id. at 1232. Thus, "items seized pursuant to search warrants issued in part on the basis of [illegally] intercepted communications...must be suppressed." *Supra*. *Giordano* has been followed by the Sixth Circuit in more recent times in *United States v. Rice*, which held that the "fruits of any evidence obtained" through an illegally issued wiretap warrant must be suppressed. 478 F.3d 704, 710 (6th Cir. 2007).

Evidence obtained as a result of each of the wiretaps is, therefore, "fruit of the poisonous tree" and cannot be relied upon to establish probable cause.

## **RELIEF REQUESTED**

The Defendant, Benjamin Bradley, hereby requests this honorable court suppress the contents of all communications recorded during the interception of TT3, TT7, TT8, and TT9 and all evidence derived therefrom.

                    Respectfully submitted,

                    /s/ James E. Mackler
                    James E. Mackler (BPR #024855)
                    BONE MCALLESTER NORTON
                    511 Union Street, Suite 1600
                    Nashville, TN 37219
                    (615) 238-6312 (phone)
                    (615) 248-4668 (facsimile)
                    jmackler@bonelaw.com

# CERTIFICATE OF SERVICE

      I, the undersigned, do hereby certify that a true and correct copy of the foregoing document was served either by electronic mail, the Court's EM/ECF system, or by First Class United States Postal Mail with sufficient postage thereunto attached to ensure delivery, to the following party of record:

Cecil W. VanDevender
Office of the United States Attorney
110 Ninth Avenue, South, Suite A961
Nashville, TN 37203-3870
cecil.vandevender@usdoj.gov

this the 5th of June, 2014.

                                                            /s/James E. Mackler