# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cr-00037-2** |
| | ) | |
| **[2] BENJAMIN BRADLEY,** | ) | **Judge Campbell** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS WIRETAPS

Defendant Benjamin Bradley has filed a motion to suppress the evidence derived from the interception of communications over four of his phones. (DE# 232.) The United States respectfully submits that Bradley's motion must be denied. Bradley argues that the wiretap applications of January 6, 2015 and February 11, 2015 were deficient because they failed to satisfy the "necessity" requirement set out in 18 U.S.C. § 2518(1)(c). In particular, he contends that the applications were flawed because, even if they established necessity generally, they failed to establish necessity as "to each of the named Target Subjects." (DE# 232 at PageID #: 463 (emphasis omitted).) But the Sixth Circuit has recently rejected this argument (albeit in an unpublished decision), holding that "necessity must be shown only for the investigation as a whole, not for each interceptee or target." *United States v. Wright*, -- F. App'x --, 2015 WL 3388778, at *8 (6th Cir. May 27, 2015). This holding is dispositive of Bradley's motion to suppress.

Bradley's motion also fails for a separate and independent reason. To satisfy the necessity requirement, a wiretap application need only demonstrate that investigators gave "'serious consideration'" to non-wiretap investigative techniques, and informed the issuing judge "'of the

reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)). Here, the wiretap affidavits—which were 101 and 119 pages, respectively—devoted dozens of pages to the discussion of alternative law enforcement techniques that were either used or considered in this case before seeking authorization for a wiretap, thereby demonstrating that wiretaps were not being "employed as the initial step in criminal investigation." *United States v. Alfano*, 838 F.2d 158 (6th Cir. 1988) (internal quotation marks omitted). Chief Judge Sharp therefore did not abuse his discretion in determining that the wiretap applications satisfied the necessity requirement.

## Background

This case involves the sale and distribution of tens of thousands of diverted prescription narcotics—primarily oxycodone and oxymorphone—which were trafficked from Detroit, Michigan to Middle Tennessee. The investigation began in 2012, when law enforcement in Davidson and Rutherford Counties began investigating the distribution of opiate pills in Middle Tennessee. The investigation eventually came to focus on Donald Duane Buchanan, Jr., whom law enforcement identified as a source of supply to several redistributors in the area. Law enforcement conducted physical surveillance, utilized confidential informants, executed a search warrant, and used pen registers, phone pings, and vehicle tracking devices to gather information about the activities of Buchanan and his co-conspirators. Nevertheless, law enforcement was unable to identify the full scope of Buchanan's drug-trafficking activities, including, crucially, his source of supply.

On November 10, 2014, the United States submitted to Chief Judge Sharp an application to conduct a wiretap on two of Buchanan's telephones, TT1 and TT2. This application included a

78-page affidavit from DEA Task Force Officer Robert C. Teasley. (3:14-sm-00024, DE# 1-2.) This affidavit contained a 17-page section devoted to the need for interception, including a discussion of the alternative investigative techniques that had been tried or considered. Chief Judge Sharp granted the application and issued an Order authorizing the interception of wire and electronic communications over TT1 and TT2.

During the initial interception period, Agents began to piece together more information about Buchanan's activities. They discovered that he was receiving large quantities of pills from people in the Detroit area, including Benjamin Bradley and Felicia Jones. However, they had not yet discovered the full scope of the people involved in the conspiracy, or the methods they used to carry out their illegal activities.

On January 6, 2015, the United States submitted a second wiretap application to Chief Judge Sharp, this time seeking authorization to intercept communications over two of Buchanan's phones (TT1 and TT5), one of Bradley's phones (TT3), and one of Felicia Jones's phones (TT4). The application was accompanied by a 101-page affidavit from DEA TFO Teasley, including a 22-page section devoted to the need for interception. (3:14-sm-00024, DE# 7-2.) Chief Judge Sharp granted the application and issued an Order authorizing the interception of wire and electronic communications over TT1, TT4, and TT5, and authorizing the interception of wire communications over TT3. As it turned out, however, technical problems made it impossible to intercept any wire communications over TT3, which meant that none of Bradley's phones were successfully wiretapped pursuant to the January 6, 2015 application and Order.

On February 11, 2015, the United States submitted a third wiretap application to Chief Judge Sharp, this time seeking authorization to intercept communications over one of Buchanan's phones (TT6) and three of Bradley's phones (TT7, TT8, and TT9). The application

was accompanied by a 119-page affidavit from DEA TFO Teasley, including a 32-page section devoted to the need for interception. (3:14-sm-00024, DE# 19-2.) Chief Judge Sharp granted the application and issued an Order authorizing the interception of wire and electronic communications over TT6, TT7, TT8, and TT9.

On March 11, 2015, a grand jury returned an indictment charging Buchanan, Bradley, Jones, and fifteen codefendants with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. (DE# 3.) The indictment also charged Buchanan, Bradley, and Jones with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (*Id.*) On June 5, 2015, Bradley filed a motion to suppress all evidence derived from the wiretaps of his four phones: TT3, TT7, TT8, and TT9. (DE# 232.)

## Discussion

### A. Legal Standard

"In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Stewart*, 306 F.3d at 304 (quoting 18 U.S.C. § 2518(1)(c)).

This "necessity" or "needs statement" provision "was placed in the statute to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974)). At the same time, while "a wiretap cannot be used as a routine initial step in criminal investigations," it also "does not have to be the last resort." *United States v. Patel*, 579 F. App'x 449, 453-54 (6th Cir. 2014) (internal quotation marks, citations, and alterations

omitted); *see also United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977); *United States v. Cooper*, 2015 WL 236271, at *2 (M.D. Tenn. Jan. 16, 2015) (Campbell, J.).

To satisfy the necessity provisions, an affidavit need not "prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. "Instead, the necessity provisions merely require that law enforcement officials 'give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" *Stewart*, 306 F.3d at 305 (quoting *Lambert*, 771 F.2d at 91). While "a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand" is inadequate, the "mere fact that [an] affidavit . . . rest[s] in part on statements that would be equally applicable to almost any . . . case [of the kind at issue] does not render the affidavit insufficient," so long as there is "information about particular facts of the case at hand which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation." *Landmesser*, 553 F.2d at 20; *see also Wright*, 2015 WL 3388778, at *4 (rejecting the argument that necessity was not shown because the affidavit "employed 'boilerplate' language applicable to any Title III investigation").

A judge presented with a wiretap application should review it "'in a practical and common sense fashion,'" considering the necessity statement within the context of the affidavit as a whole. *Landmesser*, 553 F.2d at 20-21 (quoting S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad. News, p. 2190); *Patel*, 579 F. App'x at 454. For example, the Sixth Circuit has "previously recognized that 'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" *Stewart*, 306 F.3d at 305 (quoting

5

*Landmesser*, 553 F.2d at 20). "[T]he realities of a complex drug conspiracy" may also make wiretapping particularly appropriate. *See Wright*, 2015 WL 3388778, at *4.

After a wiretap order has issued, a later court reviewing the order on a motion to suppress must "accord 'great deference' to the determinations of the issuing judge." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *Alfano*, 838 F.2d at 162). "'Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant.'" *Id.* (quoting *Alfano*, 838 F.2d at 162); *see also Wright*, 2015 WL 3388778, at *2 ("We review the issuing judge's finding of necessity for an abuse of discretion.").

### B. Application

Bradley has now moved to suppress the wiretap evidence from TT3, TT7, TT8, and TT9, on the grounds that the Chief Judge Sharp abused his discretion when he found that the applications of January 6, 2015 and February 11th, 2015 established the requisite necessity. Before discussing the details of the applications at issue, it is worth noting two aspects of Bradley's motion that contradict the Sixth Circuit's recent decision in *Wright*.

First, Bradley's entire argument is premised on the assertion that, in order to be valid, a wiretap application "must particularize those claims [of necessity] to *each of the named Target Subjects and the facts concerning each Target Subject*. Failure to do so is a failure to provide a full and complete statement of necessity as required for Title III wiretaps." (DE# 232 at PageID #: 463 (emphasis in original).)[1] That is, Bradley contends that the wiretap evidence should be

---

[1] *See also, e.g.*, DE# 232 at PageID #: 465 ("[T]he affidavit is fatally flawed as to its claim of 'necessity' as it relates to the authorization to monitor Benjamin Bradley's phones."); *id.* at PageID #: 466 ("As the following analysis demonstrates, the affidavits are nearly entirely void of attempts directed at Mr. Bradley or examples of why traditional law enforcement techniques would be ineffective *against Mr. Bradley in particular*." (emphasis in original)); *id.* at PageID #:

6

suppressed because it fails to establish necessity as to each target subject, or at least as to Bradley. But the Sixth Circuit held for the first time in *Wright* "that necessity must be shown only for the investigation as a whole, not for each interceptee or target." *Wright*, 2015 WL 3388778, at *8. This is because "the necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person. If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established necessity for the wiretap." *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) (quoted in *Wright*); *see also United States v. Mitchell*, 274 F.3d 1307, 1312 (10th Cir. 2001) (concluding that necessity did not have to be established "as to all named interceptees") (quoted in *Wright*). Because Bradley has not developed any argument that the application failed to show necessity for the investigation as a whole, his motion may be denied on these grounds alone.

Second, Bradley's argument relies entirely on an approach that the *Wright* Court criticized. Bradley acknowledges, as he must, that the wiretap affidavits devote dozens of pages to necessity, including lengthy discussions of the various alternative investigative techniques that had been tried or were considered. But in attempting to show that these portions of the affidavits failed to establish necessity, Bradley (like the defendants in *Wright*) "'parses each technique and contend[s] that more should have been done with the techniques that were working, and attempts should have been made with those that were deemed non-viable.'" *Wright*, 2015 WL 3388778, at *4 (quoting district court). The *Wright* Court concluded, however, that such "'a hyper-technical and speculative analysis is inappropriate. Rather the affidavit [should be] assessed in a practical and common sense fashion.'" *Id.* (quoting district court). Thus, when reviewing the adequacy of

470 ("This section, like the others, omits any information that would support a finding of necessity as to Benjamin Bradley's phone.").

the necessity section of a wiretap application, the point is not to review seriatim each alternative investigative technique and hypothesize about whether more could have been done with each one. Instead, the purpose of the review is simply to ensure that investigators complied with the requirement that they "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority" and inform the issuing judge "of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Lambert*, 771 F.2d at 91. Bradley does not contend that the affidavits failed to inform Chief Judge Sharp of the reasons for the investigators' belief. Instead, he simply disputes the investigators' ultimate conclusions. But that sort of "hyper-technical and speculative analysis" is not a valid basis for suppression.

Ultimately, Bradley maintains that the wiretap should be suppressed because law enforcement could have fully investigated and unraveled this years-long, multi-state, multi-defendant drug-trafficking-and-money-laundering conspiracy through other investigative methods.[2] The investigation revealed that Bradley and others acting at his direction bought up tens of thousands of pills from numerous sources; packaged and stored them at several locations throughout the Detroit area; and mailed or transported them to Nashville, often via brief, clandestine meetings in Cincinnati, where they were handed off to Buchanan, who resold them to various distributors throughout Middle Tennessee and then laundered the proceeds by depositing cash into accounts owned by Bradley, Jones, and others. The suggestion that all of this could have been successfully discovered and prosecuted without the use of wiretapping is highly speculative, if not completely fanciful. A practical, common-sense review of the affidavits

---

[2] *See, e.g.*, DE# 232 at PageID #: 473 ("A vehicle tracking device, combined with surveillance, pen registers, and other traditional techniques could have painted a very complete picture of Mr. Bradley's activities.").

suffices to show that Chief Judge Sharp did not abuse his discretion in finding that they established necessity.

### *Analysis of the Affidavits*

In addition to the overarching defects noted above, Bradley's motion fails even on its own terms. Contrary to his assertion, the affidavits in question contain numerous case-specific facts demonstrating that wiretapping was not being "employed as the initial step" in this particular investigation. *Landmesser*, 553 F.2d at 20. Far from it: by the time of the first wiretap application (which is not a subject of Bradley's suppression motion), law enforcement had engaged in a lengthy investigation of the Buchanan drug-trafficking organization, and had utilized numerous other law enforcement techniques before concluding that wiretapping was the only technique reasonably likely to accomplish the goals of the investigation. That conclusion proved true, as it was only through the initial use of wiretapping that investigators were able to identify Bradley as Buchanan's source of supply. And, as explained in the affidavits in question, investigators further believed that additional wiretaps were the only investigative technique reasonably likely to disclose Bradley's sources of supply, his methods of operation, and his network of other customers.

This case is thus readily distinguishable from the cases on which Bradley chiefly relies. For example, in *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), the district court found that the wiretap affidavit (1) contained misleading statements that were made recklessly, (2) provided no indication "that any other investigative technique was ever used or even seriously considered," and (3) suggested that the wiretap was in fact being used "as the first step in its investigation against Rice." *Id.* at 708-09; *see also United States v. Sims*, 508 F. App'x 452, 457 (6th Cir. 2012) (finding *Rice* distinguishable where the affidavit in question "discussed multiple

9

examples of actual investigative techniques that had already been used" in the investigation). Likewise, in *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), the affidavit (1) was "nearly a carbon copy of a previous application for a different suspect," (2) contained material misstatements and omissions, and (3) indicated no investigation of Blackmon prior to the wiretap application. *Id.* at 1208-1209; *see also United States v. Martinez*, 452 F.3d 1, 6 (1st Cir. 2006) (finding *Blackmon* "easily distinguishable" from a case in which the affidavit showed that the government had conducted a lengthy investigation before applying for a wiretap). As demonstrated below, the affidavits in this case do not share the same defects as those in *Rice* and *Blackmon*.

In discussing the details of the affidavits, the United States will focus on the February 11, 2015 affidavit, which sought authorization to make interceptions over three of Bradley's phones: TT7, TT8, and TT9. Bradley also disputes the adequacy of the necessity statement in the January 6, 2015 affidavit. But that affidavit only sought authorization to intercept wire communications over one of Bradley's phones: TT3—and agents never actually intercepted any wire communications over that phone, due to technical problems.[3] Thus, it is not clear what is at stake in the motion to suppress the evidence related to the January 6, 2015 affidavit. For that reason, and for the sake of simplicity, the United States will focus its discussion below on the details provided in the February 11, 2015 affidavit, though this discussion is largely applicable to the January 6, 2015 affidavit as well.

---

[3] At the beginning of the interception period, the telephone company inadvertently sent the Agents a few electronic communications over TT3. After Agents informed the phone company of the mistake, no further electronic communications were intercepted. The few text messages that were inadvertently intercepted will not be used, either directly or indirectly, by the government, thus making their suppression superfluous.

The February 11, 2015 affidavit first provided an overview of the need for interception. It explained that "law enforcement has not been able to identify from whom or where BENJAMIN BRADLEY and JONES are obtaining the thousands of diverted prescription narcotics they are supplying to BUCHANAN" and others. (3:14-sm-00024, DE# 19-2 at ¶¶ 63-64.) It further explained that "[b]ecause of the nature of diverted prescription pills, which can be legally obtained by many different individuals from different discrete pharmacies, doctors' offices and even the drug companies themselves, it is important to identify all of the pathways those pills take to arrive in the hands of distributors like BENJAMIN BRADLEY, JONES and BUCHANAN. Identifying only a single source of supply that BENJAMIN BRADLEY, JONES and BUCHANAN use to obtain pills would do little to impact the distribution network for diverted prescription pills in the Detroit, Michigan and Nashville, Tennessee areas if other parallel distribution networks remain viable." (*Id.*)

The affidavit then explained that agents had used numerous alternative investigative techniques "in an effort to penetrate the organization and identify" its sources of supply and finances, but had "exhausted all investigative possibilities except for the interception of telephones." (*Id.* ¶¶ 65-66.) It then went on to discuss these alternative investigative techniques in detail.

### 1. Physical Surveillance

The February 11, 2015 affidavit devoted nearly fifteen pages to discussion of the physical surveillance that had been conducted in this case, including an explanation of why additional physical surveillance would be unlikely to accomplish the goals of the investigation. It noted, among other things:

- Agents traveled to Detroit in January 2015 to conduct surveillance, but found surveillance "extremely difficult due to several of the residences being located in

11

high crime areas where the residents are extremely law enforcement conscious." (*Id.* ¶ 69.a.)

- Agents conducted surveillance on January 28 and 29, 2015, in connection with intercepted phone calls, and observed vehicles associated with Bradley and Jones at various locations. At one of these locations, Agents saw several vehicles parked in the driveway with no license plates attached to them. The Agents could not see what was happening inside the houses, but were able to tell from intercepted communications that the meetings were for the purpose of distributing pills. (*Id.* ¶ 69.b.)

- On January 29th, Agents intercepted calls and text messages indicating that Jones and Buchanan were traveling from Detroit and Nashville, respectively, to meet at a casino in Cincinnati. Agents were able to obtain video surveillance footage from the casino, which showed a brief meeting between Buchanan and Jones. Although it was impossible to tell just by looking what Buchanan and Jones exchanged, the intercepted communications indicated that they were exchanging money for pills. (*Id.*)

- Agents believed that Buchanan maintained a stash house at a residence in a cul-de-sac, and "attempt[ed] counter-surveillance techniques" to avoid detection, thus making physical surveillance unlikely to succeed. (*Id.* ¶¶ 69.c, d.)

- Buchanan's residence was located in a gated apartment complex, with few parking spaces, "only one way in and out of the section of the complex where his unit is located," and with only the back of the apartment visible from the entrance gate. As the affidavit explained, surveillance there was also unlikely to succeed. (*Id.* ¶ 69.e.)

- Physical surveillance "of those engaged in high-level drug distribution and trafficking is anticipated to be extremely difficult because the physical acts of handling or transferring drugs or drug proceeds are sporadic, unpredictable, and often occur in private settings. Moreover, handlers of drugs and/or drug proceeds often engage in short and disguised meetings to exchange their drugs and drug proceeds, leaving them very difficult to observe." (*Id.* ¶ 72.)

These and other statements in the affidavit provided case-specific facts showing that investigators here were not seeking to engage in wiretapping as the initial step in a criminal investigation. The affidavit also explained why the agents reasonably believed that physical

surveillance, absent wiretapping, would be unlikely to achieve the goals of the investigation. There is no factual support for Bradley's claim that "[m]ost of the affidavit's language concerning physical surveillance is boilerplate that applies to all drug trafficking cases." (DE# 232 at PageID #: 467.)

### 2. Pen Registers

The February 11, 2015 affidavit explained that pen registers had been used in the investigation—including on one of Bradley's phones—but could not "provide sufficient information regarding criminal activity in this case." (3:14-sm-00024, DE# 19-2, ¶¶ 73-75.) This is partly because of the inherent limitations of pen registers, which do "not reveal the content of the conversations between participants," and partly because of case-specific limitations, including the fact that "telephones that have been previously identified as being used by BUCHANAN, FELICIA JONES, BENJAMIN BRADLEY and MCEWEN were not subscribed in their names." (*Id.*) This sufficed to explain why the use of pen registers would not satisfy the goals of this particular investigation. *See Cooper*, 2015 WL 236271, at *5.

### 3. Grand Jury and Administrative Subpoenas

The February 11, 2015 affidavit noted that IRS agents used grand jury subpoenas in this case "to obtain bank account information" for some of the target subjects, and that this information had been "useful in confirming information obtained during intercepted communications over" the target telephones. (*Id.* ¶ 76.) The affidavit went on to explain, however, that grand jury subpoenas "would not be successful in achieving the goals of this investigation at this time." (*Id.*) This conclusion was based on several rationales. First, "not all members of the Detroit, Michigan and Middle Tennessee-based organization have been fully identified, and their whereabouts are unknown," thus making it impossible to serve subpoenas on

13

them. (*Id.*) Second, people successfully served with a subpoena "would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify," and offering immunity to compel their testimony would be unwise. (*Id.*) (In the section that follows, the affidavit provides an illustration of that point, noting that when Bobby Robertson "was arrested after obtaining hundreds of diverted prescription narcotics from BUCHANAN, ROBERTSON did not provide any statements regarding who his source of supply was." (*Id.* ¶ 79.)) Third, serving grand jury subpoenas on certain conspirators "would not only alert them to the existence of this investigation, causing them to become more cautious in their activities, but may also cause them to flee to avoid further prosecution, to threaten the lives of informants, or to otherwise compromise this investigation." (*Id.* ¶ 76.) Fourth, serving subpoenas for records on apparent custodians "would not likely result in identifying other members of the organization, due to the routine practice of providing no or misleading subscriber information when such telephones are acquired"—as the affidavit had already stated was done in this case. (*Id.* ¶ 77.)

Bradley complains that grand jury subpoenas were not actually used on conspirators in this case. But there is no requirement that agents actually use a technique that they believe is likely to fail. Instead, the requirement is simply that they include a full and complete statement as to why other investigative procedures "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(1)(c); *see also Cooper*, 2015 WL 236271, at *6.

Bradley acknowledges that the use of grand jury subpoenas poses the risk "of untruthful testimony, uncooperative witnesses, and exposure of the existence of the investigation," but he complains that the "affiant fails to show how any of these risks are unique to the facts of this investigation." (DE# 232 at PageID #: 469.) But there is no requirement that an affidavit show how standard investigative techniques are *uniquely* unlikely to succeed in a particular case. *See*

14

*Wright*, 2015 WL 3388778, at *4; *Landmesser*, 553 F.2d at 20. It makes little sense to say that a wiretap application's necessity statement is deficient because it discusses an investigative technique that is inherently (rather than uniquely) unlikely to succeed in a given case. If investigators consider the technique and explain to the issuing judge why they believe it is unlikely to succeed, they have satisfied the statutory requirement.

### 4. Confidential Sources

The February 11, 2015 affidavit described the use of three confidential sources in this case, before explaining that none of them would likely provide further investigative value going forward: CS-1 was "currently incarcerated"; CS-2 had been "'burned' by the Smyrna Police Department," and did not have any personal knowledge of Buchanan anyway; and CS-3 had bought pills from Buchanan outside of "the direction and control of Agents." (3:14-sm-00024, DE# 19-2, ¶¶ 78-79.) The affidavit further explained that Agents believed there to be only a very limited number of people who had information about the inner-workings of the conspiracy. (*Id.* ¶¶ 79-81.) This belief was based not just on training and experience with drug-trafficking generally, but also on facts specific to this case: Buchanan's customers did not seem to know who his source of supply was, and Buchanan himself did not seem to know who Bradley's source of supply was. (*Id.*) On the basis of these facts, the affidavit noted that Agents were "unaware of any other confidential sources that are affiliated with, or have the ability to be affiliated with, BUCHANAN, BENJAMIN BRADLEY, JONES or the Detroit, Michigan and Middle Tennessee-based organizations." (*Id.* ¶ 81.)

Bradley notes that "[t]he question for the court is whether the use [of] informants has been tried and failed or reasonably appears to be unlikely to succeed." (DE# 232 at PageID #:

470.) The affidavit met that test by identifying the confidential sources that had been used and explaining why further use of confidential sources would be unlikely to succeed.

### 5. Undercover Agents

The February 11, 2015 affidavit noted that "undercover agents have not been used in this investigation," and explained that this was "due to the close-knit nature of this group and the fact that it would not be possible for an undercover officer to penetrate the upper levels of the conspiracy and identify all members of the conspiracy and their respective roles." (3:14-sm-00024, DE# 19-2, ¶ 82.) The affidavit explained that "[g]enerally, members of narcotics trafficking organizations are experienced at their respective roles and only deal with long-time associates." (*Id.*) It further gave case-specific reasons why the use of undercover agents would be unlikely to succeed here, including (1) "members of the Middle Tennessee-based organization appear to utilize counter-surveillance techniques and operate in remote areas," thus making it "unreasonably difficult to protect the safety of an undercover officer operating from within the organization"; (2) the organization appeared to be very reluctant to share information with others, as demonstrated by the fact that a prior source of information had told a confidential source that Buchanan "did not want anyone he did not know in his residence"; and (3) "some of the sources of supply in Detroit, Michigan are family members of BUCHANAN and are unlikely to allow a new individual into their organization." (*Id.* ¶¶ 82-83.)

Bradley argues that "[t]here is absolutely nothing to support an inference that undercover agents would generally face a greater risk in this case than in any other drug trafficking case." (DE# 232 at PageID #: 471.) But again, there is no requirement to show that a given investigative technique is even riskier to use in this case than in most cases. All that is required is

16

to explain why investigators believe that alternative techniques "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

### 6. Consensual Recordings

The February 11, 2015 affidavit noted that consensual recordings had "been made using CS-3," but that further consensual recordings were unlikely to meet the goals of the investigation, as they "would not confirm, as an intercepted call or text would, who BUCHANAN, BENJAMIN BRADLEY or JONES' sources of supply or customers are." (3:14-sm-00024, DE# 19-2, ¶ 84.) As noted, the affidavit had already discussed the limitations on the use of confidential sources and undercover agents, who of course would be needed to make a consensual recording. *See Cooper*, 2015 WL 236271, at *10. Bradley's suggestion that specific "failed attempts at using consensual recordings" were required is meritless. *Id.* at *9 (citing *Sims*, 508 F. App'x at 457).

### 7. Interviews of Witnesses and/or Subjects and Arrest Warrants

The February 11, 2015 affidavit explained that the "likelihood of success in using interviews of independent witnesses, cooperating individuals, TARGET SUBJECTS, or their known associates as an alternative to the electronic surveillance requested is minimal." (*Id.* ¶ 85.) This is because "[t]he most knowledgeable subjects are also participants in the crimes" and would therefore be unlikely to cooperate or provide truthful information. (*Id.*) This common-sense proposition was corroborated by two case-specific examples. In one, Bobby Robertson "was arrested with over a thousand diverted" pills on him, but refused "to reveal to law enforcement who his source of supply was." (*Id.* ¶ 86.) In the other, Bradley was pulled over by Michigan State Police with $10,000 in cash on him, but provided an untruthful answer about the origin and use of the money. (*Id.*) In light of this example, Bradley's assertion that this section of

the affidavit focuses exclusively on the Middle Tennessee organization is puzzling. (DE# 232 at PageID #: 471.)

### 8. Search Warrants

The February 11, 2015 affidavit noted that search warrants were "unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of all the participants, and/or their methods of operation." (3:14-sm-00024, DE# 19-2, ¶ 87.) The affidavit illustrated this point by noting that a search warrant had been executed at Buchanan's residence in January 2014, but that "the information and evidence obtained during the search warrant did not reveal BUCHANAN's source of supply in Detroit, Michigan nor all of his customers in the Middle District of Tennessee." (*Id.*) It also explained that executing additional search warrants could "'tip off' targets of the investigation, causing them to curtail or conceal their activities and bring the investigation to an unsuccessful and premature conclusion." (*Id.*)

Given the affidavit's discussion of the search warrant that was actually executed with limited success at Buchanan's residence, it is puzzling that Bradley asserts that "[t]here is no way to know" whether a search warrant might have revealed the full scope of the conspiracy, "because this method was not tried." (DE #232 at PageID #: 472.) The affidavit's discussion of search warrants, including its discussion of their use in this case, met the statutory requirement.

### 9. Pole Cameras

The February 11, 2015 affidavit noted that Agents had "installed a pole camera on the Essence Barber Shop located at 797 Bell Road, Antioch, Tennessee," and had used it to observe the license plates on certain vehicles, but had been unable to observe hand-to-hand drug transactions, because many of them took place inside the barber shop or inside the vehicles, and thus Agents had been "unable to determine the amount and type of narcotics being distributed."

18

(3:14-sm-00024, DE# 19-2, ¶ 88.) The affidavit further noted that Agents had installed a pole camera near Walter Thomas Bowen's shop, but had been unable to see the license plates or observe drug transactions that occurred inside the shop. (*Id.* ¶ 89.)

The affidavit also explained that Agents were "unable to install a pole camera at BUCHANAN's residence because the only pole available to put a covert camera [on] is too close in proximity to the residence and would likely be discovered by BUCHANAN." (*Id.*) It then explained that Agents had not been able to identify "where BENJAMIN BRADLEY is currently living," and that they could not install a pole camera near Felicia Jones's residence "because the utilities are underground." (*Id.* ¶ 90.)

Bradley speculates that Agents could in fact "have easily confirmed" where Mr. Bradley lived. (DE# 232 at PageID #: 472.) But the investigation revealed that Bradley owned or was associated with 19 properties in and around Detroit, making it very difficult to determine exactly where he was living at a particular time. Moreover, while Bradley "argue[s] that additional pole cameras should have been used," he has "not explained how they would have provided" information "relating to the quantity and types of controlled substances involved." *See Cooper*, 2015 WL 236271, at *13.

**10. Tracking of Telephone GPS Data**

The February 11, 2015 affidavit described a series of state and federal warrants for GPS Ping data that Agents had obtained for one of Buchanan's phones. (3:14-sm-00024, DE# 19-2, ¶ 91.) The affidavit explained that the GPS Ping data had assisted in the investigation, but had limited investigative value, because it only provided an approximate location and could not "assist Agents in identifying the individuals involved or the methods of operation" of the drug-trafficking organization. (*Id.* ¶ 92.) Again, the affidavit demonstrated that other investigative

19

techniques were tried before Agents sought authorization to conduct a wiretap, and further explained why GPS Ping data would not suffice to meet the goals of the investigation.

### 11. Tracking Devices

The February 11, 2015 affidavit noted that Judge Bryant had authorized the use of a tracking device on Buchanan's 2011 Dodge Charger, which had provided some useful information about Buchanan's movements. (*Id.* ¶ 93.) The affidavit further explained, however, that Buchanan sometimes drove other vehicles, including on trips to Cincinnati to pick up pills, thus limiting the usefulness of the tracking device. (*Id.*)

The affidavit then set out various reasons why it would be of limited benefit to install a tracking device on Bradley's vehicle: first, Agents had been unable to figure out where Bradley lived; second, commercial database research indicated that Bradley owned several vehicles; and third, a recent traffic stop revealed that Bradley was driving a rented vehicle, suggesting that one (or even several) tracking devices would paint an incomplete picture of Bradley's whereabouts. (*Id.* ¶ 94.) The affidavit finally noted that it would be difficult to install a tracking device on Jones's car because she typically kept her car in a closed garage. (*Id.*)

This information again demonstrated that investigators were not seeking to engage in wiretapping as the initial stage in the investigation, but instead were seeking authorization because they reasonably concluded that alternative techniques would not suffice to achieve the goals of the investigation.

### 12. Trash Searches

The February 11, 2015 affidavit noted that trash searches would provide minimal value in this case. (*Id.* ¶¶ 95-96.) It explained that the setup of Buchanan's residence made it difficult to search through his trash can, and that in any event agents had only seen a trash can at the bottom

of his driveway once in the past three months, despite driving by his residence at least 25 times. (*Id.* ¶ 95.) The affidavit further explained that Agents could not conduct a trash search at Bradley's residence, because they did not know where he lived, and could not conduct a trash search at Jones's residence, because they had not seen any trash cans there and because the proximity of the garage to the street and to other residences created a risk of revealing the investigation. (*Id.* ¶ 96.)

This section of the affidavit again complied with the requirement that investigators consider alternative techniques and explain to the issuing judge the reasons why such techniques are dangerous or unlikely to succeed.

### 13. Financial Investigation

The February 11, 2015 affidavit first noted that drug traffickers typically launder the proceeds of their sales. (*Id.* ¶ 97.) It then stated that the financial investigation in this case had been assisted by IRS Agents, who had used information gathered during the execution of the January 2014 search warrant to help identify "a few bank accounts used by BUCHANAN, BRADLEY and JONES. Specifically, according to the IRS, between January 2013 and January 2014 cash deposits of over $483,000 [were made] into two bank accounts used by BENJAMIN BRADLEY and JONES." (*Id.* ¶¶ 97-100.) It explained that Buchanan made the cash deposits at bank branches in Tennessee, with the money being withdrawn shortly thereafter at a bank branch in Detroit, Michigan. (*Id.* ¶ 100.) The affidavit further explained that the nature of these financial transactions was being corroborated by other investigative techniques. (*Id.* ¶ 101.) But common sense confirms that a review of bank records cannot possibly reveal the full extent of a drug-trafficking conspiracy. Again, the case-specific details in the affidavit met the necessity requirement set forth in the statute.

**Conclusion**

Bradley's motion to suppress the evidence derived from the wiretaps of his phones should be denied. First, it is based on a legal premise that the Sixth Circuit has recently rejected. Second, it fails even on its own terms, as the challenged affidavits set out numerous case-specific facts demonstrating that Agents were not resorting to wiretapping as the first step in the investigation, but had instead tried or considered alternative law enforcement techniques, concluded that those alternative techniques would be inadequate to accomplish the goals of the investigation, and then submitted an affidavit explaining to the issuing judge the reasons for those conclusions. Chief Judge Sharp did not abuse his discretion in finding that the wiretap applications established the requisite necessity.

Respectfully submitted,

DAVID RIVERA
United States Attorney for the
Middle District of Tennessee

*s/ Cecil W. VanDevender*
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2015, I sent a copy of the foregoing via the Court's electronic filing system to James Mackler, counsel for Benjamin Bradley.

*s/ Cecil VanDevender*
CECIL VANDEVENDER