UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 3:15-00037-2 |
| | ) | JUDGE CAMPBELL |
| BENJAMIN BRADLEY | ) | |

MEMORANDUM

I. Introduction

Pending before the Court is Defendant Benjamin Bradley's Motion to Suppress Evidence

Obtained Pursuant to Unlawful Wiretaps: TT3, TT7, TT8, TT9. Docket No. 232. The Government

has filed a Response In Opposition (Docket No. 256), and Defendant has filed a Reply (Docket No.

267). For the reasons set forth herein, the motion to suppress will be DENIED.

II. Factual and Procedural Background

The Government alleges that Defendant was involved in the sale and distribution of tens of

thousands of prescription narcotics that were trafficked from Detroit, Michigan to Middle Tennessee.

The Government's investigation began in 2012 and came to focus on Donald Duane Buchanan, Jr.,

whom law enforcement believed was the source of supply to several redistributors in Davidson and

Rutherford Counties. After an initial wiretap of two of Buchanan's telephones, authorized by Chief

Judge Sharp of this District on November 10, 2014, law enforcement believed that Buchanan was

receiving large quantities of pills from individuals in the Detroit area, including Benjamin Bradley

and another alleged accomplice, Felicia Jones. The Government did not yet know all the individuals

involved in the alleged conspiracy or the methods they used.

On January 6, 2015, the Government sought and obtained an order from Judge Sharp authorizing the interception of communications over two of Buchanan's phones, one of Bradley's phones (Target Telephone 3 ("TT3")), and one of Felicia Jones's phones. Specifically, with respect to Bradley, the order authorized the interception of wire communications over TT3. The Government states that technical problems caused it to be unable to intercept any useful wire communications over TT3, such that none of Bradley's phones were successfully wiretapped pursuant to the January 6, 2015 application and Order. The Government further represents that the "few text messages that were inadvertently intercepted will not be used, either directly or indirectly, by the government, thus making their suppression superfluous." Docket No. 256 at 10 n.3 (Gov't Brief). Although Defendant's reply brief continues to request suppression of evidence obtained from the wiretap of TT3, he does not dispute the Government's representations that no evidence derived from that wiretap will be used.

On February 11, 2015, the Government sought and obtained a third wiretap order from Judge Sharp authorizing the interception of communications over one of Buchanan's phones and three of Bradley's phones (TT7, TT8, and TT9).

On March 11, 2015, a grand jury returned an indictment charging Buchanan, Bradley, Jones and fifteen codefendants with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. Docket No. 3. The indictment also charged Buchanan, Bradley, and Jones with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Bradley now moves to suppress all evidence obtained from the wiretaps of his four phones, contending that the application for the wiretaps failed to establish the "necessity" requirement set forth in 18 U.S.C. § 2518(1)(c).

2

III.  Analysis

A.  The Necessity Requirement

In order to obtain authorization to use a wiretap, the Government must strictly comply with the requirements set forth in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510-2530. *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011) (citing *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988)).  One of those requirements, set forth in Section 2518(1)(c), is that the wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  "The reason for this 'necessity' requirement is 'to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime' and to prevent wiretapping from being 'routinely employed as the initial step in criminal investigation.'" *United States v. Sims*, 508 F. App'x 452, 456 (6th Cir. Dec. 12, 2012) (quoting *United States v. Landmesser*, 553 F.2d 17, 19-20 (6th Cir. 1977)).

The Affidavit submitted to Judge Sharp in support of the January 6, 2015 wiretap application for TT3 is 101-pages long, and was executed and sworn to by Drug Enforcement Administration ("DEA") Task Force Officer Robert C. Teasle, and includes a 22-page section addressing the need for interception. Docket No. 232-1. The Affidavit submitted to Judge Sharp in support of the February 11, 2015 wiretap application for TT7, TT8, and TT9 was 119-pages and was also executed and sworn to by DEA Task Force Officer Teasle, and includes 32 pages addressing the need for interception. Docket No. 232-2.

Defendant argues that the wiretap applications and affidavits suffer from the following fatal flaws: (1) the statements supporting the application do not specifically relate to Bradley; (2) the

3

application is invalid on its face because the affiant's boilerplate assertions are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations, in contravention of the requirements set forth in § 2518 and *United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001) (finding the government had failed to make a full and complete statement of necessity in part because of the "boilerplate" nature of the affidavit)); (3) the application contains incomplete statements regarding the actual fruits or alleged impracticality of traditional investigative techniques. Docket No. 232 at 6–7 (Def.'s Brief)

The Sixth Circuit has recently rejected the first argument, holding that "necessity must be shown only for the investigation as a whole, not for each interceptee or target." *United States v. Wright*, No. 13-3803, 2015 WL 3388778, at *8 (6th Cir. May 27, 2015).

As for Defendant's argument that the Affidavit is inadequate because it employs "boilerplate" language, the Sixth Circuit has held that the "mere fact that the affidavit ... rested in part on statements that would be equally applicable to almost any ... case [of this kind] does not render the affidavit insufficient" so long as there is "information about particular facts ... which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation." *Id.* at *4 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (brackets in original)). It is not necessary, however, for the Government to prove that "every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163; s*ee also Poulsen*, 655 F.3d at 504. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64; *see also Sims*, 508 F. App'x at 456;

4

*Poulson*, 655 F.3d at 504. Indeed, although a criminal defendant "parse[s] each technique and contend[s] that more should have been done with the techniques that were working, and attempts should have been made with those that were deemed non-viable," such "a 'hyper-technical and speculative analysis' is inappropriate. Rather the affidavit is assessed in a practical and common sense fashion.'" *Wright*, 2015 WL 3388778, at *4 (quoting *United States v. Branch*, No. 5:12 CR 286, 2013 WL 1000561, at *10 (N.D. Ohio Mar. 13, 2013) (the district court order being reviewed in *Wright*).

With these guiding principles in mind, the Court turns to Defendant's arguments as to the alleged deficiencies in the affidavits supporting the wiretap applications.

B.    Alleged Inadequacies with the Affidavits' Showing of Necessity

As an initial matter, Defendant does not dispute the Government's representation that the January 6, 2015 authorization to intercept communications over one of Bradley's phones (TT3), resulted in only a few intercepted text messages because of a technical problem, and that those few messages will not be used by the Government either directly or indirectly. Accordingly, the Court concludes that it is unnecessary to address Defendant's challenge to the January 6, 2015 wiretap authorization and will focus instead on the February 11, 2015 wiretap authorization.

The affidavit accompanying the February 11, 2015 application (the "Affidavit") provided the following overview of the need for intercepting wire communications in this investigation:

> 63. Based on your Affiant's training and experience, as well as the experience of other federal, state, and local law enforcement agents, officers, and investigators participating in this investigation with whom your Affiant is working, and based on the facts set forth herein, it is your Affiant's belief that interception of wire and electronic communication is the only available technique that has a reasonable likelihood of accomplishing the objectives of this investigation, including identifying sources of supply, the local wholesale distributors and members of their organization,

5

determining the breadth of the Detroit, Michigan and Middle Tennessee-based organization's operations, their method of acquisition and distribution of diverted prescription narcotics, the identity of their associates and co-conspirators, the nature and scope of their illegal activities, the relationship between financiers, transporters, suppliers, and distributors of the diverted prescription narcotics, and the collection and distribution of monies which stem from the illegal drug activities and/or finance the illegal drug activities.

64. Although law enforcement has gained evidence regarding portions of the activities of BUCHANAN, BENJAMIN BRADLEY AND JONES' organization, thus far law enforcement has not been able to identify the full scope of their activities, or even the identities of all the members of the Detroit and Middle Tennessee-based organization or all of BUCHANAN's sources of supply in Tennessee and Michigan. Moreover, law enforcement has not been able to identify from whom or where BENJAMIN BRADLEY AND JONES are obtaining the thousands of diverted prescription narcotics they are supplying to BUCHANAN, MCEWEN and others. Because of the nature of diverted prescription pills, which can be legally obtained by many different individuals from different discrete pharmacies, doctors' offices and even the drug companies themselves, it is important to identify all of the pathways those pills take to arrive in the hands of distributors like BENJAMIN BRADLEY, JONES AND BUCHANAN. Identifying only a single source of supply that BENJAMIN BRADLEY, JONES AND BUCHANAN use to obtain pills would do little to impact the distribution network for diverted prescription pills in the Detroit, Michigan and Nashville, Tennessee areas if other parallel distribution networks remain viable. The interception of wire and electronic communications over TARGET TELEPHONE 6, TARGET TELEPHONE 7, TARGET TELEPHONE 8 and TARGET TELEPHONE 9 will provide law enforcement with the opportunity to identify the members of the Detroit and Nashville based organizations along with the sources of supply in Tennessee and Detroit in order to gather evidence as to the full scope of their activities and the means by which the organization(s) manufactures and distributes controlled substances.

65. Your Affiant believes that the authorized interception of wire and electronic communications over TARGET TELEPHONE 6, TARGET TELEPHONE 7, TARGET TELEPHONE 8 and TARGET TELEPHONE 9 will assist Agents in obtaining the above information. The interception of wire and electronic communications is essential because, your Affiant believes, intercepts over TARGET TELEPHONE 6, TARGET TELEPHONE 7, TARGET TELEPHONE 8 and TARGET TELEPHONE 9 will help Agents build and expand upon useful evidence recently learned about the Detroit, Michigan and Middle Tennessee-based organizations. It is essential to intercept TARGET TELEPHONE 6, TARGET TELEPHONE 7, TARGET TELEPHONE 8 and TARGET TELEPHONE 9 in order

6

to obtain a clear understanding of the drug trafficking activities of the Detroit, Michigan and Middle Tennessee-based organizations and the identification of their members, as well as the best opportunity to identify the transportation and distribution routes, and persons that are participating in and facilitating the criminal activities of the organization.

66. Moreover, as detailed above and below, Agents have used controlled purchases, surveillance, pole cameras, GPS trackers, Grand Jury subpoenas, telephone analysis and telephone pings of the targets of this investigation in an effort to penetrate the organization and identify the sources of supply, identify all of the financial aspects of the organization and effectively dismantle this organization. Through these investigative techniques, Agents have at this point exhausted all investigative possibilities except for the interception of telephones.

Docket No. 232-2 at 81–84.

1.    Physical Surveillance

Defendant's primary argument about the deficiency in the physical surveillance portion of the February 11, 2015 Affidavit is that it does not list a single instance of failed physical surveillance of Defendant, as opposed to the other targets of the investigation. To the contrary, Defendant argues, the Affidavit details a successful surveillance operation targeting him. Docket No. 232-2 at ¶ 69(b) (Affidavit). As already noted, "necessity must be shown only for the investigation as a whole, not for each intercepte or target." *Wright*, 2015 WL 3388778, at *8.

The Court has reviewed the fifteen pages the Affidavit devoted to discussion of the physical surveillance that had been conducted in this case to that date. This section includes numerous examples of instances in which the intercepted telephone calls and text messages were necessary to the determination of what was occurring within this alleged drug conspiracy and facilitated use of physical and video surveillance to follow up on information obtained from the intercepted calls and text messages. Docket no. 232-2 at 85–100. For example, the Affidavit states that on January 29, 2015, intercepted calls and text messages indicated that Jones and Buchanan were planning to travel

7

from Detroit and Nashville, respectively, to meet at a casino in Cincinnati. As a result, agents obtained video surveillance footage from the casino which did, in fact, show a brief meeting between Buchanan and Jones, as investigators had surmised from the intercepted communications. Agents would have been unable to determine from the video footage what these individuals were exchanging at the casino without the information contained in the intercepted communications. *Id.* at 86–93. The Affidavit gives another example that on January 28 and 29, 2015, surveillance conducted in connection with intercepted phone calls revealed vehicles associated with Bradley and Jones at various locations that did not have license plates. Without the intercepted communications, agents would not have known that the meetings were for the purpose of distributing pills.

The Affidavit also lists several case-specific obstacles to physical surveillance in this case, including the following: several of the Detroit residences were located in high crime areas where residents are extremely law enforcement conscious; agents believed that Buchanan maintained a stash house at a residence in a cul-de-sac and used "counter-surveillance techniques" to avoid detection; Buchanan's residence was located in a gated apartment complex with few parking spaces that was configured in a way to make surveillance unlikely to succeed.

The Affidavit concludes that physical surveillance "of those engaged in high-level drug distribution and trafficking is anticipated to be extremely difficult because the physical acts of handling or transferring drugs or drug proceeds are sporadic, unpredictable, and often occur in private settings. Moreover, handlers of drugs and/or drug proceeds often engage in short and disguised meetings to exchange their drugs and drug proceeds, leaving them very difficult to observe." *Id.* at 100.

8

The Court disagrees with Defendant's assertion that most of the Affidavit's language concerning physical surveillance is boilerplate that applies to all drug trafficking cases. The Affidavit contains many details specific to the limitations on the use of physical surveillance in this particular investigation and is sufficient to inform the Court "of the reasons for the investigators' belief that [this] non-wiretap technique[] ha[s] been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64. That the Government had successfully conducted physical surveillance of Defendant merely supports the Court's finding that the wiretap in this case was not "employed as the initial step in criminal investigation." *Wright*, 2015 WL 3388778, at *4.

2. <u>Pen Registers</u>

The Affidavit stated that although pen registers had been used in the investigation, including on one of Bradley's phones, the pen registers could not provide sufficient information regarding criminal activity in this case. Docket No. 232-2 at 100–01. The Affidavit states that the efficacy of pen registers as an investigative tool in this case is limited because telephones that had previously been identified as being used by Buchanan, Jones, Bradley, and McEwen were not subscribed in their names. The Affidavit also cited limitations inherent in pen registers, such as the fact that they do not reveal the content of the conversations between participants.

Defendant objects that although the telephone being used by Bradley was not subscribed in his name, the fact that the agents were able to identify the phone as belonging to Mr. Bradley despite the incorrect subscriber information demonstrates that agents were, in fact able to effectively use the pen register. Defendant also argues that the inherent limitations of pen registers should not support a finding of necessity.

9

The Court concludes that the Affidavit sufficiently explains the case-specific limitations on the usefulness of pen registers as well as those inherent to pen registers. The fact that agents were able to determine Bradley's identity despite his phone not being subscribed in his name merely supports the Court's finding that the wiretap in this case was not "employed as the initial step in criminal investigation." *Wright*, 2015 WL 3388778, at *4.

3. <u>Use of Grand Jury and Administrative Subpoenas</u>

Defendant argues that the section of the Affidavit relating to the use of grand juries and administrative subpoenas is also boilerplate. Although he concedes that the "risks of untruthful testimony, uncooperative witnesses, and exposure of the existence of an investigation are all inherent in the use of subpoenas," he argues that "[i]f these risks alone were sufficient to foreclose the use of this investigative technique and create the necessity for a wiretap, subpoenas would never be a viable alternative." Docket No. 232 at 13 (Def.'s Brief).

In the section titled "Use of Grand Jury and Administrative Subpoenas," the Affidavit provides as follows:

76. Grand Jury subpoenas have been used by Agents from the Internal Revenue Service, who are assisting in this investigation in order to obtain bank account information for the TARGET SUBJECTS. This information has been useful in confirming information obtained during intercepted communications over TARGET TELEPHONE 1, TARGET TELEPHONE 2 and TARGET TELEPHONE 4. Based upon your Affiant's experience, and upon conversations with Assistant United States Attorney Brent Hannafan from the Middle District of Tennessee, who had experience prosecuting violations of criminal law and investigating cases in the Grand Jury, your Affiant believes that the use of Grand Jury subpoenas to bring people believed to be involved in the conspiracy to testify before a federal Grand Jury would not be successful in achieving the goals of the investigation at this time. More specifically, not all of the members of the Detroit, Michigan and Middle Tennessee-based organization have been fully identified, and their whereabouts are unknown. As a consequence, Agents do not have the ability to serve Grand Jury subpoenas on these unidentified individuals. Furthermore, once identified, your Affiant believes

10

that, if the identified members of this conspiracy, their co-conspirators, and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. it would be unwise to seek any kind of immunity for these persons, because the granting of such immunity might foreclose prosecution of the most culpable members of this conspiracy and could not ensure that such immunized witnesses would provide truthful testimony. Additionally, the service of Grand Jury Subpoenas upon the principals of the conspiracy or their co-conspirators would not only alert them to the existence of this investigation, causing them to become more cautious in their activities, but may also cause them to flee to avoid further investigation or prosecution, to threaten the lives of the informants, or to otherwise compromise this investigation.

77. Furthermore, the service of Grand Jury subpoenas to apparent custodians of records for businesses associated width the sale or issuance of cellular telephone numbers would not likely result in identifying other members of the organization, due to the routine practice of providing no or misleading subscriber information when such telephones are acquired. Such an approach could result in having individuals employed at such locations notify the actual participants about law enforcement's interest in such telephone numbers.

Docket No. 232-2 at 101–03.

The Government is not required to use a technique it believes is likely to fail. It is only required to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The Government points out that in the section that follows, the Affidavit provides an illustration of the concern that individuals successfully served with a subpoena would likely be uncooperative, citing the fact that when Bobby Robertson "was arrested after obtaining hundreds of diverted prescription narcotics from BUCHANAN, ROBERTSON did not provide any statements regarding who his source of supply was." Docket No. 232-2 at 104. The Court finds that the Affidavit adequately explains the likely problems associated with the use of

11

grand juries and administrative subpoenas to adequately demonstrate why these techniques would be "unlikely to succeed if tried or to be too dangerous," as the statute requires.

### 4. Confidential Sources

Defendant argues that the entire discussion in this section of the Affidavit deals with Buchanan and the Middle-Tennessee based organization, not him, and that it fails to demonstrate that the use of informants had been tried or reasonably appeared to be unlikely to succeed.

The Affidavit describes the reasons that three confidential sources that had been used in this case were unlikely to provide further investigative value going forward: one was incarcerated; another had been "burned" by the Smyrna Police Department and seemed to have no personal knowledge of Buchanan anyway; and the third had bought pills from Buchanan outside the direction and control of agents. Docket No. 232-2 at 103–104. The Affidavit noted that Agents were "unaware of any other confidential sources that are affiliated with, or have the ability to be affiliated with, BUCHANAN, BENJAMIN BRADLEY, JONES or the Detroit, Michigan and Middle Tennessee-based organizations." *Id.* at 104.

The Affidavit further explained that the agents believed that, even if they had informants that could be of further use, that individual would not likely be able to "provide adequate evidence to identify or prosecute more than a select few of the associates of this investigation," because "drug distributors conduct business in such a manner as to prevent more than one or two individuals from actually coming in contact with the narcotics or money during any given transaction." *Id.* The Affidavit provides an example, as discussed above, that when "Robertson was arrested after obtaining hundreds of diverted prescription narcotics from Buchanan, Robertson did not provide any statements regarding who his source of supply was." *Id.*

The Affidavit also states the following:

80. In addition to the fact that very few subjects would be identified and prosecuted as the result of the activity of a confidential source(s), the subjects of this investigation could either flee the area or change addresses and cellular telephones soon after law enforcement Agents seize drugs or money from anyone even remotely connected to this organization. Accordingly, your Affiant believes that an individual seizure of drugs, or illegal drug proceeds, however small or large, executed without this requested electronic interception, would not accomplish the stated goals of this investigation, and would only cause the members of this organization to take steps to further insulate themselves from law enforcement investigation.

*Id.* at 105.

The Court finds that the Affidavit sufficiently details the agents' use of confidential informants during the investigation, explains why these informants can no longer be utilized, and explains more generally why the use of such informants likely would not result in information about the higher level members of the organization and the sources of its drug supplies and could potentially damage the investigation.

     5.    <u>Undercover Agents</u>

Defendant argues that this section, like the others, fails to provide information that would support a finding of necessity with respect to him, in particular, or that would support an inference that undercover agents would generally face a greater risk in this case than in any other drug trafficking case.

The Affidavit states that "[g]enerally, members of narcotics trafficking organizations are experienced at their respective roles and only deal with long-time associates. Docket No. 232-2 at 104. The agent also makes the following case-specific assertions: "[t]he role of undercover officers is limited due to the close-knit nature of this group and the fact that it would not be possible for an undercover officer to penetrate the upper levels of the conspiracy and identify all members of the

conspiracy and their respective roles;" "because members of the Middle Tennessee-based organization appear to utilize counter-surveillance techniques and operate in remote areas, it would be unreasonably difficult to protect the safety of an undercover officer operating from within the organization;" "the Middle Tennessee-based organization would not allow an undercover officer to infiltrate the upper levels of their operations," as evidenced by the fact that a prior source of information told a confidential source that Buchanan "did not want anyone he did not know in his residence" and by the fact that "some of the sources of supply in Detroit, Michigan are family members of BUCHANAN and are unlikely to allow a new individual into their organization." *Id.* at 105–06.

Again, the Government is not required to show that a given investigative technique is riskier to use in this case than in other cases, nor that necessity must be shown for this defendant specifically, as opposed to the investigation as a whole. The Court concludes that the Affidavit demonstrates that the use of undercover agents appears to be unlikely to succeed and potentially dangerous as to the investigation as a whole, as required by 18 U.S.C. § 2518(1)(c) and *Wright*, 2015 WL 3388778, at *8.

6.     Consensual Recordings

Defendant argues that, as with the other sections, this section of the Affidavit does not demonstrate that consensual recordings were tried and failed or that this investigative technique would be ineffective in the context of this particular case. The Affidavit noted that one of the confidential informants had made consensual recordings, but stated that further consensual recordings were unlikely to meet the goals of the investigation, as they "would not confirm, as an intercepted call or text would, who BUCHANAN, BENJAMIN BRADLEY or JONES' sources of

14

supply or customers are." Docket No. 232-2 at 106. The Affidavit further noted that because "consensual recordings are merely recorded conversations of an undercover or confidential source, they are subject to limitations and could not meet the objectives of this investigation for the reasons" already detailed in the sections of the Affidavit addressing the limitations to the use of undercover agents and confidential informants. *Id.* For the reasons already provided under the sections related to undercover agents and confidential informants, the Court concludes that the Affidavit demonstrates that the use of consensual recordings appears to be unlikely to succeed and potentially dangerous as to the investigation as a whole, as required by 18 U.S.C. § 2518(1)(c) and *Wright*, 2015 WL 3388778, at *8.

### 7. Interviews of Witnesses and/or Subjects and Arrest Warrants

Defendant argues that this section again focuses on the Middle Tennessee organization. As to the likelihood of success in using interviews of independent witnesses, cooperating individuals, target subjects, or their known associates, the Affidavit states that "[t]he most knowledgeable subjects are also participants in the crimes under investigation and would be unlikely to cooperate and provide information without 'tipping off' their co-conspirators," which would "compromise the entire investigation absent some degree of confidentiality." Docket No. 232-2 at 107. Defendant complains that the Affidavit does not explain why there could not be confidentiality, but the next sentence of the Affidavit states the agent's belief that "any further interviews of co-conspirators in this matter would be communicated to the principals or their subordinates or others who would take additional precautionary steps to avoid the collection of evidence by law enforcement." *Id.*

As to the possibility of seeking arrest warrants, the Affidavit states the following:

15

86. Seeking arrest warrants at this time would be premature. Your Affiant does not know whether the above-referenced individuals would cooperate with the United States. Further, even if these individuals did cooperate with the United States, your Affiant does not think that would achieve the principal objectives of the investigation as identified in this Affidavit. Moreover, as detailed above, ROBERTSON was recently arrested with over a thousand diverted prescription narcotics and did not reveal to law enforcement who his source of supply was. In addition, as detailed above, during a traffic stop by the Michigan State Police of BENJAMIN BRADLEY, the MSP seized approximately $10,000 in cash from BENJAMIN BRADLEY. During his interview BENJAMIN BRADLEY stated that he was going to use the money to pay his American Express credit card. Agents do not believe that BENJAMIN BRADLEY was being truthful during this interview and believe that the money was proceeds from the sale of diverted prescription narcotics.

*Id.*

Again, the Government is not required to show necessity for this defendant specifically, as opposed to the investigation as a whole. *Wright*, 2015 WL 3388778, at *8. As to arrest warrants, the agent actually did give an example specific to Bradley, whom agents believed was dishonest when interviewed by the Michigan State Police when they seized $10,000 from him during a traffic stop. The Court finds that the Affidavit adequately explains the limitations on the effectiveness of interviewing witnesses and/or subjects and use of arrest warrants in this investigation.

8.    Search Warrants

Defendant argues that a search warrant might have uncovered drug sale ledgers, contact information, photographs, and other useful information, but asserts that this method was not tried. In the next sentence of his brief, Defendant acknowledges that a search warrant was, in fact, executed on Buchanan's residence in January 2014, but argues that the Affidavit does not demonstrate that this search harmed the investigation.

The Affidavit includes the following as to the use of search warrants:

16

87. Based upon your Affiant's experience and that of other law enforcement Agents, the use of search warrants is unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of all the participants, and/or their methods of operation. Execution of search warrants would also "tip off" targets of the investigation, causing them to curtail or conceal their activities and bring the investigation to an unsuccessful and premature conclusion. Furthermore, law enforcement has only identified a few members of the Detroit, Michigan and Middle Tennessee-based organizations and has not yet identified all of the locations that they use for storage/distribution of drug and drug proceeds within the Detroit, Michigan and Middle District of Tennessee. As detailed above, although a search warrant was executed on BUCHANAN's residence in January 2014, the information and evidence obtained during the search warrant did not reveal BUCHANAN's source of supply in Detroit, Michigan nor all of his customers in the Middle District of Tennessee. Based upon the foregoing, your Affiant believes that it would be more productive to execute search warrants at the conclusion of this investigation, once these locations have been established and the other goals of the investigation have been substantially achieved.

Docket No. 232-2 at 107–08.

The Court finds that Affidavit adequately explains the reasons that search warrants have been and will likely be inadequate for this investigation. The Government is not "required to attempt an ill-advised investigative technique in order to establish necessity." *United States v. Cooper*, No. 3:14-00090, 2015 WL 236271, at *11 (M.D. Tenn. Jan. 16, 2015) (citing *United States v. Sims*, 508 F. App'x 452 (6th Cir. 2012)).

9. Pole Cameras

Defendant argues that the Affidavit's claim that agents could not install a pole camera at his home because they had not positively identified where he was living is disingenuous because Detroit police would have obtained his identification when they had him at a traffic stop and also that DEA agents from the Detroit office had conducted surveillance at two residences that they believe were associated with Mr. Bradley and had observed cars registered to him at those addresses. The Government counters, without offering a citation to the record, that the investigation revealed that

17

Defendant owned or was associated with 19 properties in and around Detroit, which made it difficult to determine exactly where he was living at a given time. The Government further argues that although Defendant had argued that additional pole cameras should have been used, he has not explained how they would have provided information relating to the quantity and types of controlled substances involved.

The Affidavit provides the following with respect to pole cameras:

88. Due to the limitations of pole cameras, it would be difficult to learn information about the workings of the organization, such as the quantities and types of controlled substances involved. In late November 2014, Agents installed a pole camera on the Essence Barber Shop located at 797 Bell Road, Antioch, Tennessee. Agents believed based upon intercepted communications over TARGET TELEPHONE 1 and physical surveillance that BUCHANAN conducted some of his illegal drug trafficking activities at that location. Although Agents were able to install the covert pole camera at the barber shop, Agents have only been able to observe a few tags of vehicles Agents believed were meeting BUCHANAN in order to conduct drug transactions. Because of the location of the pole camera and the large parking area, Agents are unable to observe all of the vehicles that park near the barber shop. Moreover, because some of the transactions occur inside the barber shop or inside the vehicles, Agents are unable to observe the hand-to-hand transaction and are therefore unable to determine the amount and type of narcotics being distributed.

89. Although Agents were able to install a covert pole camera near BOWEN's shop, because the camera was located at distance from the shop, Agents were unable to clearly identify vehicle tags or individuals. Moreover, because the drug transactions occurred inside of the shop, Agents were unable to determine the quantities or types of drugs being distributed. Agents are unable to install a covert pole camera at BUCHANAN's residence because the only pole available to put a covert camera is too close in proximity to the residence and would likely be discovered by BUCHANAN. As stated above, based upon the limited parking and the limited poles on which to put a covert camera, Agents believe attempting to install a covert camera would risk revealing the investigation.

90. Because Agents have not positively identified where BENJAMIN BRADLEY is currently living Agents are unable to install a covert pole camera. In addition, although Agents believe that FELICIA JONES is currently residing at 360 Brookfield Drive in Detroit, Michigan, because the utilities are underground Agents are unable to install a covert pole camera.

Docket No. 232-2 at 108–09.

The Court finds that the Affidavit contains a sufficient description of the investigators' use of pole cameras and explanation of the reasons placement of additional pole cameras either was not possible or not effective. The Affidavit further explains that pole cameras cannot provide investigators with information relating to the quantity and types of controlled substances involved. Although Defendant argues that additional pole cameras should have been used, he has not explained how they would have provided the information needed by investigators to understand this alleged drug network. Again, the Government need not prove that "every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. Investigators clearly gave "serious consideration" to this non-wiretap technique[] prior to applying for wiretap authority," and the Affidavit sufficiently informs the Court "of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64.

### 10. Tracking of GPS Telephone Data

Although Defendant concedes that GPS telephone "data only give 'approximate locations' and, absent interception, do not identify details regarding individuals or modes of operation," he argues that "they could be a valuable tool when used in conjunction with other traditional techniques." Docket No. 232 at 17 (Def.'s Brief). He also acknowledges that the Affidavit details that agents used GPS ping data to locate a suspect in order to install a vehicle tracking device. *Id.* (citing paragraph 76 of the Affidavit). Nonetheless, Defendant argues that the agents did not make any attempt to use GPS Ping data against Defendant in particular nor did the Affidavit explain why this data would not be a useful tool to investigate Mr. Bradley.

19

The Affidavit explains that GPS Ping data coupled with surveillance had enabled agents to identify one of the phones being used by Buchanan. Docket No. 232-2 at 110. The Affidavit further explains that the GPS Ping data does not give an exact location of the phone but rather an approximate location, and that, without the wiretap, GPS Telephone data "will not assist Agents in identifying the individuals involved or the methods of operation." *Id.*

The Court finds that the Affidavit contains a sufficient description of the investigators' use of GPS telephone data and an explanation of the limitations to the effectiveness of this tool in unraveling the details of this alleged drug conspiracy. Again, the Government only needs to show necessity to the investigation as a whole, not to this particular Defendant. *Wright*, 2015 WL 3388778, at *8.

### 11.    Tracking Devices

Defendant argues that although agents had identified several vehicles registered to him, the Affidavit did not articulate why it was not possible to use GPS trackers on these vehicles. The Affidavit explained that a tracking device had been placed on one of Buchanan's vehicles, which had provided some useful information about his movements, but the device was limited in usefulness because Buchanan drove other vehicles as well, including on trips to Cincinnati to pick up pills. Docket No. 232-2 at 110. The Affidavit gave several reasons that it would be of limited benefit to install a tracking device on Bradley's vehicle: (1) agents were unsure where Bradley lived; (2) commercial database research indicated that Bradley owned several vehicles; (3) at a recent traffic stop, Bradley was driving a rented vehicle, which led agents to believe he may frequently utilize rental vehicles to thwart law enforcement efforts; and (4) tracking devices would be unable to paint

20

a complete picture of Bradley's whereabouts. *Id.* Last, the Affidavit stated that it would be difficult to install a tracking device on Jones's car because she kept it in a closed garage. *Id.*

The Court finds that the Affidavit contains a sufficient explanation of the agents' use of tracking devices and the reasons that additional use of trackers was not practical and would not enable them to obtain the necessary information to discover the scope of this alleged drug conspiracy.

### 12. Trash Searches

Defendant argues that the Affidavit did not demonstrate why trash searches of Defendant's residence were not possible, given that, in his view, agents knew or could easily have confirmed the location of two residences "associated" with Defendant.

The section of the Affidavit titled "Trash Searches" provides as follows:

95. Agents believe that it would be difficult to conduct a trash search of BUCHANAN's residence for the reasons described above; specifically, that BUCHANAN lives in a gated community with only one way in and out of the street on which BUCHANAN's apartment is located. Furthermore, Agents have driven by BUCHANAN's residence at least 25 times in the last approximately three months and have only seen a trash can at the bottom of BUCHANAN's driveway for pick up on one occasion. Additionally, the distance between where the trash would be placed for pick up and the front door of the residence is extremely close, approximately 10 yards, and Agents believe they would likely be detected while attempting to conduct a trash search.

96. For the reasons detailed above, because Agents have been unable to identify where BENJAMIN BRADLEY is currently residing, Agents are unable to conduct a trash search of his residence. Additionally, during the surveillance of FELICIA JONES, Agents did not observe any trash cans outside the residence. Moreover, because the distances from the garage and entrance of the home are in such close proximity to the street, Agents would not be able to conduct a trash search if a receptacle were located at the curb without risking revealing the investigation. Additionally, because it is a condominium complex and the residences are located in extreme close proximity to each other, Agents believe it would risk revealing the investigation if they attempted a trash search.

Docket No. 232-2 at 112.

The Court concludes that the Affidavit contains a sufficient explanation of the reasons that trash searches are unlikely to succeed in providing the information needed in this investigation. The Government is not "required to attempt an ill-advised investigative technique in order to establish necessity." *Cooper*, 2015 WL 236271, at *11.

13.     Financial Investigation

Defendant does not address this portion of the Affidavit, but as the Court reviews the entire Affidavit to determine whether the Government has establish the necessity for intercepting communications, the Court will review this portion of the Affidavit as well. The Affidavit states that the financial investigation of this organization is being assisted by the Internal Revenue Service. During the execution of a search warrant on Buchanan's residence in January 2014, investigators identified bank accounts belonging to Buchanan, which led to the seizure of $36,000 from his accounts. Investigators have also identified an account in the name of Felicia Jones into which large amounts of cash were deposited in Nashville, Tennessee and withdrawn in Detroit, Michigan. Agents from the IRS have identified a few bank accounts used by Buchanan, Bradley, and Jones. Specifically, the IRS has found that between January 2013 and January 2014, cash deposits of over $483,000 were placed into two bank accounts used by Bradley and Jones, and subsequently withdrawn. According to the IRS, after Buchanan deposits cash into a bank in Tennessee, the money is withdrawn shortly thereafter at a bank in Detroit, Michigan.

The section of the Affidavit with the title "Financial Investigation" further states:

101. Through intercepted communications over TARGET TELEPHONE 1, TARGET TELEPHONE 2 AND TARGET TELEPHONE 4, Agents with the assistance of the Internal Revenue Service have been able to identify bank accounts

22

such as Bank of America and Comerica which BUCHANAN and BENJAMIN BRADLEY use. Additionally, as detailed above, through intercepted communications, Agents have been able to identify accounts in other people's names which BENJAMIN BRADLEY and JONES are utilizing. Moreover, the Internal Revenue Service was able to corroborate the deposit of thousands of dollars by BUCHANAN based upon intercepted communications and GPS tracking device of BUCHANAN's Charger which revealed BUCHANAN at multiple bank locations in the Nashville, Tennessee area. Agents believe based upon intercepted communications over TARGET TELEPHONE 1 and TARGET TELEPHONE 2 that these deposits were made by BUCHANAN for payment of the thousands of diverted prescription narcotics he receives from BENJAMIN BRADLEY and JONES. The financial aspect of this investigation is ongoing and being assisted by the Internal Revenue Service. Agents are attempting to further identify assets of BUCHANAN's including real property, vehicles and bank accounts.

Docket No. 232-2 at 113–14.

This portion of the Affidavit demonstrates that although investigators were utilizing many different investigative techniques to piece together information about this alleged drug conspiracy, the intercepted communications were essential to their task. The Court finds that this portion of the Affidavit, like the others, satisfies the necessity requirement contained in Section 2518(1)(c).

## IV. Conclusion

Having considered the information provided in the Affidavit the Government asserts supports the necessity for the wiretaps, and the Defendant's challenges thereto, the Court concludes that the Affidavit fully satisfies Section 2518(1)(c) and applicable case law discussed herein. Contrary to Defendant's position, the Court finds that the Affidavit does not simply consist of "boilerplate" language that fails to show the necessity of the telephone wiretaps. Defendants' Reply brief argues that this boilerplate language is identical to an affidavit filed in another criminal case on which his attorney is appointed as counsel, and he created a chart to put the same sections of the two affidavits side by side to show portions that have identical language. That government investigators do not

23

create each wiretap affidavit from scratch does not surprise or trouble the Court. Indeed, the courts themselves rely heavily on the wording and analysis employed by other courts who have considered similar legal issues. Most court opinions are replete with quotations from other court cases, and this one is no exception. As detailed above, the "mere fact that the affidavit ... rested in part on statements that would be equally applicable to almost any ... case [of this kind] does not render the affidavit insufficient" so long as there is "information about particular facts ... which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation." *Wright*, 2015 WL 3388778, at *4. The Affidavit in this case provides many details that demonstrate that wiretaps were not employed as the initial step in this criminal investigation.

Defendant also repeatedly objects that the Affidavit does not provide information about why a certain technique would not be successful as to him, specifically, which is contrary to the Sixth Circuit's holding "that necessity must be shown only for the investigation as a whole, not for each interceptee or target." *Id.* at *8. The Affidavit clearly sufficiently demonstrates that the various traditional tools of investigation, even when used together in sophisticated ways, were not sufficient to discovering the scope of the alleged drug conspiracy, the manner in which it operated, and all of the participants therein.

For the foregoing reasons, the Court will deny the Defendant's motion challenging the wiretaps in this case

An appropriate order is filed herewith.


TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE