RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0160p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee*,

    *v.*

BENJAMIN EDWARD HENRY BRADLEY,

    *Defendant-Appellant*.

No. 17-5725

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:15-cr-00037-2—Aleta Arthur Trauger, District Judge.

Argued: July 26, 2018

Decided and Filed: August 1, 2018

Before: SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Sinéad Redmond, UNIVERITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Cecil Woods VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Sinéad Redmond, Melissa M. Salinas, UNIVERITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Cecil Woods VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

    SUTTON, Circuit Judge. Having pled guilty to distributing painkillers and laundering money, Benjamin Bradley challenges his sentence: a million-dollar forfeiture order and a 204-

month prison term. He is right and wrong. Precedent forbids the joint-and-several nature of the forfeiture order, but his prison sentence was reasonable.

I.

Between 2012 and 2015, an eighteen-member trafficking ring ran opiate pills from Detroit to central Tennessee. On the Detroit end, Bradley and others collected pills. They would drive patients to the doctor, pay them for their prescription refills, and store the pills in various places, including a house Bradley owned. Bradley recruited Pamela O'Neal to live in the stash house and accept pill deliveries from several individuals. She received deliveries of 300 pills (usually oxycodone) every day between July 2014 and March 2015. Other participants handled similar amounts.

The group shipped pills to a buyer in Nashville, Donald Buchanan, who sold the pills to redistributors. Buchanan deposited the payments into different bank accounts that belonged to Bradley, Bradley's wife, and Felicia Jones. Half of these accounts belonged to Jones, who would wait for a call from Buchanan or Bradley confirming a new payment was in her account, then withdraw between $3,000 and $5,000 and take the money to Bradley or one of the others.

A grand jury indicted the members of the drug ring in the Middle District of Tennessee. Count 1 charged the eighteen individuals with conspiring to possess with intent to distribute oxycodone and oxymorphone. *See* 21 U.S.C. §§ 841(a)(1), 846. Count 2 charged Bradley, Buchanan, and two others with conspiring to launder the operation's proceeds. *See* 18 U.S.C. § 1956(a)(1)(A)(i), (h). Bradley pleaded guilty to both counts.

The court ordered Bradley to forfeit currency that the police seized and real property that he used in the conspiracy and at least a million dollars in cash, reasoning that Bradley obtained the real property with tainted funds or used it to facilitate his crimes, *see* 21 U.S.C. § 853(d), and that the gross proceeds of the drug-distribution and money-laundering schemes reached a million dollars, *see id.* § 853(a). The forfeiture order applies the million-dollar judgment jointly and severally to Bradley and his co-defendants. The court sentenced Bradley to seventeen years.

II.

*Forfeiture.* Bradley objects to the forfeiture order on several grounds, but one leaps off the page: its creation of joint and several liability. Precedent stands in the way.

The criminal forfeiture statute says that persons convicted of certain drug crimes must forfeit to the United States (1) "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [the offense]," and (2) "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, [the offense]." *Id.* The Supreme Court recently clarified that the statute bars joint and several liability for forfeiture judgments. *Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017). The two requirements of the statute, the Court observed, "limit forfeiture under § 853 to tainted property" and "define[] forfeitable property solely in terms of personal possession or use." *Id.* But joint and several liability puts defendants on the hook regardless of their share of the fault or the proceeds, meaning it would "require forfeiture of untainted property" as well as amounts the defendant did not "obtain[]." *Id.* at 1632–33. *Honeycutt* puts an end to such collective liability.

That ruling invalidates this order. The court ordered Bradley to pay one million dollars not because the government showed that he pocketed that much money from his misdeeds, but because the district court found that "the foreseeable amount of the proceeds of the drug-distribution conspiracy" and "the foreseeable value of property involved in the money laundering conspiracy" totaled that much. R. 1005 at 1. That's just what *Honeycutt* bars.

It's not that clear, the government responds, because Bradley did not raise the issue below. That means Bradley must show an error that is plain, that affects his substantial rights, and that seriously affects the fairness or integrity of the proceedings. *Johnson v. United States*, 520 U.S. 461, 466–67 (1997).

Accepting that the forfeiture order satisfies the first two prongs, the government maintains that it falls short on the last two. As the government reads the record, the evidence shows that Bradley personally obtained at least one million dollars anyway, precluding any violation of substantial rights or serious unfairness. It first points to the $850,000 Buchanan

deposited into four bank accounts, two owned by Bradley or his wife and two owned by Jones, who withdrew Buchanan's deposits for Bradley. It then adds other amounts. Once the trafficking ring stopped using banks and switched to cash exchanges, it points out, Jones took plenty of cash back to Bradley. There were approximately fifteen such exchanges between Jones and Buchanan, and at least some of them grossed $20,000 or more. All told, says the government, "it is easy to see that the total amount that Bradley directly received exceeded [a million dollars]." App'ee Br. 30.

That is wishful math, it seems to us, too wishful to uphold this million-dollar order. The district court did not make any factual findings about how much money Bradley obtained. It found only that the proceeds of the conspiracy amounted to a million dollars. That Jones delivered Buchanan's payments to Bradley tells us nothing about what happened to the money after that. The evidence says nothing about whether Bradley kept all of this money—an improbable development in an eighteen-member conspiracy.

The reality is that the district court looked in one direction (the proceeds attributable to all members of the conspiracy) and *Honeycutt* required it to look in another (the proceeds attributable just to Bradley). Back-of-the-envelope calculations cannot justify this million-dollar order without affecting Bradley's substantial rights and the fairness of the forfeiture proceeding.

Nor can the *Honeycutt* problem be resolved solely by addition. It is a net, not a gross, monetary forfeiture judgment. The order says that the value of Bradley's real property and the seized currency, as well as the assets of any co-defendant, must be subtracted from the judgment. That leaves just as many candidates for lessening Bradley's liability as for increasing it. Better on this record, we think, to vacate the entire forfeiture order and remand to the district court so that it can conduct fresh factfinding and figure out "an amount proportionate with the property [Bradley] actually acquired through the conspiracy." *United States v. Elliott*, 876 F.3d 855, 868 (6th Cir. 2017).

That conclusion disposes of the harm incurred by the forfeiture order and requires new factfinding before the court may impose an individual forfeiture order on Bradley. In that light,

it's worth adding a word or two about Bradley's other challenges—as one of them might preclude new factfinding (says Bradley) and the other might affect how it is done.

As to the first: Bradley argues that, when the district court permitted the government to introduce new evidence after the sentencing hearing in support of its request for a criminal forfeiture, it violated Rule 32.2(b) of the Federal Rules of Criminal Procedure and due process. New factfinding should cure any complaint about adherence to the Criminal Rules. But to clear away some of the brush for the next round of proceedings and to eliminate any doubt about a second round of factfinding, we take up Bradley's protest that the court denied him "fair and adequate proceedings for contesting the deprivation of his property rights." Appellant Br. 26.

That isn't so. The initial proceedings, to be sure, presented Rule 32.2 irregularities. The government moved for forfeiture late. The court held off on entering a forfeiture order until after sentencing. And the court allowed the government to reply to Bradley with new evidence. But not all coloring outside the lines produces a constitutional violation. The most prejudicial irregularity was the government's introduction of new evidence. But the court softened the impact of this development by giving Bradley the chance to file a sur-reply to the government's new evidence—with proof and argument of his own. That does not violate due process, as Bradley had serial opportunities to be heard and retained the last word. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

As to the second argument: Bradley argues that the Sixth Amendment prohibits a judge, as opposed to a jury, from finding facts that trigger a mandatory criminal forfeiture. That is an unanswered question in this circuit. It prompts these questions: Does the Supreme Court's extension of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), to fines in *Southern Union Co. v. United States*, 567 U.S. 343, 350 (2012), apply to criminal forfeitures? Is the Court's statement in *Libretti v. United States*, 516 U.S. 29, 48–49 (1995), that the Sixth Amendment does not provide a right to a jury trial over criminal forfeiture necessary to the disposition of that case? Do any of our precedents bear on the question? What do historical practices tell us about the original understanding of the judge's and jury's factfinding roles in criminal forfeiture proceedings? The parties may wish to address these questions on remand.

*Procedural reasonableness.* Bradley claims that the district court failed to explain the amount of drugs for which it held him accountable, making his sentence procedurally unreasonable. In sentencing an individual, a district court must properly calculate the advisory guidelines range, consider the § 3553(a) factors, rely on facts that aren't clearly erroneous, and explain the selected sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). In the context of drug-quantity determinations, the court must rule on disputed calculations, Fed. R. Crim. P. 32(i)(3)(B), and explain its factual foundation for doing so, *United States v. Poulsen*, 655 F.3d 492, 512–13 (6th Cir. 2011). In this instance, we assess Bradley's complaint for plain error because he did not object to the adequacy of the court's explanation, even after the court gave him a chance to do so. *See United States v. Vonner*, 516 F.3d 383, 385 (6th Cir. 2008) (en banc).

The district court relied on the probation officer's calculation in finding the relevant drug amounts. The officer used the pill counts from Buchanan's and O'Neal's testimony, and reduced those counts in several places to err on the side of a conservative estimate. The pre-sentence report attributed to Bradley 110 oxycodone pills and 2 oxymorphone pills, drawn from Buchanan's statement that, for years, he bought 50 to 60 pills at a time from Bradley and that the latter was his main source of supply for oxycodone. The report attributed another 186,300 oxycodone pills to Bradley, drawn from O'Neal's statement that she mainly received oxycodone pills, about 300 every day from July 2014 to March 12, 2015. Even so, the probation officer started counting on the last day of July and assumed all of the pills were oxycodone, which carries a lower penalty than oxymorphone. After considering Bradley's objections to this calculation, the court found that the evidence supported the report, noting it was "about the best estimate we can get" and "a very conservative estimate" at that. R. 919 at 235.

Even if we assume error—that this explanation did not satisfy our requirements—no plain error occurred. The record amply supports this conservative estimate. The two statements represent zoomed-in snapshots of an expansive landscape. Keep in mind that O'Neal's 300-pills-a-day estimate is substantial and does not stand in isolation. She was not the only stash-house operator he directed. Jones's intercepted phone call with Bradley revealed that she had received more than 300 pills on that one day. Out of caution, the probation officer also assumed that Bradley barely traded in oxymorphone, the more serious drug at issue, when the evidence

indicates that the group's oxymorphone to oxycodone ratio by the end of the relevant period was close to 2 to 1. Even if we excised the 110 oxycodone and 2 oxymorphone pills that Bradley purportedly sold to Buchanan over their years-long relationship, Jones regularly sold to Buchanan *hundreds* of each kind of opiate on behalf of Bradley. On this record, no violation of Bradley's substantial rights occurred.

Bradley separately claims that the district court erred in assessing drug weights. At one point, the U.S. Attorney's Office for the Middle District of Tennessee measured the weight of oxymorphone and oxycodone by the weight of the active ingredients in the pills. That was a mistake. The guidelines measure oxymorphone by total weight. U.S.S.G. § 2D1.1(c) n.*(A)–(B). The U.S. Attorney's Office realized the error at some point before Bradley pleaded guilty and notified Bradley and his co-defendants about the new and proper weighing of the drugs.

Bradley contends that the district court should have considered the sentence disparities between the defendants whose sentences preceded the U.S. Attorney's Office's change in drug-weight-calculation method and those who followed it. No doubt, district courts should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). But even if we read § 3553(a)(6) as contemplating intra-district sentence disparities, *but see, e.g.*, *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (the factor concerns *national* sentence disparities), any such differences would not be "unwarranted." Now that the government has realized its mistake, the guidelines do not set it at liberty to weigh oxymorphone in the old manner. Yes, that means a proper weighing subjects Bradley to a higher base offense level than oxymorphone dealers from a few years ago. But this is not the kind of disparity § 3553(a)(6) is after. There is nothing "unwarranted" about correct sentencing calculations. Maintaining accuracy in guidelines calculations is one way to accomplish a key goal of the guidelines system: parity in the federal system's treatment of similar defendants. *See* U.S.S.G. ch. 1, pt. A, subpt. 1. Accepting Bradley's argument would perpetuate disparity with other districts.

*Substantive reasonableness.* Bradley claims that his seventeen-year sentence is too long—substantively unreasonable in sentencing lingo. That is a tall order, particularly when a defendant challenges a sentence that does not exceed the guidelines range, *Vonner*, 516 F.3d at

389–90, and a still taller order when a defendant challenges a sentence that is less than half of the recommended range, as here, *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

In claiming that his sentence is too high, he argues by analogy—namely an analogy to co-defendant Buchanan's sentence of twelve years. The five-year differential between the two sentences, Bradley maintains, must turn on the trial court's differential (and unfair) weighing of the same discretionary factor—the purported unfairness of the intra-district sentence disparities wrought by the government's course correction on drug-weight calculation.

But this comparison overstates Buchanan's role in the conspiracy and understates Bradley's. Bradley played an instrumental role in collecting the pills, at least partly through fraudulent use of prescriptions. He owned a stash house. He recruited several people, some in desperate circumstances, to run the house and get the drugs to Buchanan. Buchanan was isolated from these more abusive and blameworthy links in the supply chain—and simply bought from his supplier and sold to redistributors, who in turn sold to end users. The five-year difference in their sentences turns on differences in their conduct.

For these reasons, we vacate the forfeiture order, affirm Bradley's prison sentence, and remand for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-5725

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BENJAMIN EDWARD HENRY BRADLEY,

    Defendant - Appellant.

**FILED**
Aug 01, 2018
DEBORAH S. HUNT, Clerk

Before:  SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the forfeiture order is VACATED, Benjamin Bradley's prison sentence is AFFIRMED, and the case is REMANDED for proceedings consistent with this opinion.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk