**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cr-00037-2** |
| | ) | |
| **BENJAMIN BRADLEY,** | ) | **Judge Trauger** |
| | ) | |
| **Defendant.** | ) | |

**RESPONSE IN OPPOSITION TO MOTION
TO DISMISS FORFEITURE ALLEGATIONS AND DENY MONEY JUDGMENT**

The United States respectfully submits this response in opposition to Benjamin Bradley's motion to dismiss the forfeiture allegations in the indictment and to deny the government's request for a money judgment. (DE# 1125, Motion.) As set forth below, the legal premise of Bradley's first argument—that the Sixth Amendment requires a jury to find all facts relevant to forfeiture—has been rejected by every court to have considered it, including the Supreme Court. Moreover, even if Bradley's legal premise were valid, the relief he requests would not be. Having waived his jury-trial rights by pleading guilty, and having litigated the case through final judgment with the express understanding that it would be a judge, not a jury, who would find the facts related to forfeiture, he cannot turn around now and claim that an unobjected-to procedural error entitles him to keep all of his ill-gotten gains. This is particularly true given the fact that the Supreme Court has held that Sixth Amendment errors of the type Bradley is asserting are not structural in nature and should be reviewed for harmlessness.

Bradley's request that the Court decline to issue a money judgment should likewise be denied. Bradley's argument (which he has waived in any event) is again based on a legal theory that courts have uniformly rejected. The Court should therefore deny Bradley's motion and enter a revised forfeiture order, after considering additional evidence and argument if necessary.

## I. Offense Conduct, Charges, and Guilty Plea

A federal wiretap investigation revealed that Benjamin Bradley was at the top of a distribution chain that sent tens of thousands of opioid pills from Detroit to Tennessee, between 2009 and 2015. (DE# 1019, PSR, ¶¶ 10-16, 22.) During the interception period, Bradley was routinely heard engaging in drug-related phone calls, including while at work as a CAT Scan technician at Sinai-Grace Hospital in Detroit. Indeed, there were numerous calls in which Bradley answered the phone at work by saying, "CAT Scan, Ben," before beginning to discuss drug transactions. (DE# 919, Sentencing Tr., PageID#: 3324-25.)

The investigation revealed that Bradley purchased pills from multiple sources, and directed several women—including Felicia Jones, Pamela O'Neal, and Bradley's older sister Bernadette Bradley—to collect, store, and count pills and money on his behalf. (DE# 1019, PSR, ¶¶ 10-16.) Pamela O'Neal, for example, was initially paid by Bradley to drive patients to the doctor and the pharmacy to get pills. (DE# 919, Sentencing Tr. (O'Neal), PageID#: 3234-39.) Then, after her long-time partner died of cancer and she was unable to afford her rent, Bradley suggested that she could live rent-free in one of his houses if she allowed people to drop pills off there. (*Id.* at PageID#: 3238-43.) O'Neal would then store and count the pills, before handing them off to Felicia Jones and others for delivery. (*Id.* at PageID#: 3243-45.)

Bradley would then arrange distributions from the Detroit area to Middle Tennessee. (DE# 1019, PSR, ¶ 11.) During the interception period, these distributions were typically carried out by Jones and Donald Buchanan driving from Detroit and Nashville, respectively, and meeting in Cincinnati to exchange pills for money. (*Id.*)

Prior to delivery, the pills would usually be put into empty candy boxes, which would be sealed up with a hot glue gun. (DE# 919, Sentencing Tr. (Jones), PageID#: 3188-89.) There were also several years when Bradley (or people acting at his direction) sent the pills to Buchanan through the mail, rather than making the drive and delivering them in person. (*Id.* at PageID#: 3216-17, 3317.)

After Buchanan sold the pills to redistributors (who sold them on to end users), Bradley and Buchanan would launder the profits, typically by making cash deposits at banks in Tennessee into accounts owned or controlled by Bradley. (*Id.* at PageID#: 3169-71, 3348-51.) For example, agents reviewed bank records showing the following cash deposits made at Tennessee bank branches into accounts owned by Jones, Bradley, or Bradley's wife, Kareema Hawkins, with individual deposits typically structured to avoid reporting requirements:

**Cash Deposits in Tennessee**

| Year | Cash Deposited into Jones Account #*2500 | Cash Deposited into Bradley Account #*1977 | Cash Deposited into Hawkins Account #*9818 | Cash Deposited into Jones Account #*9848 | Total |
|------|------|------|------|------|------|
| 2012 | $225,417 | $0 | 0 | $55,953 | $281,370 |
| 2013 | $261,119 | $134,846 | 0 | 0 | $395,965 |
| 2014 | $44,082 | $17,540 | $115,620 | 0 | $177,242 |
|      |      |      |      |      | $854,577 |

(*Id.* at PageID#: 3348-51.)

When Jones received the cash deposits into her accounts, she would withdraw the money and give it to Bradley. (*Id.* at PageID#: 3169-71.) These cash deposits stopped in roughly June 2014, because Bradley and Buchanan grew concerned that their money laundering would be

3

detected. (*Id.* at PageID#: 3170-72.) At that point, Buchanan began delivering cash by hand when he drove to Cincinnati to meet Jones, who would then deliver the cash to Bradley. (*Id.*)

Bradley used the proceeds of his drug-trafficking to travel and live lavishly, with bank records showing that Bradley and his wife put over $184,000 on their credit cards between 2012 and 2014. (*Id.* at PageID#: 3351.) Wire interceptions provided concrete illustrations of his spending. For example, in an intercepted call on February 20, 2015, Bradley told a friend about an upcoming trip to Las Vegas for his birthday, where he "just booked a $20,000 cabana today." (DE# 852, Sealed Govt. Sentencing Mem., p. 4.) On another call, from February 26, 2015, an unknown male asked Bradley what it cost to charter a jet, and Bradley responded that it depended on the size, but cost about $7,000 each way for one that holds 23 people. (*Id.* p. 5.)

Likewise, when Bradley was pulled over in a traffic stop in early 2015, police found roughly $10,000 in cash on him. (*Id.* p. 5.) And when search warrants were executed at Bradley's house on March 12, 2015, agents found $78,300 in cash, Rolex watches, over 60 pairs of expensive sneakers, and a receipt from the Marquee Night Club in Las Vegas, dated September 16, 2014 at 1:07 a.m., showing that Bradley had spent $11,108.76 in one evening. (DE# 919, Sentencing Tr., PageID#: 3329-35.) Bradley also owned numerous residential properties in and around Detroit. (*Id.* at PageID#: 3352-54.) During this time period, Bradley earned roughly $55,000 a year from his job as a CAT scan tech, and had a small money-losing side business as a party promoter. (*Id.* at PageID#: 3351-52.)

On March 11, 2015, a grand jury returned an indictment charging Buchanan, Bradley, Jones, and fifteen codefendants with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. (DE# 3, Indictment, PageID#: 7-14.) The indictment also charged Buchanan, Bradley, and Jones with conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h). (*Id.*) Most of the defendants were arrested the next day. At the time, Jones and Buchanan were just about to leave their homes, in Detroit and Nashville, respectively, to meet in Cincinnati. (*Id.* at PageID#: 3321-23.) In her car, Jones had 770 Oxymorphone pills that she was planning to deliver to Buchanan. (*Id.*) In his car, Buchanan had $24,830 in cash that he was planning to hand off to Jones. (*Id.*) Agents also executed search warrants at five locations in Middle Tennessee and five additional locations in the Detroit area, and found pills, money, and guns. (*Id.* at PageID#: 3301-07.) On June 8, 2016, Bradley pleaded guilty without a plea agreement to Counts One and Two of the Indictment. (DE# 478, Order, PageID#: 1397-1402.)

## II. Sentencing

On February 1, 2017, the Court held an all-day sentencing hearing, at which it heard testimony from Jones, O'Neal, Bernadette Bradley, and three law enforcement officers. The Court found that Bradley was responsible for distributing over 180,000 opioid pills, which—even under the most favorable assumptions—yielded a base offense level of 36. As the Court explained, this finding represented "a very conservative estimate." (DE# 919, Sentencing Tr., PageID#: 3387.) After applying several other appropriate enhancements, the Court found a total offense level of 45, or two levels higher than the top of the sentencing table. (*Id.* at PageID#: 3410.) This resulted in an advisory guidelines range of life imprisonment, which was reduced to 480 months, under U.S.S.G. § 5G1.1(a), as a result of the statutory maximums. (*Id.* at PageID#: 3414-15.)

After listening to Bradley's allocution and hearing argument from the parties, the Court imposed a sentence of 180 months on the drug-trafficking count, followed by 24 months on the money-laundering count, for a total sentence of 17 years' imprisonment. (*Id.* at PageID#: 3432.) The Court described this as "a very, very significant variance," noting that it had "been very generous" in selecting the appropriate sentence. (*Id.* at PageID#: 3436-37.)

### III. Forfeiture Litigation

In addition to the substantive charges, the indictment contained two forfeiture allegations. These were later supplemented with two bills of particulars, which specifically identified the currency, personal property, and real property that the government sought to forfeit. (DE# 279, Bill of Particulars for Forfeiture of Property, PageID#: 857-61; DE# 432, Bill of Particulars for Forfeiture of Real Property, PageID#: 1293-98.) Both bills of particulars were filed before Bradley entered his guilty plea.

At the plea hearing, the parties and the Court discussed how Bradley's guilty plea would affect forfeiture. (DE# 1027, Plea Tr., PageID#: 4008-14.) The Court explained that while Bradley "would still be able to contest the property that would be subject to forfeiture" in a future proceeding, "the forfeiture allegation would be operative" as a consequence of his guilty plea. (*Id.* at PageID#: 4010.) Defense counsel expressly acknowledged that Bradley's guilty plea "certainly makes the forfeiture issue ripe," while reserving his right to "contest some of the forfeiture allegations" at a future hearing. (*Id.* a PageID#: 4010-11.) At no point did Bradley suggest that the indictment was defective for failing to allege all facts related to forfeiture. Nor did he suggest that he wanted future forfeiture-related proceedings to be in front of a jury.

The day before the sentencing hearing, the government filed motions for the entry of a preliminary order of forfeiture, and for a forfeiture money judgment. (DE# 858, Motion for Preliminary Order of Forfeiture, PageID#: 2751-80; DE# 861, Motion for Forfeiture Money Judgment, PageID#: 2795-2801.) Those motions sought forfeiture of two parcels of cash and five pieces of real property—which had previously been identified in two bills of particulars—as well as a money judgment of $1,000,000. (*Id.*)

At the sentencing hearing, the Court chastised the government for its tardy filing, but noted that it would consider forfeiture-related evidence presented at the hearing and allow post-hearing briefing, with Bradley free to request an additional hearing on forfeiture if he wanted. (DE# 919, Sentencing Tr., PageID#: 3157-58, 3433-34.) The Court made clear, however, that absent a request for "a further hearing," the Court would "rule on the papers." (*Id.* at PageID#: 3433-34.) Bradley agreed with that approach, and gave no indication that he wanted the question of forfeiture to be decided by a jury.

The government then presented evidence supporting its requests for forfeiture. With regard to the request for a money judgment (and forfeiture of specific parcels of cash), the evidence showed that Bradley had sold at least tens of thousands, and likely hundreds of thousands, of Oxycodone and Oxymorphone pills over the course of many years. (DE# 1019, PSR, ¶ 22.) Based on the street values of Oxycodone and Oxymorphone ($1 and $3 per milligram, respectively), those pills were worth a total of at least $2.8 million, and likely much more. (*See* DE# 191, Sentencing Tr., PageID#: 3315-17.)[1] The proof further showed that Buchanan had transferred over $850,000 to Bradley, by way of cash deposits made in the Nashville area into accounts controlled by Bradley. And those cash deposits did not even represent the entirety of what Buchanan gave to Bradley, since money was also mailed and hand-delivered. That Buchanan was delivering $25,000 to Bradley on the day of the arrests shows just how substantial those-hand deliveries were. The $850,000 figure also excludes money Bradley earned by selling to others. The government further

---

[1] The Court adopted the PSR's finding of 186,412 pills. The PSR elected to treat nearly all of those as 30 mg Oxycodone pills, which (while factually implausible) gave Bradley every benefit of the doubt for purposes of sentencing. The street value of those pills would be roughly $5.59 million. In its sentencing memorandum, the government had set forth a very conservative estimate of 47,550 30 mg Oxycodone pills and 31,500 15 mg Oxymorphone pills. (DE# 852, Sealed Govt. Sentencing Mem., p. 9.) The street value for that mix of pills would be $2.8 million.

put on evidence showing that $46,300 in cash had been found hidden behind a bar at Bradley's parents' house, with another $78,300 in cash seized from Bradley's residence.

The government also put on evidence showing that the five pieces of real property listed in the bill of particulars were forfeitable. In particular, it showed that four of the pieces of real property were regularly used as stash houses, while the fifth was bought at a time when Bradley was engaged in large-scale drug trafficking and money laundering, and was then transferred to his wife shortly after his indictment.

At the end of the hearing, Bradley initially requested an additional two weeks to file his response to the motion for forfeiture. Later, he requested the appointment of an extra attorney with expertise in forfeiture. (DE# 901, Motion.) After the new attorney was appointed, Bradley requested and was granted a 30-day extension to respond to the motion for forfeiture. (DE# 941, Motion, PageID#: 3480-81.)

Bradley then filed his response to the motion for forfeiture, laying out his objections for the first time. (DE# 958, Response, PageID#: 3714-25.) As it turned out, he chose not to contest forfeiture of the two bundles of cash, or forfeiture of four of the five real properties. (*Id.*) Moreover, he raised no objection to the Court's ability to issue a forfeiture money judgment, nor even to the $1,000,000 total. Instead, he merely argued that the money judgment should not be construed to allow for collection of $1,000,000 *in addition to* the specifically named pieces of property (which the government later clarified that it would not). (*Id.*; DE# 986, Reply, PageID#: 3813-14.) Thus, the only substantive objection he raised was to the forfeiture of the Harmony Lane residence, which he claimed could have been purchased with legitimate income, and was not properly forfeitable in any event, because he had transferred it to his wife before conviction. (DE# 958, Response,

PageID#: 3714-25.) Again, he never objected to the Court's ability to make the relevant factual findings, nor requested the empanelment of a jury.

After being granted leave to do so, the government submitted a reply that included an affidavit from an IRS Special Agent that provided more details regarding the Harmony Lane property. (DE# 971, Order, PageID#: 3767; DE# 986, Reply, PageID#: 3813-32.) Specifically, the affidavit cast doubt on the legitimacy of the transfer from Bradley to his wife, and described how Bradley had purchased the house in 2014 for $105,000 using gold coins and scrap gold.[2]

After being granted leave to file a sur-reply, Bradley argued that the district court should not consider any evidence that was not presented at the sentencing hearing, should not consider hearsay evidence, and should deny forfeiture of the Harmony Lane residence on the grounds that Bradley transferred his interest in the property after indictment but before conviction. (DE# 990, Order, PageID#: 3837; DE# 996, Forfeiture Sur-Reply, PageID#: 3849-52.) Bradley did not deny the allegation that he had purchased the property using gold coins and scrap gold. Nor did he request any additional hearing, much less a hearing in front of a jury.

The Court ultimately granted the motion and issued an order of forfeiture. (DE# 1005, Forfeiture Order, PageID#: 3895-3900.) In its accompanying memorandum, the court criticized the government for being "dilatory in waiting until the submission of its Reply brief to present evidence of the nexus between the [Harmony Lane] Property and" the crimes of conviction. (DE# 1004, Memorandum, PageID#: 3892.) It nevertheless concluded that the totality of the evidence

---

[2] Because forfeiture of the Harmony Lane property was not based on joint-and-several liability, it was unaffected by the Sixth Circuit's remand order. Nevertheless, should the Court find it relevant, the government is prepared to present additional evidence regarding the Harmony Lane property, including further proof that the transfer from Bradley to Hawkins was fraudulent, and that the property is currently listed for sale, with a listing price of $449,900.
*See* https://www.realtor.com/realestateandhomes-detail/45669-Harmony-Ln_Belleville_MI_48111_M40660-07026.

established that "the defendant acquired the Property while the drug distribution and money laundering conspiracies were ongoing, and there was no likely source for the funds to purchase the property other than his criminal activity," thus giving rise to a presumption of forfeitability that Bradley had failed to rebut. (*Id.* at PageID#: 3892-93.) As such, the Court ordered forfeiture of the real and personal property identified in the government's motion, and ordered a personal money judgment in the amount of $1,000,000, with that money judgment taken against Bradley "jointly and severally with any other co-conspirator against whom a similar money judgment is taken as to the Indictment in this matter." (DE# 1005, Forfeiture Order, PageID#: 3895.) Bradley then filed two motions for reconsideration, which ultimately resulted in an order staying the forfeiture order pending appeal. (DE# 1011, Motion for Reconsideration; DE# 1017, Pro Se Motion for Reconsideration; DE# 1018, Stay Order.)

## IV. Direct Appeal and Remand

On appeal, Bradley raised various challenges to his sentence. As relevant here, he argued (1) that the forfeiture money judgment must be vacated in light of the Supreme Court's intervening decision in *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017), given that the forfeiture money judgment imposed joint-and-several liability; and (2) that the Court's reliance on judge-found facts in calculating forfeiture violated his Sixth Amendment jury-trial rights, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Southern Union Co. v. United States*, 567 U.S. 343 (2012).

The government conceded that the imposition of joint-and-several liability was error in light of *Honeycutt*, but argued that the error was likely harmless in light of the evidence as a whole. The Sixth Circuit ultimately vacated the forfeiture order on *Honeycutt* grounds. *See United States v. Bradley*, 897 F.3d 779, 783 (6th Cir. 2018). It therefore remanded the case so that this Court could conduct "further factfinding" in order to determine the amount of proceeds that Bradley

10

personally obtained. *Id.* at 784. In remanding the case, the Sixth Circuit acknowledged Bradley's Sixth Amendment argument, and suggested that "the parties may wish to address" certain questions on remand, including the following:

> Does the Supreme Court's extension of [*Apprendi*] to fines in [*Southern Union*] apply to criminal forfeitures? Is the Court's statement in *Libretti v. United States*, 516 U.S. 29, 48–49 (1995), that the Sixth Amendment does not provide a right to a jury trial over criminal forfeiture necessary to the disposition of that case? Do any of our precedents bear on the question? What do historical practices tell us about the original understanding of the judge's and jury's factfinding roles in criminal forfeiture proceedings?

*Id.* at 784.

After remand, the Court held a status conference at which the parties discussed the next steps for forfeiture. At the conference, the Court encouraged the parties to discuss the possibility of settlement. The government had previously attempted to reach a forfeiture settlement at various stages of the case, and did so again after the status conference. To date, Bradley has rejected every proposed settlement offer. This litigation follows. [3]

### DISCUSSION

## I.     Bradley's Request to Dismiss the Forfeiture Allegations on Sixth Amendment Grounds Should Be Denied.

Bradley first asks the Court to dismiss the forfeiture allegations in the indictment on Sixth Amendment grounds. As described in more detail below, the Sixth Amendment's jury-trial right does not apply to criminal forfeiture. And even if it did apply, Bradley would not be entitled to the remedy of dismissal. By failing to move for dismissal before his guilty plea, and by litigating the case through the entry of a final judgment without ever requesting a jury determination of

---

[3] Bradley has also filed a *pro se* petition for a writ of certiorari, arguing that this Court inadequately explained how it calculated the applicable drug quantity. *See Bradley v. United States*, Supreme Court Case No. 18-7282. According to the docket, that petition has been distributed for conference.

forfeiture, he waived any right he might have had to dismissal. Moreover, an *Apprendi* error like the one asserted here is not structural, and should be reviewed for harmlessness. Outright dismissal is therefore unwarranted, and would lead to an unjust result.

### A. The Sixth Amendment's Jury-Trial Right Does Not Apply to Criminal Forfeiture.

#### 1. *The Supreme Court's holding in* Libretti *requires denial of Bradley's motion.*

Bradley's motion to dismiss is premised on a legal claim that is foreclosed by on-point Supreme Court precedent. In *Libretti*, the Supreme Court held that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." *Libretti v. United States*, 516 U.S. 29, 48-49 (1995). Although Bradley attempts to dismiss this statement as mere *dicta*, that is not so.

One of the issues presented in *Libretti* was the defendant's claim that "his waiver of a jury determination as to the forfeitability of his property under Federal Rule of Criminal Procedure 31(e)" was inadequate. *Id.* at 48. And he claimed that the waiver was inadequate precisely because the right at issue was both statutory *and constitutional* in nature. *Id.* The Court rejected his challenge to the adequacy of the waiver by rejecting the legal premise, holding that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." *Id.* at 49. "Given that the right to a jury determination of forfeitability is merely statutory in origin," the Court explained, "we do not accept Libretti's suggestion that the plea agreement must make specific reference to Rule 31(e)." *Id.* This was plainly one of the holdings of the case, rather than some off-hand or passing *dictum*. Indeed, members of the Court appear to have understood it as such, given that Justice Souter wrote separately because he did not think the Court should have "reach[ed] the question of a Sixth Amendment right to trial by jury on the scope of forfeiture." *Id.* at 52 (Souter, J., concurring).

The Sixth Circuit and other Courts of Appeals have consistently treated this portion of *Libretti* as binding precedent, rather than as *dicta* that can be ignored or cabined to the specific facts of the case. *See United States v. Hall*, 411 F.3d 651, 654 (6th Cir. 2005) (referring to "*Libretti*'s holding" on the Sixth Amendment question); *see also, e.g.*, *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018) ("The Supreme Court held in *Libretti* . . . that 'the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection.'"); *United States v. Elliott*, 600 F. App'x 225, 228 (5th Cir. 2015) (similar); *United States v. Sigillito*, 759 F.3d 913, 935 (8th Cir. 2014) (similar) *United States v. Johnson*, 540 F. App'x 573, 575 (9th Cir. 2013) (similar); *United States v. Saccocia*, 564 F.3d 502, 507 (1st Cir. 2009) (similar); *United States v. Leahy*, 438 F.3d 328, 332 (3d Cir. 2006) (similar); *United States v. Fruchter*, 411 F.3d 377, 380 (2d Cir. 2005) (similar); *United States v. Davis*, 63 F. App'x 76, 82 (4th Cir. 2003) (similar).

The advisory committee notes to Rule 32.2 likewise read *Libretti* in the same way. *See* Fed. R. Crim. P. 32.2 advisory committee's notes (2000) ("In *Libretti* . . . the Supreme Court held that . . . the defendant has no constitutional right to have a jury determine any part of the forfeiture."). The very treatise on criminal procedure upon which Bradley relies does the same. *See* LaFave, Israel, King & Kerr, 6 CRIM. PROC. § 26.6(d) (4th ed. 2017) ("The Supreme Court held in *Libretti* that a defendant is not constitutionally entitled to a jury determination of forfeiture issues . . . .").

Because this portion of *Libretti* constitutes an on-point holding of the Supreme Court, it binds this Court until such time as the Supreme Court itself sees fit to overrule it. Thus, even if Bradley were correct that intervening precedent, like *Apprendi* and *Southern Union*, had cast doubt on *Libretti*'s reasoning, or raised doubts about its continuing vitality, such a conclusion would provide no basis for this Court to depart from *Libretti*'s bottom-line rule. *See, e.g.*, *Rodriguez de*

13

*Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989) (explaining that a lower court is bound to follow on-point Supreme Court precedent, even if it "appears to rest on reasons rejected in some other line of decisions"); *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (explaining that Supreme Court decisions "remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (internal quotation marks omitted)); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."). *Libretti* is thus dispositive of Bradley's motion.[4]

### 2. *Sixth Circuit case law likewise requires denial of Bradley's motion.*

The Sixth Circuit has also squarely held that the Sixth Amendment's jury-trial right, as interpreted in *Apprendi*, does not extend to criminal forfeiture. *See United States v. Corrado*, 227 F.3d 543, 550-51 (6th Cir. 2000); *United States v. Hall*, 411 F.3d 651, 654-55 (6th Cir. 2005); *United States v. McAuliffe*, 490 F.3d 526, 540 (6th Cir. 2007). This is because the rule of *Apprendi* extends to any fact (other than the fact of a prior conviction) that increases the mandatory minimum or statutory maximum. *See, e.g.*, *Alleyne v. United States*, 570 U.S. 99, 116-17 (2013). The criminal forfeiture statutes, however, "amount[] to a form of indeterminate sentencing, which has never presented a Sixth Amendment problem," because the statutes lack a mandatory minimum or statutory maximum. *Hall*, 411 F.3d at 655.

---

[4] The proposition that the Supreme Court, in its *Apprendi* line of cases, has overruled *Libretti* by implication is further undermined by the Court's remedial opinion in *United States v. Booker*, 543 U.S. 220 (2005). There, the Court addressed "the question of *which* portions of the sentencing statute we must sever and excise as inconsistent with the Court's constitutional requirement." *Id.* at 258. The Court expressly noted that 18 U.S.C. § 3554, which deals with forfeiture, "is perfectly valid" under the Court's constitutional reasoning. *Id.*; *see also United States v. Alamoudi*, 452 F.3d 310, 315 n.2 (4th Cir. 2006) (making the same observation).

14

Thus, even independent of *Libretti* itself, the rule of *Hall* remains binding "unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the Sixth Circuit] sitting *en banc* overrules" it. *Salmi v. Sec'y Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). Contrary to Bradley's suggestion, *Southern Union* does not qualify as an inconsistent decision that requires modification of the *Hall* rule.

In *Southern Union*, the defendant was charged with one count of violating the Resource Conservation and Recovery Act of 1976. *Southern Union*, 567 U.S. at 346. The penalty provision of that statute authorized "'a fine of not more than $50,000 for each day of the violation.'" *Id.* at 347 (quoting 42 U.S.C. § 6928(d)). At trial, the jury was not asked to find the duration of the violation, and was instead advised that it could convict so long as it found that the violation lasted for a single day. *Id.* At sentencing, however, the court concluded that the violation had lasted for 762 days, such that the maximum potential fine under the statute was $38.1 million. *Id.* The court ultimately imposed a fine of $6 million, or 120 times the statutory maximum that was authorized by the jury's verdict. *Id.* After analyzing applicable Sixth Amendment case law, the Court concluded that this fine violated *Apprendi*. *Id.* at 360.

Although the Sixth Circuit has not yet directly addressed *Southern Union*'s applicability to criminal forfeiture, it has addressed its applicability to the closely analogous context of restitution. *See United States v. Sawyer*, 825 F.3d 287 (6th Cir. 2016); *United States v. Churn*, 800 F.3d 768 (6th Cir. 2015). In doing so, the Sixth Circuit has explained that "*Southern Union* does not cast doubt" on its prior conclusion that the jury-trial right does not extend to restitution, noting that "if anything, [*Southern Union*] reinforces [that] decision." *Churn*, 800 F.3d at 782. Before *Southern Union*, the Sixth Circuit had held that the jury-trial right as interpreted by *Apprendi* was inapplicable to restitution "because the restitution statutes do not specify a statutory maximum."

15

*United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005). In *Southern Union*, the Supreme Court reiterated that there could be no "*Apprendi* violation where no statutory maximum is prescribed." *Southern Union*, 567 U.S. at 353. Thus, in the Sixth Circuit's view, "*Southern Union* did nothing to call into question the key reasoning at the heart of *Sosebee*, namely that the restitution statutes do not specify maximum awards," thus making the rule of *Apprendi* inapplicable. *Sawyer*, 825 F.3d at 297 (citing *Churn*, 800 F.3d at 781-82).

The same reasoning dictates the result here. Because the Sixth Circuit has rejected *Apprendi*'s application to the criminal forfeiture statutes on the ground that those statutes lack a statutory maximum, *Hall*, 411 F.3d at 655, and has separately concluded, in the restitution context, that *Southern Union* reinforces, rather than undermines that rationale, *Sawyer*, 825 F.3d at 297, it follows that, in the Sixth Circuit's view, *Southern Union* does nothing to alter the rule of *Hall*.

Indeed, every Circuit to have considered Bradley's exact argument has rejected the contention that *Southern Union* extends the rule of *Apprendi* to forfeiture, with the Supreme Court routinely denying further review in those cases. *See United States v. Lo*, 839 F.3d 777 (9th Cir. 2016), *cert. denied* 138 S. Ct. 354 (2017); *United States v. Stevenson*, 834 F.3d 80, 85-86 (2d Cir. 2016), *cert. denied* 137 S. Ct. 1212 (2017); *Sigillito*, 759 F.3d at 935-36, *cert. denied* 135 S. Ct. 1019 (2015); *United States v. Simpson*, 741 F.3d 539, 559-60 (5th Cir. ), *cert. denied* 134 S. Ct. 2318 (2014); *United States v. Rosbottom*, 763 F.3d 408, 420 (5th Cir. 2014), *cert. denied* 135 S. Ct. 985 (2015); *United States v. Phillips*, 704 F.3d 754, 769-71 (9th Cir. 2012), *cert. denied* 133 S. Ct. 2796 (2013); *United States v. Day*, 700 F.3d 713, 732-33 (4th Cir. 2012), *cert. denied* 133

S. Ct. 2013).[5] Given this uniform body of on-point case law, Bradley's attempt to use *Southern Union* as a basis to overrule *Corrado*, *Hall*, and *McAuliffe* should be rejected.

3. *The history of criminal forfeiture shows that the Sixth Amendment's jury-trial right does not apply.*

As Bradley rightly notes, even if the forfeiture statutes were to fall within the rule of *Apprendi* and *Southern Union* as that rule is typically formulated, that would not be the end of the inquiry. The next step would be to consider "the historical role of the jury at common law" as it applied to criminal forfeiture. *See Oregon v. Ice*, 555 U.S. 160, 170 (2009); *see also Southern Union*, 567 U.S. at 353. Bradley asserts that "the historical record is even clearer [than in *Southern Union*] that juries both at common law and throughout most of American history decided issues of forfeiture." (Mot. at 11.) Recent scholarship on the topic, however, indicates that this is not so.

A law review article has sought to "engage[] in the sort of detailed historical analysis carried out in *Southern Union* and *Ice* in order to determine what (if any) role the jury played in criminal forfeitures at common law." Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: the Role of the Jury at Common Law*, 35 CARDOZO L. REV. 1, 4 (2013). It summarizes the results of that detailed historical analysis as follows:

> Although the Supreme Court has previously analogized criminal forfeitures to criminal fines, modern criminal forfeiture in fact springs from a distinct historical tradition. At common law, the forfeiture of one's estate was an automatic penalty imposed against anyone convicted of a felony—so automatic, in fact, that some early commentators defined "felony" as any crime for which forfeiture was part of the penalty. Unlike modern American criminal law, however, the common law did not limit criminal forfeiture to property bearing a relationship to the offense of conviction; rather, the offender's entire estate was forfeited, either to his lord or to

---

[5] That two Justices recently dissented from the denial of certiorari in a case raising a Sixth Amendment challenge to the calculation of restitution does not help Bradley here. *See United States v. Hester*, 708 F. App'x 441 (9th Cir. 2018), *cert. denied* 139 S. Ct. 509 (2019) (Gorsuch, J., dissenting from the denial of certiorari). Indeed, that denial merely confirms that at least six members of the current Court do not view the issue (at least as it was presented in that case) as worthy of further review.

17

the Crown. This practice largely continued in colonial America. While there is evidence that some early colonial American petit juries served an administrative role in reporting the existence of an offender's property to the court, they found no additional facts (other than those required for conviction), and their failure to identify an offender's property did not preclude later inquest and seizure of the property by government authorities. Shortly after the nation's founding, however, the First Congress banned criminal forfeiture as a penalty for federal crimes. As a result, there is nothing in the English common law tradition of trial by jury, nor in the colonial American tradition, to indicate that the common law gave defendants the right to have any facts supporting criminal forfeiture found by a jury (beyond the facts supporting the conviction itself).

*Id.* at 5-6 (footnotes omitted); *see also id.* at 23 ("[L]ike their English counterparts, colonial juries had no legal power to constrain the forfeiture of the defendant's property through factfinding.").

This scholarship, and the sources cited therein, demonstrates that any right to have a jury determine facts related to forfeiture is statutory in nature—just as the Supreme Court said in *Libretti*—and does not stem from any sort of longstanding constitutional tradition. At a minimum, this scholarship belies Bradley's assertion that the historical record presents a "clear" picture of courts "routinely abiding by the Sixth Amendment in criminal forfeiture proceedings for more than 200 years" before inexplicably "stray[ing] beyond their constitutionally imposed restraints." (Mot. at 14.) The historical evidence therefore provides an independent basis to deny Bradley's motion.

4. <u>Extending the Apprendi rule to criminal forfeiture would pose serious practical problems.</u>

Finally, it is worth noting that extending the *Apprendi* rule to criminal forfeiture would pose serious practical problems. In Bradley's view, the government must allege, and the grand jury must find, the precise amount of the defendant's ill-gotten gains at the moment of indictment; the petit jury must then find all facts related to forfeiture beyond a reasonable doubt at trial. Particularly in the context of long-term or complex criminal cases, any such requirement would pose an extraordinary burden that could undermine ongoing investigations, extend the duration of criminal conduct, grant windfalls to sophisticated criminals, and threaten the rights of victims.

18

As the Sixth Circuit has noted, no court has ever attempted to apply the rule of *Apprendi* to an indeterminate sentencing scheme like forfeiture. *See Hall*, 411 F.3d at 655. Instead, cases involving the *Apprendi* rule have typically involved a discrete question about the defendant's core offense conduct. Was the defendant's crime motivated by racial animus? *Apprendi*, 530 U.S. at 491. Did the defendant's drug-trafficking involve more than five kilograms of cocaine? *United States v. Roberts*, 198 F. App'x 501, 507 (6th Cir. 2006). Did the defendant brandish the firearm that he carried? *Alleyne*, 570 U.S. at 115-16. Did the criminal conduct last for a certain number of days? *Southern Union*, 567 U.S. at 346. These questions are intertwined with the core offense conduct; do not require a separate, collateral financial investigation; and can generally be answered by a simple yes or no.

By contrast, consider what it would mean to apply Bradley's rule to even a run-of-the-mill drug conspiracy. Normally, the government could present the indictment to the grand jury after gathering sufficient evidence to prove that the proposed defendants had knowingly conspired to distribute controlled substances. Under Bradley's rule, however, the government could not indict without first gathering sufficient evidence to prove the total amount of proceeds that each proposed defendant personally obtained during the life of the conspiracy. This would require the government to trace each defendant's assets to identify every dollar, every house, every vehicle that constituted, or was derived from, the proceeds of the crime, or was used in the commission of the crime. If those proceeds had already been dissipated, the government would likewise have to identify suitable substitute assets. That process would inevitably delay indictment, thereby allowing the criminal activity to continue longer than it otherwise would have. And in many cases—such as conspiracies carried out primarily through cash—the relevant questions would be virtually

impossible to answer before indictment without tipping off the members of the conspiracy and jeopardizing the investigation.

These problems would only be compounded in a complex fraud and money-laundering case. Consider a case in which a defendant is charged with a large-scale Ponzi scheme. After he pleads guilty, the government discovers that millions of dollars in proceeds were not dissipated, as the defendant claimed, but were in fact parked in various offshore bank accounts, which were listed under pseudonyms and hidden behind a web of shell companies. In Bradley's view, the defendant should be rewarded for the sophistication of his deception: because the assets held in those accounts had not been identified in the indictment and expressly admitted as forfeitable at the plea hearing, it would be impermissible to make the defendant forfeit them. Indeed, under Bradley's theory, even complex questions of third-party ownership—which are dealt with today in ancillary hearings that often take place after sentencing—would have to be alleged in the indictment and then proved to a jury beyond a reasonable doubt, since those questions pertain to facts that affect the forfeitability of a particular piece of property. As the Advisory Committee has explained, however, "[e]xperience has shown that ancillary hearings can involve issues of enormous complexity that require years to resolve." Fed. R. Crim. P. 32.2 advisory committee notes (citing cases involving of an "ancillary proceeding involving over 100 claimants and $451 million" and "litigation over [a] third party claim continuing 6 years after [a] RICO conviction"). Bradley would cast that experience aside and require all forfeiture-related facts to be alleged as of the date of indictment and proved once and for all by the time of the trial or guilty plea.

In short, it is one thing to say that the government cannot seek the enhanced statutory penalty for brandishing a firearm without first alleging that the defendant actually brandished it, or to say that the government cannot multiply a $50,000-a-day fine by 700 days without first

20

alleging that the crime lasted for 700 days. It is quite another to say that the entire amount of the defendant's ill-gotten gains must be precisely calculated at the outset of the proceedings and included in the indictment, or else the defendant is entitled to keep them. Such an approach would severely undercut the "important governmental interests" embodied in the forfeiture statutes, "such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessening the economic power of criminal enterprises." *Honeycutt*, 137 S. Ct. at 1631 (quotations omitted).

The logic of Bradley's argument would seemingly also require extension of the *Apprendi* rule to restitution. That would mean that, before indicting a case, the government would have to contact every victim of the crime and get a full accounting of his or her losses. Not only would this jeopardize any ongoing investigation, it would inevitably delay indictment and allow the crime to continue far longer than it otherwise would have. Each time a new victim became known after indictment—or each time a known victim's losses increased—the government would presumably have to file a superseding indictment. And if a victim were identified only after the defendant pleaded guilty—as is routinely the case now—that victim would be precluded from receiving restitution. Bradley's rule would therefore result in significant prejudice to crime victims, in contravention of Congress's purposes in enacting the criminal restitution statutes. *See United States v. Church*, 731 F.3d 530, 536 (6th Cir. 2013) ("When Congress enacted § 3663A as part of the Mandatory Victims Restitution Act (MVRA), its stated purpose was 'to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society.'" (quoting S. Rep. 104-179, at 12 (1995))); *United States v. Moreland*, 622 F.3d 1147, 1170 (9th Cir. 2010) ("The primary and overarching goal of the MVRA is to make victims of

crime whole, to fully compensate these victims for their losses and to restore victims to their original state of well-being." (quotations and emphasis omitted)).

Bradley asks the Court to take a longstanding constitutional rule and apply it formalistically to an area of law where it has never been applied. The practical problems and adverse consequences that would flow from this approach further counsel against its adoption.

### B. Even if the Sixth Amendment's Jury-Trial Right Did Apply to Criminal Forfeiture, Bradley's Request for Dismissal of the Forfeiture Allegations Should Still Be Denied.

Even if Bradley's Sixth Amendment argument were correct on the law, it would not entitle him to the relief he seeks, for three reasons. First, the right to trial by jury, like any right, can be waived. *See, e.g.*, *United States v. Leachman*, 309 F.3d 377, 384 (6th Cir. 2002). Indeed, defendants waive their Sixth Amendment jury-trial rights every day by pleading guilty. And when Bradley entered his guilty plea in this case, it was with the explicit understanding that it would be a judge, not a jury, who would decide the extent of his forfeiture obligations. (DE# 1027, Plea Tr., PageID#: 4008-14.) This is not a case in which Bradley entered a guilty plea while specifically requesting that a jury find all facts related to forfeiture. Instead, it is a case where Bradley pleaded guilty with the understanding that the Court would decide forfeiture at sentencing, then extensively litigated the scope of forfeiture without ever requesting a jury determination. Only after the forfeiture order was entered did he first contend that his jury-trial rights—the very rights that he knowingly waived at the plea hearing—had been violated. By belatedly asserting his rights long after he waived them, Bradley lost the ability to seek dismissal.

Second, and relatedly, Bradley's request for the remedy of dismissal was waived when he failed to challenge the adequacy of the indictment before trial. *See* Fed. R. Crim. P. 12(b)(3); *United States v. Brown*, 498 F.3d 523, 527-28 (6th Cir. 2007). Bradley never sought dismissal of the forfeiture allegations before trial, or even before judgment was entered. Even on appeal,

Bradley never requested that the forfeiture allegations be dismissed. Instead, Bradley asked the Court to vacate the forfeiture order and remand for further proceedings, citing a post-*Honeycutt* case that expressly contemplated the recalculation of forfeiture without joint-and-several liability, rather than outright dismissal of the forfeiture allegations. As such, it is too late for him to seek dismissal as a remedy now.

Third, even if Bradley's Sixth Amendment claim had merit and he had adequately preserved it, the appropriate remedy would not be outright dismissal of the forfeiture allegations. *Apprendi* errors of the sort alleged here are not structural in nature and do not mandate automatic reversal, but instead "are considered to be trial-type errors subject to harmless-error review." *See Campbell v. United States*, 364 F.3d 727, 737 (6th Cir. 2004); *see also Goode v. United States*, 305 F.3d 378, 384-85 (6th Cir. 2002) (describing *Apprendi* as a non-watershed procedural rule for purposes of retroactivity).

Reviewing for harmlessness, rather than dismissing the forfeiture allegations outright, would be particularly appropriate here. Given Bradley's failure to raise any Sixth Amendment challenge to forfeiture until after a final judgment was entered, it would be inappropriate to grant him a windfall by allowing him to keep all of his ill-gotten gains, on the basis of a novel legal theory—which no court has ever accepted—that he presented for the first time on appeal.

The Supreme Court has made a similar point in a case involving an *Apprendi* error. *See United States v. Cotton*, 535 U.S. 625 (2002). There, the defendant was charged with and convicted of drug trafficking prior to *Apprendi*. *Id.* at 628. The indictment did not allege, and the jury did not find, any applicable drug quantity. *Id.* At sentencing, however, the district court found the defendant responsible for distributing a quantity of drugs that far exceeded the triggering amount set out in the statute, and sentenced him to 30 years' imprisonment. *Id.* On appeal, the defendant

argued that, in light of the undisputed *Apprendi* error, he should be resentenced with an applicable statutory range of 0-20 years—i.e., the range that would apply absent a finding of a drug quantity high enough to trigger the enhanced statutory range. In rejecting that argument, the Court explained that "[t]he real threat . . . to the fairness, integrity, and public reputation of judicial proceedings would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." *Id.* at 634 (internal quotation marks omitted).

So too here. Bradley engaged in a vast drug-trafficking and money-laundering conspiracy, and lived lavishly as a result. It would be entirely unjust to allow him to keep the proceeds of his crimes on the basis of a procedural error that was never objected to at trial. Thus, even if the Court accepts Bradley's novel legal theory, it should still issue an order that requires him to forfeit any proceeds for which there is overwhelming proof of forfeitability—which would include the real and personal property subject to the original forfeiture order, and (at a minimum) the $854,577 in cash deposits that were made in Tennessee into bank accounts that Bradley controlled.[6]

---

[6] The Sixth Circuit's opinion suggests in passing that Bradley should only be required to forfeit money that he ultimately kept. *See Bradley*, 897 F.3d at 783-84 (noting that the fact that "Jones delivered Buchanan's payments to Bradley tells us nothing about what happened to the money after that," and does not address "whether Bradley kept all of this money"). This appears to allude to an issue that the parties never addressed on appeal—namely, whether § 853's reference to forfeiture of all "proceeds" means forfeiture of *gross receipts* or merely *net profits*. The Sixth Circuit has actually addressed that issue and held that, in this context, "proceeds" means *gross receipts*. *See United States v. Logan*, 542 F. App'x 484, 498 (6th Cir. 2013); *see also, e.g.*, *United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015); *United States v. Peters*, 732 F.3d 93, 101-02 (2d Cir. 2013); *United States v. Simmons*, 154 F.3d 765, 770-71 (8th Cir. 1998) (R. Arnold, J.). Nothing in the Court's passing reference to an un-briefed issue requires a contrary conclusion. In any event, that question can be addressed in subsequent briefing if necessary.

## II.  Bradley's Alternative Request to Forego a Money Judgment Should Be Denied

Bradley next argues that even if the forfeiture allegations against him are not dismissed, the Court should refuse to enter a new forfeiture money judgment now. On this point, Bradley's argument is not constitutional in nature but instead rests on the claim that 21 U.S.C. § 853 does not authorize personal money judgments.

As an initial matter, Bradley waived this argument by failing to raise it on direct appeal. He certainly could have argued that money judgments were unavailable under the statute, but failed to do so, instead arguing only that the money judgment should not be based on a theory of joint-and-several liability. Because Bradley "could have raised his arguments . . . in the prior appeal, but failed to do so, . . . he waived his right to raise these issues before the district court on remand." *See United States v. Adesida*, 129 F.3d 846, 849-50 (6th Cir. 1997). This is because "[t]he law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *Id.* at 850.

In any event, even if Bradley did not waive the argument, it should be rejected on the merits. Section 853 includes procedures designed to preserve and recover criminal proceeds and other tainted property subject to forfeiture. *See* 21 U.S.C. § 853(c), (e). In practice, however, criminals have often dissipated or concealed the proceeds of their offenses by the time they are caught. Congress addressed that problem by enacting a substitute-assets provision, in § 853(p). Section 853(p) states that if, as a result of any act or omission of the defendant, the tainted property subject to forfeiture "cannot be located upon the exercise of due diligence," "has been commingled with other property which cannot be divided without difficult," or meets other statutory criteria of unavailability, then "the court shall order the forfeiture of any other property of the defendant, up to the value of" the unavailable tainted property. *See* 21 U.S.C. § 853(p)(1), (2). As the Supreme

25

Court recently explained, "Section 853(p)(1) demonstrates that Congress contemplated situations where the tainted property itself would fall outside the Government's reach" and "authorized the Government to confiscate [other] assets . . . from the defendant who initially acquired the property and who bears responsibility for its dissipation." *Honeycutt*, 137 S. Ct. at 1634.

As the Supreme Court further explained in *Honeycutt*, when Congress enacted § 853 it added "an *in personam* aspect to criminal forfeiture," thereby "ma[king] it easier for the Government to hold the defendant who acquired the tainted property responsible." *Id.* at 1635. In light of this *in personam* aspect to forfeiture, the Courts of Appeals—including the Sixth Circuit—have uniformly held that the government may obtain a money judgment reflecting the amount of the defendant's forfeiture liability, and may do so even when the amount of the judgment exceeds the defendant's available assets at the time of conviction. *See United States v. Hampton*, 732 F.3d 687, 691-92 (6th Cir. 2013); *see also, e.g.*, *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999); *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Vampire Nation*, 451 F.3d 189, 202-03 (3d Cir. 2006); *United States v. Blackman*, 764 F.3d 137, 145 (4th Cir. 2014); *United States v. Olguin*, 643 F.3d 384, 397 (5th Cir. 2011); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000); *United States v. Smith*, 656 F.3d 821, 827 (8th Cir. 2011); *United States v. Casey*, 444 F.3d 1071, 1073-77 (9th Cir. 2006); *United States v. McGinty*, 610 F.3d 1242, 1246-47 (10th Cir. 2010); *United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008); *United States v. Day*, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008).[7]

---

[7] As Bradley acknowledges, the only cases in which courts have found money judgments to be unavailable under the statute were later reversed or disavowed on appeal. (DE #1125, Mot., PageID#: 4452 (noting that "each district judge was reversed or subsequently overruled by the court of appeals").

Rule 32.2 reflects the same understanding. In 2000, the Advisory Committee recommended, and the Supreme Court promulgated, amendments to the rule that expressly recognize the government's ability to seek a forfeiture money judgment, and establish procedures for money judgments that differ from procedures involving the forfeiture of specific property. Subdivision (a)(1), for example, specifies that the indictment "need not . . . specify the amount of any forfeiture money judgment that the government seeks." Fed. R. Crim. P. 32.2(a)(1). Subdivision (b)(1) further notes that "[i]f the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1). And subdivision (c)(1) states that "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment." Fed. R. Crim. P. 32.2(c)(1). In recommending these amendments, the Advisory Committee observed that "[a] number of cases have approved the use of money judgment forfeitures." Fed. R. Crim. P. 32.2 advisory committee notes (2000). And while the Committee itself "t[ook] no position on the correctness of those rulings," *id.*, Congress allowed the amendments to go into effect, and later enacted a general provision authorizing courts to enter criminal forfeitures "pursuant to the Federal Rules of Criminal Procedure," including Rule 32.2. *See* 28 U.S.C. § 2461(c) (enacted as part of the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Tit. IV, § 410). In light of this history, and the uniform body of case law authorizing money judgments, Bradley's assertion that money judgments contravene congressional intent must be rejected.

Bradley's claim that *Honeycutt* changes the analysis fares no better. As the Eleventh Circuit recently explained, "*Honeycutt* held only that a district court may not hold members of a conspiracy jointly and severally liable for property that a conspirator derived from the crime." *Elbeblawy*, 899 F.3d at 941. "And far from *sub silentio* abolishing *in personam* judgments against

27

conspirators, the Court presumed the continued existence of *in personam* proceedings when it stated that [§ 853] 'adopt[ed] an *in personam* aspect to criminal forfeiture.'" *Id.* (quoting *Honeycutt*, 137 S. Ct. at 1635; *see also United States v. Ford*, 296 F. Supp. 3d 1251, 1256-58 (D. Or. 2017) (addressing the same argument at length and concluding, "[i]n sum, *Honeycutt* did not overrule the universally recognized rule among the federal courts of appeals permitting *in personam* money judgments against criminal defendants"). Indeed, considering that *Honeycutt* itself dealt with a forfeiture money judgment under § 853, *Honeycutt*, 137 S. Ct. at 1630-31, it would be exceedingly odd for the Court to have addressed the *permissible scope* of the forfeiture money judgment if money judgments were unavailable under the statute in the first place.

Because the Sixth Circuit (and every other circuit) has expressly authorized forfeiture money judgments, and because nothing in *Honeycutt* "requires modification" of that rule, *Salmi*, 774 F.2d at 689, the Court should deny Bradley's belated request to decline to include a money judgment as a component of the forfeiture order.

<h2 style="text-align:center">CONCLUSION</h2>

Bradley's request to dismiss the forfeiture allegations or, in the alternative, decline to enter a new money judgment, should be denied. After his motion is denied, the Court should issue a new forfeiture order that fully complies with *Honeycutt*. In the government's view, that forfeiture order should include all of the real and personal property included in the prior forfeiture order, plus a money judgment of at least $854,577, which represents an extremely conservative estimate of the proceeds that Bradley personally obtained. The government is prepared to submit additional evidence or argument to assist in the Court's calculation of a new forfeiture order, should the Court find such evidence or argument useful.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

**s/ *Cecil W. VanDevender***
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 11, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for defendant Benjamin Bradley.

*s/ Cecil VanDevender*
CECIL VANDEVENDER