UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cr-00037-2 |
| | ) | |
| BENJAMIN BRADLEY, | ) | Judge Trauger |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENTAL MEMORANDUM
## IN SUPPORT OF MOTION FOR FORFEITURE

The Court has scheduled an evidentiary hearing for May 24, 2019, to determine (1) the forfeitability of the real and personal property identified in the government's motion for a preliminary order of forfeiture, and (2) the appropriate amount of the forfeiture money judgment in light of *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). (*See* DE# 1163, Order.)[1] At the hearing, the government expects to call two witness to testify about relevant facts, but will otherwise rely on testimony and documentary evidence introduced at Bradley's sentencing hearing. The government respectfully submits this memorandum to set forth its views on why the Court should re-enter an order of forfeiture that includes the previously identified real and personal property as well as a money judgment in the amount of $1,000,000.

---

[1] The government notes in passing that when the Court granted Bradley's motion to expand the scope of the evidentiary hearing, it described Bradley's request as "unopposed." (DE# 1163, Order, PageID#: 4644.) The government actually opposed Bradley's request, but does not seek reconsideration of the order on those grounds now. (*See* DE# 1157, Motion, PageID#: 4626 (noting that "[t]he government opposes this motion.").)

## I. FORFEITURE OF THE REAL AND PERSONAL PROPERTIES

The government first seeks forfeiture of two parcels of cash and four[2] real properties. (DE# 858, Motion for Preliminary Order of Forfeiture; *see also* DE# 279, Bill of Particulars; DE# 432, Bill of Particulars.) As set forth below, the Court should adhere to its prior decision granting forfeiture of these pieces of real and personal property.

### A. *Applicable law*

The background and applicable law are set forth in the Court's memorandum of June 22, 2017. (DE# 1004, Memorandum.) In short, where (as here) the government has provided proper notice to the defendant of its intent to seek forfeiture, the defendant "shall forfeit to the United States" (1) "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation," and (2) "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." 21 U.S.C. § 853(a)(1), (2). When the government establishes by a preponderance of the evidence (1) that the property at issue "was acquired by [the defendant] during the period of the violation" and (2) that "there was no likely source for such property other than the violation," that triggers "a rebuttable presumption" that the property "is subject to forfeiture." 21 U.S.C. § 853(d).

### B. *The parcels of cash*

The government first seeks forfeiture of two parcels of cash that were discovered during the execution of search warrants on March 12, 2015. A parcel of $46,300 was found hidden behind

---

[2] The Court's prior order included forfeiture of five real properties. (DE# 1005, Order.) One of those real properties—located at 14425 Curtis Street—has since been found to have a net equity that was too low to make forfeiture worthwhile for the government. As such, the government released its lis pendens on the property and no longer seeks to forfeit it. Accordingly, the government submits that the property at 14425 Curtis Street should not be included in any forfeiture order issued by the Court. The neighboring property, at 14427 Curtis Street, however, should still be included.

2

a bar in Bradley's parents' home on Prevost Street, where Bradley also stored pills. (DE# 919, Sentencing Hearing Tr., PageID#: 3302-04.) And a parcel of $78,300 was found in Bradley's home on Harmony Lane, with some of the cash "vacuum sealed" and some "in bundles." (*Id.* at PageID#: 3329-30.) There does not appear to be any dispute that these parcels of cash represent the direct proceeds of drug-trafficking and are forfeitable as such.

### C. *The real properties*

The government next seeks forfeiture of four pieces of real property. When the issue was previously litigated, Bradley did not contest the forfeitability of the properties on Curtis Street, Lesure Street, and Ohio Street and "dispute[d] only the forfeiture of the parcel located at 45669 Harmony Lane." (DE# 1004, Memorandum, PageID#: 3888.) The Court ultimately found that the Harmony Lane property was subject to a presumption of forfeitability because Bradley purchased it in 2014—five years into the conspiracy—and paid roughly $100,000 in cash for it, at a time when he made approximately $55,000 per year in legitimate income. (*Id.* at PageID#: 3892-93.) "Likewise . . . the location, manner of storage and packing of the currency sought for seizure constitutes evidence that the real property sought for forfeiture was either purchased with the use of commingled funds or with cash that was not obtained through legitimate activity." (*Id.* at PageID#: 3893.) And because Bradley "offered no evidence to rebut" the presumption of forfeitability, the Court overruled Bradley's objections to forfeiture. (*Id.*) Absent additional evidence from Bradley presented at the hearing, the Court should adhere to its prior reasoning and order forfeiture of the real properties.

Bradley also previously objected to forfeiture of the Harmony Lane residence on the grounds that he no longer owned it, since he had transferred it to his wife, Kareema Hawkins, via quitclaim deed shortly after he was indicted. As the Court correctly noted, that argument may have

3

been relevant to a substitute-property analysis under § 853(p), but became moot when the Court found that the Harmony Lane property was directly forfeitable under § 853(a). (*Id.* at PageID#: 3893.) *See also* Fed. R. Crim. P. 32.2 advisory committee notes (2000) (noting that "[t]he defendant would have no standing to object to the forfeiture on the ground that the property belonged to someone else"). Nevertheless, should the validity of the transfer become relevant, either at the May 24 hearing or in subsequent ancillary proceedings, the government is prepared to put on evidence showing that the transfer was fraudulent, insofar as it bore the notary stamp and signature of Sonja Halton, who has stated that she did not sign or notarize the quitclaim deed.

## II. THE FORFEITURE MONEY JUDGMENT

The government next seeks the entry of a forfeiture money judgment in the amount of $1,000,000. (DE# 861, Motion for Money Judgment.) This amount is fully consistent with *Honeycutt* and with the Sixth Circuit's remand order, and represents a very conservative estimate of Bradley's forfeiture liability.

### A. Applicable law

As noted, federal drug laws mandate the forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. § 853(a)(1). In *Honeycutt*, the Supreme Court construed this language—with its focus on what the defendant "obtained"—to preclude the imposition of joint and several forfeiture liability. *Honeycutt*, 137 S. Ct. 1632-33. As such, a defendant can be required to forfeit only the proceeds that he personally obtained as a result of his crime; he cannot be required to forfeit, on *Pinkerton* grounds, proceeds obtained by a co-conspirator. *Id.*

A person "obtains" the proceeds of a crime (or the property derived therefrom), within the meaning of *Honeycutt*, when he has "personal possession" of them or comes into the "enjoyment"

4

of them "by [his] own effort." *Id.* at 1632. By contrast, a person does not obtain the proceeds of a crime when he has no "ownership interest" over them and does not "personally benefit" from them. *Id.* at 1635. This rule is consistent with the general principle of forfeiture law equating ownership of property with having "dominion and control" over it. *See, e.g.*, *In re Bryson*, 406 F.3d 284, 291 (4th Cir. 2005).

Prior to *Honeycutt*, the well-settled rule in this and other Circuits was that the term "proceeds" in the forfeiture statutes refers to *gross receipts* rather than to *net profits*. *See United States v. Logan*, 542 F. App'x 484, 498 (6th Cir. 2013); *see also, e.g.*, *United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015); *United States v. Peters*, 732 F.3d 93, 101-02 (2d Cir. 2013); *United States v. Olguin*, 643 F.3d 384, 399 (5th Cir. 2011); *United States v. Bucci*, 582 F.3d 108, 121-24 (1st Cir. 2009); *United States v. Keeling*, 235 F.3d 533, 537 (10th Cir. 2000) *United States v. Simmons*, 154 F.3d 765, 770-71 (8th Cir. 1998); *United States v. DeFries*, 129 F.3d 1293, 1313-14 (D.C. Cir. 1997) (per curiam); *United States v. McHan*, 101 F.3d 1027, 1041-42 (4th Cir. 1996).

Nothing about *Honeycutt*'s rejection of joint and several liability changed that well-settled rule. *See, e.g.*, *United States v. Ward*, 2017 WL 4051753, at *3 (W.D. Mich. Aug. 24, 2017) ("*Honeycutt* does not suggest that calculating forfeiture based on gross proceeds is improper."), *R&R adopted by* 2017 WL 3981160 (W.D. Mich. Sep. 11, 2017); *see also United States v. Levya*, 91 F.3d 14, 29 (D.C. Cir. 2019) (noting, more than eighteen months after *Honeycutt*, that the defendant "concedes that 'proceeds' in § 853 means gross receipts, not net profits").

Thus, once a defendant obtains proceeds of the crime—that is, comes into personal possession of them, personally benefits from them, exercises dominion and control over them—it is irrelevant how he chooses to spend them thereafter. "Congress sought to punish equally the thief who carefully saves his stolen loot and the thief who spends the loot on 'wine, women, and song.'"

5

*United States v. Newman*, 659 F.3d 1235, 1243 (9th Cir. 2011). Likewise, Congress did not intend for the leader of a drug conspiracy to be able to deduct from his forfeiture liability whatever sums he used to pay off his underlings or to purchase additional drugs. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 199 (1983) (explaining that the RICO forfeiture provision, which is materially identical to § 853(a)(1), uses "the term 'proceeds' . . . in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits"). Indeed, a contrary approach would open the door to absurd results if a defendant were able to claim that whatever "business expenses" that go along with being a drug dealer should be written off for forfeiture purposes. *See Ward*, 2017 WL 4051753, at *3 (rejecting the argument "that the Court should take into account the actual expenses of producing and selling the marijuana, such as 'wages, rent, water, electricity, soil, fertilizer, tools, transportation, etc[.]' and employee theft").

In sum, the Court must now determine the value of the proceeds (i.e., the gross receipts) that Bradley personally obtained as a result of the drug conspiracy of which he was convicted. Doing so does not require "mathematical exactitude" and can be based on "reasonable extrapolations" from the facts, including from the quantity of drugs the defendant sold. *See United States v. Prather*, 456 F. App'x 622, 626 (8th Cir. 2012). As set forth below, $1,000,000 remains a very conservative estimate of the proceeds that Bradley obtained.

### B. *$1,000,000 remains a conservative estimate of what Bradley "obtained"*

#### 1. <u>The $854,577 in cash transfers represents a small subset of what Bradley obtained</u>

The clearest evidence of how much money Bradley obtained from his criminal activity comes from bank records. As documented at Bradley's sentencing hearing, Bradley sold thousands of pills to co-defendant Donald Buchanan, who in turn sold the pills to others and transferred Bradley's share of the profits back to him. (DE# 919, Sentencing Tr., PageID#: 3169-71, 3348-

6

Case 3:15-cr-00037   Document 1176   Filed 05/20/19   Page 6 of 14 PageID #: 4703

51.) For part of the conspiracy, Buchanan did so by making cash deposits at banks in Tennessee into accounts owned or controlled by Bradley. (*Id.*) Specifically, bank records showed that, between 2012 and 2014, Buchanan (or people acting at his direction) deposited $854,577 into accounts owned by either Bradley, Hawkins, or co-defendant Felicia Jones. (*Id.* at PageID#: 3348-51.) As Jones explained at sentencing, she would withdraw any money she received into those accounts and give it to Bradley, keeping only $50 for herself. (*Id.* at PageID#: 3169-71.)

The $854,577 in laundered proceeds represents the minimum possible amount for the forfeiture money judgment, as there is no doubt that Bradley personally benefited from that money and had dominion and control over it. The cash deposits made by Buchanan between 2012 and 2014, however, represent only a portion of the total proceeds that Bradley obtained. The conspiracy began in 2009, and prior to 2012 the money was delivered to Bradley by mail or by hand. As Jones explained at the sentencing hearing, the cash deposits stopped in roughly June 2014, when Buchanan and Bradley became concerned that their money laundering would be detected. (*Id.* at PageID#: 3170-73.) The conspiracy, however, continued for more than eight additional months. During that time, Buchanan (or people acting at his direction) hand-delivered money to Bradley on a near-weekly basis, either directly or by giving it to Jones or others, who in turn passed it along to Bradley.

The investigation provided two snapshots that revealed just how substantial each of these hand-deliveries were. First, on January 8, 2015, agents learned through wiretap interceptions that Buchanan would be flying from Nashville to Detroit to meet with Bradley, and had enlisted a friend who worked at the airport to help him get a large sum of cash through security. Buchanan later told agents that he had roughly $12,000 in cash with him that day, with some of it hidden in his shoes. Second, on March 12, 2015, Buchanan was arrested as he left his house in Antioch to

7

drive to Cincinnati to meet Jones. Inside his car, he had $24,830 in cash that he was planning to hand to Jones to deliver to Bradley.

Taking these two snapshots and extrapolating them over the eight-plus months between June 2014 and March 2015 yields additional proceeds obtained by Bradley of between $288,000 and $595,920 (assuming three trips per month). Adding even the lowest amount of $288,000 to the prior total of $854,577 brings the total to $1,142,577. And that figure does not even include money that Bradley obtained from Buchanan between 2009 (when the conspiracy began) and 2012 (when the cash deposits first started).

It is also worth emphasizing that these sums represent the amount of proceeds that Bradley received from Buchanan alone. As the investigation made clear, Bradley was also selling pills to other people in Middle Tennessee, including co-defendant Bobby Robertson, who was stopped on December 5, 2014 with 1,058 Oxymorphone pills. Likewise, in an intercepted call between Bradley and co-defendant Eric McEwen on March 2, 2015,[3] McEwen complains to Bradley that Buchanan has stolen most of his customers in Middle Tennessee, making it impossible to pay the increased prices Bradley was now demanding. In response, Bradley tells McEwen that Buchanan "ain't the only n**** I f*** with, bro. . . . I got two or three people." And Bradley also sold to buyers in the Detroit area. Given that Bradley obtained more than $1,000,000 from Buchanan alone, a $1,000,000 money judgment would represent a very conservative estimate of the money that he obtained during the conspiracy.

---

[3] (*See* TT9, Call 3192.)

Case 3:15-cr-00037   Document 1176   Filed 05/20/19   Page 8 of 14 PageID #: 4705

### 2. *Other evidence shows that Bradley obtained millions of dollars in gross receipts and over $1,000,000 in net profits.*

The Court can also calculate the appropriate amount of the money judgment on the basis of the number of pills Bradley sold. At sentencing, the Court adopted Probation's estimate that Bradley sold 186,412 pills. This estimate was supported by the testimony of co-defendant Pamela O'Neal, who testified about hundreds of pills being dropped off at her house every day. (DE# 919, Sentencing Hearing Tr., PageID#: 3241-43.) The price of each pill varied by type, with Bradley selling Oxycodone 30 mg pills to Buchanan for $9 to $10 per pill and selling him the more valuable Oxymorphone pills for $20 to $22 for the 15 mg pills and $30 to $32 for the 40 mg pills. Even giving Bradley the benefit of the doubt and assuming that *all* of those pills were the cheaper Oxycodone pills, this would still result in gross receipts of $1,677,708—far in excess of the $1,000,000 money judgment the government seeks. And if the Court were to use a more realistic mix of pills—say, 50% Oxycodone 30 mg pill; 25% Oxymorphone 15 mg pills; and 25% Oxymorphone 40 mg pills—that would yield total proceeds to Bradley of $3,169,004. This much higher number represents the forfeiture amount that would be most consistent with the facts and the law. Nevertheless, in order to err on the side of caution and give Bradley the benefit of the doubt, the government is seeking less than a third of that figure here.[4]

Indeed, it is worth noting that even if the law were to change such that *net profits*, rather than gross receipts, became the proper measure of forfeiture liability, Bradley would still be required to forfeit $1,000,000. In the March 2, 2015 call between Bradley and McEwen referenced

---

[4] The street value of the pills sold likely exceeded $10 million, given that Oxycodone pills typically sold for approximately $1 per milligram and Oxymorphone pills typically sold for approximately $3 per milligram. (DE# 919, Sentencing Hearing Tr., PageID#: 3316-17.) Even before *Honeycutt*, the government has not sought to hold Bradley liable for anywhere close to the total amount obtained by the conspiracy as a whole.

9

above, the two men discuss the fact that Bradley is increasing his prices in response to his own increased costs. He explains that McEwen will now have to pay $32 per pill (presumably for the 40 mg Oxymorphone pills), because Bradley is now "paying 26, sometimes 27." As Bradley puts it, "I got to make something. I can't just make two dollars, three dollars, that's preposterous." Instead, Bradley insists on making $5 or $6 per pill at a minimum. (Presumably, he obtained a higher markup when selling to other buyers with less negotiating leverage.) Even a $5.50 profit per pill, multiplied by 186,412 pills would yield $1,025,266—again, more than the amount of the money judgment that the government seeks, even on the assumption that *Honeycutt* requires a change from gross receipts to net profits.

> 3. *Nothing in the Sixth Circuit's opinion precludes the re-entry of a $1,000,000 money judgment.*

The government acknowledges that when the Sixth Circuit vacated the forfeiture order, it refused to find that any *Honeycutt* error was harmless, noting that the government's argument on this point relied on math that was "too wishful to uphold this million-dollar order." *Bradley*, 897 F.3d at 783. The government also acknowledges the Court's statement regarding the ultimate disposition of the money that Jones gave to Bradley: "That Jones delivered Buchanan's payments to Bradley tells us nothing about what happened to the money after that. The evidence says nothing about whether Bradley kept all of this money—an improbable development in an eighteen-member conspiracy." *Id.* Neither of these statements precludes the re-entry of a $1,000,000 money judgment.

The first statement simply underscores the Sixth Circuit's view that the safer course, on balance, is "to vacate the entire forfeiture order and remand to the district court so that it can conduct fresh factfinding and figure out 'an amount proportionate with the property [Bradley] actually acquired through the conspiracy.'" *Id.* at 783-84 (quoting *United States v. Elliott*, 876 F.3d

10

855, 868 (6th Cir. 2017)). The evidence described above and put on at the hearing will provide an ample basis for finding that Bradley acquired more than $1,000,000 through the conspiracy.

The second statement addresses an issue that was never raised, briefed, or argued on appeal. And given its placement as one of many justifications for refusing to find harmless error, it should not be read to require a dramatic departure from settled law. As noted above, what matters (even after *Honeycutt*) is what the defendant personally obtained—i.e., took personal possession of, benefitted from, or exercised dominion and control over. What he did with the money after obtaining it is irrelevant. We know, for example, that Bradley spent some of the money on things like $20,000 cabanas in Las Vegas, flights on private airplanes, fancy sneakers, and drinks at a nightclub. Those expenditures clearly cannot be deducted from his forfeiture liability. That Bradley spent some of the money to pay Jones for her time delivering and counting pills for him is no different.

Moreover, even if the money that Bradley paid to Jones and other coconspirators could be deducted from the total for forfeiture purposes, it would not change the result. The witnesses at the sentencing hearing explained that Bradley would pay them very modest sums in exchange for the work they did for him. Jones explained that either Bradley or Buchanan would typically pay her $50 to mail packages for them, back when the pills were being sent through the mail. She was likewise paid $50 each time she picked up money that Buchanan had deposited in her bank account and delivered it to Bradley. The trips that she took to meet Buchanan in Cincinnati initially resulted in payments of $500 per trip (plus $100 for gas), which was later reduced to $350 per trip. Even granting the generous assumption that, between 2012 and March 2015, Bradley paid out $2,000 per month to Jones and other coconspirators, that would amount to less than $80,000 total. Given the forfeiture calculations set forth above, a money judgment of $1,000,000 would therefore be

11

appropriate even if there were some basis to deduct payments to Jones and others from Bradley's forfeiture liability.

> **C. Forfeiture of the real and personal properties will be credited against the money judgment, mitigating any concerns about unfairness.**

The government recognizes the Court's view that "saddling defendants who have spent years in jail with large forfeiture judgments is very unfair." (DE# 1123, Status Conference Tr., PageID#: 4427.) The government notes, however, that there are several factors that mitigate any unfairness concerns here.

First, the law would permit the government to seek forfeiture in excess of $3,000,000, given the quantity, mix, and price of the pills that Bradley actually sold. Although $1,000,000 is certainly a significant sum, it represents a fairly small portion of what Bradley obtained by spending years as a high-level dealer in diverted prescription opioids.

Second, forfeiture of the real and personal properties will be credited against the money judgment. (DE# 1004, Memorandum, PageID#: 3888.) The two parcels of cash alone reduce Bradley's money judgment by $124,600. The house on Harmony Lane is currently listed for sale for $449,900.[5] Commercial databases estimate the market values of the remaining three properties as $61,800, $64,000, and $59,000, respectively.[6] To be sure, the ultimate sales prices could be lower (or higher), and some of the properties may still be subject to unpaid liens (although a 2017 analysis showed a net equity for the Harmony Lane house of over $400,000). But if the properties

---

[5] *See* https://www.realtor.com/realestateandhomes-detail/45669-Harmony-Ln_Belleville_MI_48111_M40660-07026.

[6] *See* https://www.realtor.com/realestateandhomes-detail/14427-Curtis-St_Detroit_MI_48235_M39496-21116 (Curtis Street); https://www.realtor.com/realestateandhomes-detail/16617-Lesure-St_Detroit_MI_48235_M37998-37921 (Lesure Street); https://www.realtor.com/realestateandhomes-detail/15355-Ohio-St_Detroit_MI_48238_M46806-66406 (Ohio Street).

are ultimately sold at the current estimated prices, the proceeds (when combined with the parcels of money) would leave Bradley with a forfeiture obligation of $240,700—a significant amount, certainly, but far lower than the top-line figure of $1,000,000.

Third, it is entirely possible that Bradley has hidden away assets that could be used to satisfy some or all of the remaining amount. When the search warrants were executed, agents found large bundles of cash in properties owned or controlled by Bradley, with some of the money vacuum-sealed or hidden out of view. Agents only searched a small fraction of the approximately 17 properties that Bradley owned in the Detroit area at the time of the search warrants. (DE# 919, Sentencing Hearing Tr., PageID#: 3352.) Bradley also used gold coins and scrap gold to purchase the home on Harmony Lane, suggesting that at least some of his money was held in the sort of non-traditional assets that would be very difficult to trace. (DE# 986-1, DeSantis Affidavit, PageID#: 3818.) It stands to reason that Bradley may well have additional assets hidden away that he can use to satisfy at least a portion of his forfeiture liability, further mitigating the amount of debt he will have when he completes his sentence. In any event, to the extent that he will continue to owe money on his forfeiture judgment after his sentence is complete, that is entirely a function of the fact that Bradley chose to spend years enriching himself by trafficking in prescription opioids, while dissipating at least some of the ill-gotten proceeds on "'wine, women, and song.'" *Newman*, 659 F.3d at 1243.

### III. CONCLUSION

As set forth above, the government respectfully submits that, after considering the evidence presented at the upcoming hearing, the Court should order forfeiture of the two parcels of cash and the four real properties identified in the motion for a preliminary order of forfeiture, and should enter a forfeiture money judgment in the amount of $1,000,000.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

*s/ Cecil W. VanDevender*
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for defendant Benjamin Bradley.

*s/ Cecil VanDevender*
CECIL VANDEVENDER