No. 3:15-cr-00037-2
IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

UNITED STATES OF AMERICA,

*Plaintiff*,

vs.

BENJAMIN BRADLEY,

*Defendant*.

---

## BENJAMIN BRADLEY'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS FOR FORFEITURE

---

Benjamin Bradley respectfully submits this Memorandum of Law in Opposition to the Government's Motion for Entry of a Preliminary Order of Forfeiture (DE# 858) and Motion for an Order of Forfeiture Consisting of At Least $1,000,000 United States Currency Money Judgment (DE# 861) (collectively, "Forfeiture Motions").

## ARGUMENT

The government has not carried its burden of proof. The Forfeiture Motions seek forfeiture of Bradley's four real properties (the "Properties")[1] and two parcels of currency seized from his and his parents' homes (the "Currency").[2] To obtain forfeiture, however, the

---

[1] The Properties consist of: (i)14427 Curtis St., Detroit, MI 48235 ("Curtis Street"); (ii) 16617 Lesure, Detroit, MI 48235 ("Lesure Street"); (iii)15355 Ohio Street, Detroit, MI 48238 ("Ohio Street"); and (iv) 45669 Harmony Lane, Belleville, MI 48111 ("Harmony Lane") (DE# 858, Motion for Preliminary Order of Forfeiture, PageID# 2752.)

[2] The Currency consists of: (i) $46,300 seized from Bradley's parents' house, located at 15540 Prevost Street, Detroit, Michigan on March 12, 2015; and (ii) $78,300.00 United States currency seized from Harmony Lane. (DE# 858, Motion for Preliminary Order of Forfeiture, PageID# 2752.)

government must establish a sufficient connection between those assets and Bradley's drug-distribution offense. *See* 21 U.S.C. § 853. The government has not done so here. Instead, it merely points to Bradley's conviction and his possession of these assets, asking the Court to draw an inference between the two. (*See* DE# 1176, Gov't Supp. Mem., PageID# 4699-4701.) Section 853 requires more. The Court should deny forfeiture of the Properties and the Currency.

In addition, the government seeks entry of a money judgment against Bradley requiring him to pay up to $1,000,000 after completing his 17-year prison sentence. (DE# 861, Motion for Money Judgment, PageID# 2795.) Here, too, the government bears the burden of proof. The Sixth Circuit instructed the government that it would need to establish Bradley's net share of the conspiracy's proceeds on remand. *United States v. Bradley*, 897 F.3d 779, 783 (6th Cir. 2018). The government has not attempted that task. (DE# 1185, Hearing Tr., at 40-41.) In any event, the record does not support a $1,000,000 money judgment—regardless of whether the standard is gross or net proceeds. The Court should deny the government a money judgment or, alternatively, grant one of a substantially lesser amount.

## I. The Court should deny forfeiture of the Properties and the Currency

### A. The government is not entitled to the Section 853(d) presumption

The government attempts to rely on a rebuttable presumption that the Properties are subject to forfeiture. (DE# 1176, Gov't Supp. Mem., PageID# 4700.) That presumption, codified in 21 U.S.C. § 853(d), provides that property belonging to a defendant convicted of a drug-distribution violation is presumptively forfeitable upon two conditions:

> (1) that the property was acquired during the period of the violation; and
>
> (2) that "there was no likely source for [the] property other than the violation."

2

To gain the presumption, however, the government must establish both elements beyond a preponderance of the evidence. *Id.* It has failed to do so here.

Bradley had substantial legitimate income before and during the conspiracy. Between 2010 and 2014, he earned over $292,000 through pension distributions, real estate sales, and his work at Sinai Grace Hospital. (DE# 1185, Hearing Tr., at 62-74; *see also* Ex. 1A, 2A, 3A, 5A, and 6A.)[3] In fact, the Court noted this substantial income as one justification for Bradley's prison sentence. (DE# 919, Sentencing Tr., PageID# 3430 ("He had a good occupation . . . He had a good business of buying houses . . . Plenty of money, it looks like, to support his family on.").) And Bradley paid barely any federal income tax on those earnings. (Defs. Ex. 1A, 2A, 3A, 5A, and 6A.) As IRS Agent William DeSantsis testified, Bradley's "total income figure . . . is about what he made" after taxes. (DE# 1185, Hearing Tr., at 67.) Thus, Bradley took home roughly $290,000 in post-tax, legitimate income between 2010 and 2014.

Bradley's income also significantly understates the total amount of legitimate funds at his disposal. In 2013, he received $99,700 from the sale of 11 investment properties. (Defs. Ex. 4A.) But he reported a gain on those sales of only $23,529—meaning that Bradley collected an additional $76,171 in legitimate funds not reflected by his income. (*See id.*) Similarly, Bradley received $90,465 in sales through his event promotion business in 2014, none of which is reflected in his income because the business operated at a loss. (Defs. Ex. 6A, at 5.) Bradley's total legitimate cash flow throughout this period was therefore in excess of $450,000.

In contrast, Bradley purchased the Properties for very modest sums. Agent DeSantsis testified that Bradley paid $1,800 for Curtis Street, $3,000 for Lesure Street, and $900 for Ohio

---

[3] More specifically, Bradley earned $56,435 in 2010 (Defs. Ex. 1A), $68,112 in 2011 (Defs. Ex. 2A), $55,030 in 2013 (Defs. Ex. 3A), $68,007 in 2013 (Defs. Ex. 5A), and $44,937 in 2014 (Defs. Ex. 6A).

Street—a mere $5,700 combined. (DE# 919, Sentencing Tr., PageID# 3353.) With regard to Harmony Lane, Agent DeSantis suggested that Bradley paid somewhere between $91,350 and $100,000 in periodic payments between November of 2012 and January of 2014. (DE# 1185, Hearing Tr., at 47-49.)[4] Collectively, therefore, the government contends that Bradley paid as little as $97,050 in total for the Properties. That sum—when contrasted with nearly three times as much legitimate, after-tax income—does not support a finding that "there was no likely source" of legitimate funds for Bradley's purchase of the Properties. *See* 21 U.S.C. § 853(d)(2). Consequently, Section 853(d)'s presumption does not apply.

B.      **The government has not connected the Properties to Bradley's drug-distribution violation**

Without Section 853(d)'s presumption, the government bears the full burden of proving the Properties are tainted by Bradley's drug-distribution offense. The government may meet that burden in two ways. First, it can prove Bradley "used, or intended to [] use[]" the Properties to facilitate his drug-distribution offense. 21 U.S.C. § 853(a)(2). The government appears not to rely on that theory here. (*See* DE# 1176, Gov't Supp. Mem., PageID# 4700-01; DE# 1185, Hearing Tr., at 89-92.) Second, the government can prove that the Properties "constitute[e], or [are] derived from, any proceeds" of Bradley's drug-distribution offense. 21 U.S.C. § 853(a)(1). The government briefly suggested its reliance on this second theory—that Bradley purchased the Properties with illicit proceeds—at the Evidentiary Hearing on May 24, 2019. (DE# 1185, Hearing Tr., at 91.) But the government has not produced any evidence sufficient to support a finding that Bradley purchased the Properties with illicit proceeds.

---

[4]     A file-stamped transcript of the Evidentiary Hearing held on May 24, 2019 is not yet available. Thus, all citations thereto rely on internal pagination numbers.

1.    *Harmony Lane*

The government's evidence concerning Bradley's purchase of Harmony Lane consists almost entirely of Agent DeSantis's testimony about conversations he had with Majid Krikor. (*See generally* DE# 1185, Hearing Tr.)   This testimony does not indicate Bradley paid for Harmony Lane with funds drawn from an account where he stored illicit proceeds. (*See id.* at 44-56.)   Nor does it establish any other direct link between payments Bradley received through the conspiracy and the funds used to purchase Harmony Lane. (*Id.*)   Instead, Agent DeSantis testified that Kirkor told him Bradley purchased Harmony Lane by making periodic payments in gold coins and watches, totaling roughly $100,000 in value, between November of 2012 and January of 2014. (*Id.* at 47-48.)   The government asserts the purported method of Bradley's payments—in gold and over a 14-month period of time—supports an inference that Bradley purchased Harmony Lane with illicit proceeds. (*Id.* at 90-91.)

Proof of payment in gold is insufficient for the government to carry its burden.   Section 853(a)(ii) requires the government to prove that Harmony Lane "constitute[s], or [is] derived from, any proceeds" of Bradley's drug-distribution offense.   DeSantis and Krikor have not provided any testimony on the origin of the supposed gold payments.   Nor has the government ever suggested Bradley received gold in payment for drugs.   In contrast, Bradley's tax records show ample resources for his purchase of Harmony Lane—whether he paid in gold or otherwise. (Defs. Ex. 1A, 2A, 3A, 4A, and 5A.)   In particular, Bradley's 2013 tax return lists the sale of 11 real estate properties in 2013. (Defs. Ex. 4A.)   The proceeds from those sales totaled $99,700. (*See id.*)   Thus, contrary to the government's assertions, the strongest inference supported by the record is that Bradley merely reinvested his real estate proceeds into Harmony Lane.

5

Moreover, Majid Krikor's statements are not reliable. He has repeatedly provided the government with conflicting accounts of the price and method of Bradley's purchase of Harmony Lane. In 2017, Krikor told Agent DeSantis Bradley had purchased the property in 2014 for exactly $105,000. (DE# 1185, Hearing Tr., at 57; DE# 986-1, DeSantis Aff., PageID# 3818.) His 2014 tax return, however, lists the sale at $91,350. (DE# 1185, Hearing Tr., at 49; Gov't Ex. 3A.)[5] Perhaps recognizing this discrepancy, Krikor changed his story in 2019, telling DeSantis that he "didn't remember the exact sale price" but that it was "around $100,000." (DE# 1185, Hearing Tr., at 50, 59.)

Similarly, Krikor appears to have originally told DeSantis that Bradley paid for Harmony Lane in one, lump-sum payment. (DE# 986-1, DeSantis Aff., PageID# 3818-19.) DeSantis's affidavit devotes four paragraphs to summarizing Krikor's 2017 recollection and makes no mention of either the transaction beginning in 2012 or Bradley making installment payments. (*See id.*) In 2019, Krikor changed his story. He now claims Bradley paid for Harmony Lane in gold installments over the course of "a year or so." (DE# 1185, Hearing Tr., at 47.) Once again, however, Krikor's tax records contradict his statements. Krikor reported the entirety of the purported sale on his 2014 tax return. (Gov't Ex. 3A.) Had Krikor received periodic payments from Bradley between November of 2012 and January 2014, he would have reported those payments on his 2012 and 2013 tax returns, leaving only a fraction of the overall sales price for

---

[5]    While Agent DeSantis attempted to speculate as to what could cause this discrepancy (DE# 1185, Hearing Tr., at 50), he admitted Krikor "didn't offer an explanation." (*Id.*) Nor does it appear that the government inquired.

2014. I.R.S. Publ'n 537 (2018), *https://www.irs.gov/publications/p537*. The government provides no explanation for this discrepancy.[6]

The Court should not rely solely on Krikor's statements regarding when and how Bradley purchased Harmony Lane, given the numerous inconsistencies in Krikor's other reported statements concerning the sale. Krikor's statements are rendered even less reliable by their lack of exposure to cross-examination due to the government's decision to use Agent DeSantis as a conduit for Krikor's testimony. Indeed, one possible inference is that Krikor may have felt pressure to say whatever he thought the government wanted to hear in hopes of avoiding further scrutiny into his tax records. Despite legitimate reasons to doubt Krikor's veracity, the government does not appear to have sought further corroboration of the alleged gold payments. Given the lack of reliability of the testimony, the lack of evidence that the purported gold payments were drug payments, and the presence of other, legitimate sources of income, the Court should find the government failed to meet its burden of showing Bradley purchased Harmony Lane with illicit proceeds.

### 2. *Curtis Street, Lesure Street, and Ohio Street*

The government did not produce any evidence relating to Curtis Street, Lesure Street, and Ohio Street at the Evidentiary Hearing. (*See generally* DE# 1185, Hearing Tr.) Similarly, at Bradley's sentencing hearing, Agent DeSantis testified only to the date and amount of Bradley's purchase of each of these properties. (*See* DE# 919, Sentencing Tr., PageID# 3353.) Specifically, he testified that Bradley purchased: (i) Curtis Street for $1,800 on November 16, 2018; (ii) Lesure Street for $3,000 on November 18, 2011; and (iii) Ohio Street for $900 on

---

[6] The government has also never reconciled Krikor's contentions with the auction sheet introduced at Bradley's sentencing hearing (Defs. Ex. 3), which indicates that Bradley purchased Harmony Lane through an auction. (DE# 919, Sentencing Tr., PageID# 3337.)

7

November 16, 2012. (*Id.*) Beyond this cursory information, the record does not contain any information about Bradley's purchase of these properties.

The government therefore has wholly neglected its burden with respect to Curtis Street, Lesure Street, and Ohio Street. The existence of Section 853(d)'s presumption—and its inapplicability in this case—demonstrates the insufficiency of mere evidence concerning the timing and amount of Bradley's acquisitions of these properties. Proof of forfeiture under Section 853(a) requires more. The Court should deny the government forfeiture of Curtis Street, Lesure Street, and Ohio Street.

**C.     Bradley's possession and storage of currency at Harmony Lane is insufficient for forfeiture**

The government also seeks forfeiture of $124,600 in currency seized from Bradley's and his parents' homes. (DE# 1176, Gov't Supp. Mem., PageID# 4699-700.) Here, too, the government bears the burden of proving that this currency constitutes proceeds of Bradley's drug-distribution offense. 21 U.S.C. § 853(a). $78,300 of this currency, however, was found at Harmony Lane. (DE# 1176, Gov't Supp. Mem., PageID# 4700.) Despite voluminous wiretaps and co-defendant testimony, the government has provided no evidence linking Harmony Lane to Bradley's illegal activity. (*See generally* DE# 919, Sentencing Tr., PageID# 3153-3440; DE# 1176, Gov't Supp. Mem., PageID# 4698-4711; DE# 1185, Hearing Tr.) Indeed, throughout these proceedings, the government has argued only that Bradley acquired Harmony Lane with illicit proceeds—not that the property facilitated any crimes. (*See* DE# 986, Gov't Reply, PageID# 3816-17; DE# 1176, Gov't Supp. Mem., PageID# 4700.)

8

Instead, the government relies on the fact that "some of the cash" found at Harmony Lane was vacuum sealed and in bundles. (DE# 1176, Gov't Supp. Mem., PageID# 4700.)[7] But Bradley's mere possession and peculiar storage of cash is insufficient to establish forfeiture. *United States v. Mondragon*, 313 F.3d 862, 866 (4th Cir. 2002) ("[O]ddly packaged" currency "without more, [] does not suggest a connection to drug trafficking."); *United States v. One Lot of U.S. Currency Totaling $14,665*, 33 F. Supp. 2d 47, 49 (D. Mass. 1998) ("The possession of cash, even in large amounts, does not create a rebuttable presumption that one is engaged in criminal activity."); *United States v. $506,231 in United States Currency*, 125 F.3d 442, 451-52 (7th Cir. 1997) (storage of $500,000 in a barrel was insufficient to prove that currency constituted illicit proceeds).

The record shows Bradley had substantial sources of legitimate cash flow during this time. For example, Bradley reported more than $90,000 in sales through his event promotions business on his 2014 tax return—sales that were likely received in cash and used to pay business expenses accumulated on his credit cards. (*See* Defs. Ex. 6A; DE# 1185, Hearing Tr., at 75.) At sentencing, Bernadette Bradley testified about her knowledge of this business and confirmed it had nothing to do with the conspiracy. (DE# 919, Sentencing Tr., PageID# 3297-98.) The government has provided no evidence to the contrary.

Section 853 requires the government to establish a connection between the seized currency and Bradley's criminal offense. Here, the government has only demonstrated that Bradley had $73,300 in currency at Harmony Lane. (DE# 1176, Gov't Supp. Mem., PageID# 4700.) That fact, standing alone, is insufficient. The Court should deny forfeiture of the $73,300 in currency found at Harmony Lane.

---

[7] Exactly how much of this cash was stored in that manner, the government does not say. (*See* DE# 1176, Gov't Supp. Mem., PageID# 4700.)

9

Likewise, Bradley does not concede the $46,300 in currency seized from his parents' house is subject to forfeiture. He maintains that the government has failed to meet its burden of proof with respect to that parcel of currency. Accordingly, Bradley requests the Court deny forfeiture with respect to both parcels of seized currency.

## II. The record does not support a $1,000,000 money judgment

In addition to forfeiture of the Properties and the Currency, the government seeks entry of a $1,000,000 money judgment against Bradley. (DE# 861, Mot. for Money Judgment, PageID# 2795.) Bradley maintains his position that a money judgment is not authorized under Section 853. (DE# 1125, Motion to Dismiss, PageID# 4449-57.) To the extent the Court disagrees, however, the government bears the burden of proving it is entitled to the requested money judgment. *See* 21 U.S.C. § 853.

Again, the government has failed to meet its burden. Section 853 requires the government to demonstrate Bradley's net share of the proceeds generated by the conspiracy. *Bradley*, 897 F.3d at 793 (interpreting *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017)). The government has not offered that individualized accounting here. It would be appropriate, therefore, for this Court to deny the government's motion for a money judgment in its entirety

In any event, however, the record does not support a money judgment even approximating the $1,000,000 sought by the government. The government has established Bradley's possession of only $268,006 in illicit proceeds—the total value of cash deposited from Tennessee into Bradley's and his wife's bank accounts. (DE# 919, Sentencing Tr., PageID# 3350.) But as noted above, Section 853 limits forfeiture to Bradley's net share of those proceeds, requiring a deduction of distributions made to other members of the conspiracy.

10

*Bradley*, 897 F.3d at 793.   The Court therefore should limit the money judgment to an amount substantially less than $268,006.

A.   **Forfeiture is limited to the net proceeds Bradley personally obtained**

The government concedes that Section 853 only permits forfeiture of proceeds Bradley personally "obtained" through the conspiracy.   (*See* DE# 1176, Gov't Supp. Mem., PageID# 4701.)   But Bradley and the government dispute the next step of the calculation—whether a defendant "obtains" proceeds that he later distributes to co-conspirators.

The government contends Bradley is liable for proceeds distributed to co-conspirators so long as he first possessed those proceeds prior to their distribution.   (*Id.*)   That argument is wrong for three reasons.   First, it contradicts *Honeycutt*'s prohibition on joint liability between co-conspirators.   137 S. Ct. at 1635.   Second, it ignores the Sixth Circuit's express statements in this case.   *Bradley*, 897 F.3d at 783.   Third, it would render Section 853 unworkable in the absence of joint and several liability.   The Court should therefore hold that Bradley only obtained the net proceeds attributable to him.

*Honeycutt* limits Section 853's authorization of money judgments to the net proceeds a defendant received through the conspiracy.   137 S. Ct. at 1635.   There, the Sixth Circuit had held a hardware store clerk jointly and severally liable for the gross proceeds obtained by the store. *Id.* at 1630.   The Supreme Court reversed, holding joint and several forfeiture liability is impermissible because Section 853 limits forfeiture to the "property the defendant himself actually acquired."   *Id.* at 1635.

The Sixth Circuit recognized that *Honeycutt*'s narrow construction of Section 853 has broader implications than just the cessation of joint and several liability.   *Bradley*, 897 F.3d at 793.   The court held that *Honeycutt* requires "a net, not a gross, monetary forfeiture judgment."

11

*Id.*  Indeed, when the government attempted to show that Bradley received enough cash payments to render the imposition of joint and several liability harmless error, the court declared "the *Honeycutt* problem [cannot] be resolved solely by addition."  *Id.*  As the court elaborated, the mere fact "[t]hat Jones delivered Buchanan's payments to Bradley tells us nothing about what happened to the money after that.  The evidence says nothing about whether Bradley kept all of this money."  *Id.*  The Sixth Circuit therefore expressly considered and rejected the precise argument now advanced by the government.  *See id; see also United States v. Elliott*, 876 F.3d 855, 868 (6th Cir. 2017) (holding that *Honeycutt* limits forfeiture money judgments to an "amount proportionate with the property defendants actually acquired through the conspiracy").

The government's contrary, gross-proceeds interpretation of Section 853 is completely unworkable in a system without joint and several liability.  First, it would multiply the cumulative forfeiture liability of co-conspirators in a single conspiracy.  If one defendant received $1,000 in illicit payments for controlled substances but later distributed $900 of those proceeds to a co-conspirator, the government's gross-proceeds theory would allow it to obtain $1,900 in total money judgments against the two defendants, even though only $1,000 in illicit proceeds ever existed.  In large conspiracies, this ratchet effect could be exponential, allowing the government to obtain cumulative money judgments vastly exceeding the total amount of illicit proceeds generated by the conspiracy.

Second, the government's interpretation of Section 853 would create asymmetry between how a defendant's forfeiture debt is calculated and paid.  The government seeks to hold defendants liable for the gross proceeds he or she once possessed.  (DE# 1176, Gov't Supp. Mem., PageID# 4701-03.)  But with *Honeycutt*'s removal of joint and several liability, a defendant's debt can only be satisfied by the collection of the net proceeds he actually acquired.

12

Funds collected from co-conspirators—even if once possessed by the defendant—no longer reduce a defendant's monetary liability. After *Honeycutt*, it is therefore inappropriate to include proceeds distributed to co-conspirators when calculating a defendant's forfeiture liability. Instead, Section 853 requires an individualized accounting of the net proceeds each defendant "actually acquired through the conspiracy." *Bradley*, 897 F.3d at 784.

**B.    The government has ignored its obligation to determine the net proceeds Bradley obtained**

Despite the Sixth Circuit's clear statement of the insufficiency of the government's prior evidence after *Honeycutt*, the government has not brought any additional evidence to the table. Agent John Krieger, for example, testified he did not "recall" any effort to investigate or determine the net proceeds distributed to 15 other co-defendants in this conspiracy. (DE# 1185, Hearing Tr., at 47.) Even with respect to Jones, who played a significant role in the conspiracy, and Buchanan, whom the government called a "co-equal" to Bradley (*See* DE# 948, Buchanan Sentencing Tr., PageID# 3586.), neither Krieger nor the government has provided an estimate of their respective allocations from the conspiracy. (*See generally* DE# 1185, Hearing Tr.; DE# 1176, Gov't Supp. Mem.)

Forfeiture after *Honeycutt* requires more than evidence of the gross payments received by one member of the conspiracy. *Bradley*, 897 F.3d at 794. Under Section 853, the government bears the burden of proving how much in net proceeds Bradley personally obtained. The government has failed to offer that individualized accounting here. The Court should therefore consider denying the government's motion for a money judgment in its entirety.

13

## C. Under either a gross- or net-proceeds standard, the record does not support a $1,000,000 money judgment

The government claims $1,000,000 is a "very conservative" estimate of the proceeds Bradley obtained. (DE# 1176, Gov't Supp. Mem., PageID# 4703.) It offers two theories to support this massive figure. First, the government points to $854,577 deposited into bank accounts belonging to Felicia Jones, Kareema Hawkins, and Bradley. (*Id.* at PageID# 4703.) Second, it asks the Court to estimate Bradley's net proceeds based on the amount of pills he sold. (*Id.* at PageID# 4706.) Neither theory supports a $1,000,000 money judgment.

The government's deposit-based theory suffers several flaws. As a threshold matter, those deposits still leave the government roughly $150,000 short of the $1,000,000 it seeks. To fill that gap, the government asks the Court to take "two snapshots" of cash seized from Buchanan and "extrapolate[e] them over . . . eight-plus months." (*Id.* at 4705.) That sort of back-of-the-envelope math is plainly insufficient to satisfy the government's burden of proof. *See United States v. Corrado*, 227 F.3d 543, 558 (6th Cir. 2000) (weekly gambling distributions were "insufficient to calculate accurately a forfeiture award."); *United States v. King*, 231 F. Supp. 3d 872, 954 (W.D. Okla. 2017) ("The court is unwilling to use twenty-four months as the base period for an extrapolation to 108 months."); *United States v. Lyons*, 870 F. Supp. 2d 281, 287 (D. Mass. 2012) (rejecting the government's extrapolation where there were only "two specific reported cash collections.")

Furthermore, the government's deposit-based theory assumes Bradley received all $854,577 cash deposits. In fact, $530,618 of that sum was deposited into Felicia Jones's bank account—not Bradley's. (DE# 919, Sentencing Tr., PageID# 3349-50.) And Jones began distributing pills with Buchanan before she ever met Bradley. (*Id.* at PageID# 3164-66.) Indeed, Jones and Buchanan were childhood friends. (DE# 919, Sentencing Tr., PageID# 3349-50.)

14

Even after Jones began working with Bradley, she maintained an independent pill distribution operation with Buchanan. (*Id.* at PageID# 3178 ("No, they weren't all coming from Mr. Bradley.").) Indeed, she testified that she regularly picked up pills from "a couple other people" and delivered them to Buchanan alongside pills provided by Bradley. (*Id.* at PageID# 3178, 3212-13.) As a result, some of the money deposited into her bank account "had nothing to do with Mr. Bradley." (*Id.* at PageID# 3211.) Buchanan's bank statements also contain numerous deposit slips showing that money was frequently deposited into his account from Detroit-area branches of the Fifth Third Bank—the same bank used by Jones. (*See generally* Defs. Ex. 7A-1, 7A-2, and 7A-3.) Much of the money deposited into Jones's account could have been redistributed back to Buchanan—Bradley's co-equal co-defendant—by hand or deposit.

The government has never attempted to quantify the amount of proceeds deposited into Jones's account that reached Bradley. (*See* DE# 1176, Gov't Supp. Mem., PageID# 4703-05.) Even under a gross-proceeds interpretation of Section 853, the government bears the burden of proving Bradley's possession and control of these funds. 21 U.S.C. § 853. Its failure to do so asks the Court to guess. But that is too insufficient a foundation "to calculate accurately a forfeiture award." *Corrado*, 227 F.3d at 558. The Court should not attribute the deposits made into Jones's account to Bradley.

Moreover, Section 853 requires the Court to deduct Bradley's distributions to co-conspirators from the gross proceeds he received. *Bradley*, 897 F.3d at 783. "It is a net, not a gross, monetary forfeiture judgment." *Id.* Even assuming all of the Jones's deposits reached Bradley, the Sixth Circuit held that fact was insufficient to support the $1,000,000 judgment sought by the government. *Id.* The Court must issue a money judgment that is "proportionate with the [proceeds] Bradley actually acquired through the conspiracy." *Id.* (citation and internal

15

brackets omitted). Because the record only supports a finding that Bradley received the $268,006 deposited into his and his wife's bank accounts, the Court should grant a money judgment, if any, substantially less than that amount.

The government's alternative justification for a $1,000,000 money judgment—an extrapolation based on the amount of pills Bradley distributed—also fails. (*See* DE# 1176, Gov't Supp. Mem., PageID# 4703.) As a threshold matter, calculating Bradley's forfeiture method in this manner contradicts the individualized accounting of net proceeds required by Section 853 after *Honeycutt*. *See Bradley*, 897 F.3d at 783. And it is far too speculative a basis for accurately calculating a forfeiture order. *See Corrado*, 227 F.3d at 558; *United States v. King*, 231 F. Supp. 3d at 954. Regardless, the evidence pertaining to Bradley's pill distributions does not support a finding that he obtained $1,000,000 in proceeds.

Bradley's involvement in the conspiracy spanned, at most, 28 months. The indictment alleges that the conspiracy began in November of 2012 and continued until his arrest in the beginning of March in 2015. (*See* DE# 3, Indictment, PageID# 8; *see also* DE# 919, Sentencing Tr., PageID# 3166 (Jones's testimony confirming she became involved with Bradley in 2012).)[8] During this period, the government assumes Bradley distributed pills to Buchanan an average of three times per month. (DE# 1176, Gov't Supp. Mem., PageID# 4705.) But Buchanan stated that those trips sometimes happened only "a couple of times per month." (DE# 919, Sentencing Tr., at 3338.) Thus, a more fair estimate is two trips per month, which would result in an

---

[8]  While Buchanan claims that he began distributing pills with Bradley in 2009 (DE# 1185, Hearing Tr., at 31), those distributions involved between 60 and 100 ecstasy pills per trip, which Buchanan would purchase from Bradley for between $2 and $4 per pill. (*Id.* at 32-33.) These small proceeds—of as little as $120 per trip—are immaterial in the scope of the $1,000,000 judgment the government seeks. In any event, ecstasy was not included in the indictment and should not be considered for purposes of the Forfeiture Motions. (*See* DE# 3, Indictment, PageID# 8.)

16

aggregate number of only 56 distributions from Bradley to Buchanan throughout the conspiracy. This more conservative estimate is appropriate given the government's burden of proof.

Likewise, the government's implied number of pills per distribution is far from conservative. Buchanan stated at his proffer that he never received more than 300 pills in a single distribution. (DE# 1185, Hearing Tr., at 40-41.) He further stated that some of the distributions contained as few as 50 pills. (*Id.*) Indeed, at Bradley's sentencing hearing, the government played a recording of a phone call between Bradley and Buchanan where Buchanan voiced frustration at receiving only 59 pills after expecting delivery of 300 pills. (DE# 919, Sentencing Tr., PageID# 3328-3329.) Given this evidence, 200 pills per trip is a much more reasonable estimate.

These figures, taken together, simply do not support the notion that Bradley received $1,000,000 in gross proceeds from the conspiracy. Taking that estimate of 200 pills per distribution and extrapolating it across 56 distributions establishes the sale of only 11,200 pills from Bradley to Buchanan. The government contends that Bradley sold these pills for between $9 and $32 per pill. (DE# 1176, Gov't Supp. Mem., PageID# 4706.) Thus, taking a government-friendly average price of $20.50 per pill would yield gross proceeds of only $229,600. In contrast, if Bradley primarily sold $9 pills, his gross proceeds would be $100,800.

Bradley's actual forfeiture liability should be even lower. Jones admitted that she combined Bradley's pills with those supplied by others when making distributions to Buchanan. (DE# 919, Sentencing Tr., PageID# 3178, 3212-13.) And some of the distributions contained as few as 50 pills. (DE# 1185, Hearing Tr., at 40-41.) And, of course, the distributions to other co-conspirators should be deducted from Bradley's gross proceeds. The government bears the burden of proof. Any inferences should favor Bradley. Thus, while the government's attempt to

17

extrapolate Bradley's proceeds from his pill distributions is an insufficient foundation for a forfeiture order, the record still would only support a finding of gross proceeds below or between $100,800 and $229,600—far beneath the $1,000,000 sought by the government.

## III.  The Forfeiture Motions would create an unreasonable sentencing disparity

The government's Forfeiture Motions are unreasonable because out of the 18 co-defendants in this case, Bradley alone is subject to the potential forfeiture of multiple houses and a $1,000,000 money judgment.   This would create a significant disparity in the blame and penalty apportioned to members of this conspiracy, many of whom were similarly culpable. That disparity provides the Court with an independent reason to dismiss the Forfeiture Motions.

Under 18 U.S.C. § 3553(a)(6), the district court may consider disparities in co-defendants' sentences when sentencing a single individual in a multi-defendant case.   While Section 3553(a)(6) is primarily concerned with national disparities, a district judge is permitted to "exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence." *United States v. Simmons*, 501 F.3d 620, 623-624 (6th Cir. 2007) (citing *United States v. Nelson*, 918 F.2d 1268, 1272-73 (6th Cir. 1990)).

Forfeiture is a type of monetary punishment that is part of a defendant's sentence. *Libretti v. United States*, 516 U.S. 29, 42 (1995).  Indeed, this Court rejected Bradley's argument that forfeiture is a mandatory minimum punishment protected by the Sixth Amendment.   (DE# 1154, Memorandum.)   If forfeiture is considered only part of the defendant's punishment and is appropriately determined at sentencing, then Section 3553 should apply.[9]

Nothing in this circuit or other circuits bars a district judge from considering the Section 3553(a) sentencing factors in the forfeiture context.   In the lone case that addresses a similar

---

[9]   Bradley continues to assert that the Sixth Amendment applies to criminal forfeiture.

18

argument, *United States v. Taggert*, 484 F. App'x 614, 615 (2d Cir. 2012), the Second Circuit declined to decide this issue and resolved the case on other grounds.    Therefore, this Court can consider the implications of placing the full burden of forfeiture on Bradley alone as a relevant sentencing factor.

The Forfeiture Motions would clearly create a disparity of the kind the Court is entitled to consider under Section 3553(a)(6).    Consideration of the Forfeiture Motions in this context puts its excessiveness in stark perspective.    The government seeks $1,000,000 from Bradley, while it sought virtually nothing from other defendants.    Even Buchanan, who the government characterized as a "co-equal" of Bradley's, shoulders far less of this penalty.    (*See* DE# 948, Buchanan Sentencing Tr., PageID# 3586.)    While the Forfeiture Motions seek forfeiture of several properties and the imposition of a $1,000,000 money judgment, Buchanan was required to forfeit only two Rolex watches.    (DE# 900, Buchanan Forfeiture Order, PageID# 3030-31.)

At Buchanan's sentencing, the government's own position was that Buchanan and Bradley should receive the same sentence because "it's important not to have unwarranted disparities, certainly nationwide, but also between codefendants." (DE# 948, Buchanan Sentencing Tr., PageID# 3645, 3646.)    Yet the Forfeiture Motions would create a wide gulf between their sentences, despite facts demonstrating that Bradley was far from the only defendant who obtained proceeds from the conspiracy.

Even if the Court does not find Section 3553 applies directly to the Forfeiture Motions, it is still entitled to set forth an order it feels is adequately apportioned among the co-defendants in this case.    Placing such a high burden on Bradley's shoulders alone, when the government only pursued negligible forfeiture demands on other co-defendants, saddles Bradley with a grossly disproportionate share of the penalty in this 18-defendant conspiracy.    Ordering forfeiture against

Bradley alone would create an unjust disparity between co-equal defendants. The Court should exercise its discretion and deny the Forfeiture Orders.

## CONCLUSION

For the foregoing reasons, Bradley respectfully requests that the Court deny the Forfeiture Motions.

Respectfully submitted,

*/s/ Melissa Salinas*
MELISSA SALINAS, Esq. (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic
363 Legal Research Building
801 Monroe Street
Ann Arbor, Michigan 48109-1215
Ph: 734.763.4319
salinasm@umich.edu

DAVID B. SMITH, Esq. (VA-25930)
David B. Smith, PLLC
108 North Alfred Street
Alexandria, VA 22314
Ph: 703.548.8911
dbs@davidbsmithpllc.com

ROBERT L. PARRIS, Esq. (TN-19847)
8 South 3rd Street
Memphis, TN 38103
Ph: 901.299.1479
rlp@robertparisattorney.com

EMERSON BURSIS, Esq. (NY-5671060)
Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
Ph: 212.390.4472
emerson.bursis@kirkland.com

*Counsel for Benjamin Bradley*

20

## CERTIFICATE OF SERVICE

I hereby certify this Memorandum of Law in Opposition to the Government's Forfeiture Motions was filed on June 7, 2019, using the Court's ECF system, which will send notice of this filing to all counsel of record indicated on the electronic receipt.

/s/ Melissa Salinas
Melissa Salinas (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic