# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cr-00037-2 |
| | ) | |
| BENJAMIN BRADLEY, | ) | Judge Trauger |
| | ) | |
| Defendant. | ) | |

## REPLY MEMORANDUM
## IN SUPPORT OF MOTION FOR FORFEITURE

The United States respectfully submits this reply in support of its motion for forfeiture. The government makes four main points in response to Bradley's opposition brief. (DE# 1191, Response.) First, forfeiture of the real and personal properties is warranted, and nothing about Bradley's side businesses—where he made a small amount of money buying and selling real estate, and lost money as a party promoter—undercuts the presumption of forfeitability, which has not been rebutted. Second, even after *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), the proper measure of forfeiture liability is gross receipts, not net profits. Bradley's alternative approach would allow criminals to avoid all forfeiture liability simply by dissipating their ill-gotten gains. Third, regardless of whether gross receipts or net profits are used, $1,000,000 remains a conservative estimate of Bradley's forfeiture liability. His claim to the contrary not only seeks to relitigate findings that were made at sentencing, it is contradicted by the record. Indeed, the best evidence of the quantity and frequency of pill distributions comes from the wiretap calls and sworn testimony at the sentencing hearing, not from self-serving statements Donald Buchanan gave in his initial proffer. And that evidence shows that Bradley distributed over 180,000 pills and made well over $1,000,000 in profits (plus much more in gross receipts). Fourth, Bradley's reliance on

18 U.S.C. § 3553(a)(6) is unavailing: the § 3553(a) factors do not apply to forfeiture in the first instance, and even if they did, Bradley could not show an unwarranted disparity.

   1. *Forfeiture of the real and personal properties is warranted.*

As the government previously explained (DE# 1176, Pre-Hearing Mem., PageID#: 4699-4701), a presumption of forfeitability applies to any property that "was acquired by [the defendant] during the period of the violation" if "there was no likely source for such property other than the violation." 21 U.S.C. § 853(d). That presumption applies to the real property at issue here, because (as the Court previously found) Bradley purchased at least the Harmony Lane residence in cash for a price—roughly $100,000, paid out over the course of 12-14 months[1]—that vastly exceeded the amount of legitimate income he earned during that period.

The mere fact that Bradley made a small amount of extra money by selling houses (and lost some money by working as a party promoter) does not change the analysis. Even if he had extra cash on hand at the time of the purchase because he had recently flipped certain properties, he only had the cash to purchase those properties because of his drug dealing and money laundering. Indeed, Bradley asks the Court to believe that he could have used his salary of roughly $55,000 to support his family—and spend lavish sums on things like cabanas in Las Vegas, flights

---

[1] Bradley's attempt to cast doubt on the facts surrounding the purchase is unavailing. As Special Agent DeSantis explained, Majid Krikor initially told him that he sold the Harmony Lane property to Bradley for slightly more than $100,000 in early 2014. Special Agent DeSantis initially assumed that this meant there was a single, lump-sum transaction at that time. In preparation for the recent hearing, SA DeSantis follow up with Krikor to drill down on the details, and learned that the roughly $100,000 payment was paid out over the course of 12-14 months, and was made in the form of non-traditional assets like jewelry and scrap gold. Krikor's statements about timing and amount are broadly consistent with both the information in his tax returns and the Property Transfer Affidavit that Bradley filed with the Michigan Department of Treasury. That document says that Harmony Lane was sold for $100,000, and the listed date of transfer is October 31, 2012, with the date of filing being February 3, 2014. Thus, Bradley's own signed filings corroborate Krikor's statements that, between roughly late October 2012 and January 2014, Bradley paid him approximately $100,000 to purchase the Harmony Lane residence.

on private airplanes, fancy sneakers, and drinks at a nightclub—and still have over $7,000 per month left over to purchase real estate. That theory simply does not add up. Absent Bradley's drug trafficking, he would not have been able to afford the real property at issue here, making it subject to a presumption of forfeitability, which Bradley has not rebutted.

Bradley's attempt to cast doubt on the forfeitability of the parcels of cash is even less persuasive. As previously noted, a parcel of $46,300 was found hidden behind a bar in Bradley's parents' home on Prevost Street, where Bradley also stored pills. (DE# 919, Sentencing Hearing Tr., PageID#: 3302-04.) And a parcel of $78,300 was found in Bradley's home on Harmony Lane, with some of the cash "vacuum sealed" and some "in bundles." (*Id.* at PageID#: 3329-30.) The suggestion that Bradley withdrew roughly two years' worth of salary in cash, sealed it up, and hid it in various locations, cannot be credited. As the Court previously found, "the location, manner of storage and packing of the currency sought for seizure constitutes evidence that the real property sought for forfeiture was either purchased with the use of commingled funds or with cash that was not obtained through legitimate activity. (DE# 1004, Memorandum, PageID#: 3893.)

> 2. ***Even after* Honeycutt*, the proper measure of forfeiture is gross receipts, not net profits.***

As the government previously showed (DE# 1176, Pre-Hearing Mem., PageID#: 4702-03), the clear rule prior to *Honeycutt* was that forfeiture liability is determined by reference to gross receipts, not net profits. Nothing about *Honeycutt* changes that rule. The decision in *Honeycutt* turned on the meaning of the word "obtained" as used in 21 U.S.C. § 853(a)(1). By contrast, the question at issue here turns on the word "proceeds," which was not at issue in *Honeycutt*. And as numerous courts have explained, Congress intended "proceeds" in § 853 to mean "gross receipts." *See United States v. Logan*, 542 F. App'x 484, 498 (6th Cir. 2013); S. Rep. No. 225, 98th Cong.,

3

1st Sess. 199 (1983) (explaining that the RICO forfeiture provision, which is materially identical to § 853(a)(1), uses "the term 'proceeds' . . . in lieu of the term 'profits' in order to alleviate the unreasonable burden on the government of proving net profits"); *United States v. Ward*, 2017 WL 4051753, at *3 (W.D. Mich. Aug. 24, 2017) ("*Honeycutt* does not suggest that calculating forfeiture based on gross proceeds is improper.")

Thus, the relevant inquiry is simply the value of the criminally derived proceeds that Bradley obtained—meaning what he came into personal possession of, personally benefited from, or exercised dominion or control over. What Bradley ultimately did with the money after obtaining it does not change the result.

Under Bradley's theory, however, a person who puts his ill-gotten gains in a safe is subject to forfeiture, while a person who dissipates all his money—whether by paying off co-conspirators, or buying ringside seats to a boxing match—should be treated as though he has never "obtained" any proceeds at all. That is contrary to both the plain language of the statute and congressional intent in enacting § 853. *United States v. Newman*, 659 F.3d 1235, 1243 (9th Cir. 2011) ("Congress sought to punish equally the thief who carefully saves his stolen loot and the thief who spends the loot on 'wine, women, and song.'").

Bradley's concerns about double-counting (DE 1191, Response, PageID#: 4886) do not require a different result. It is true that in some conspiracies, multiple defendants may "obtain" the same funds, either because they have joint dominion and control over them, or because one person uses part of the proceeds he obtained to pay off another person. But that it is not at all inconsistent with *Honeycutt*. Indeed, the hypothetical involving the mastermind and the student suggest that if the mastermind obtained $3,000,000 in proceeds and paid the student $3,600 out of that sum, each

4

could be made to forfeit the full amount that he obtained, for a total forfeiture amount ($3,003,600) that exceed the total proceeds from the conspiracy. *Honeycutt*, 137 S. Ct. at 1632-33.

This does not mean, however, that the government can actually collect an amount that exceeds the total proceeds. Under both Department of Justice policy and applicable case law, the government's total collection is capped at the total proceeds for the conspiracy, even though each co-conspirator is liable for the amount that he or she obtained.

Prior to *Honeycutt*, this principle was embodied as a part of joint and several liability. *See, e.g.*, *United States v. Hurley*, 63 F.3d 1, 23 (1st Cir. 1995) (explaining, in a case where the drug conspiracy obtained $136 million, that "[t]he government can collect its $136 million only once but, subject to that cap, it can collect from any appellant so much of that amount as was foreseeable to that appellant"); *United States v. Masters*, 924 F.2d 1362, 1369 (7th Cir.) (describing an order requiring each defendant to forfeit $42,000 as "joint and several liability, meaning that $42,000 is the cap on the total amount that the government can collect but that subject to the ceiling each defendant is liable for the full amount") (internal citation omitted). Following *Honeycutt*, this principle will likely be embodied in the concept of "set-offs." *See, e.g.*, *United States v. McKay*, 506 F. Supp. 2d 1206, 1214 (S.D. Fla. 2007) (providing a "set-off" against RICO forfeiture to reflect amounts forfeited for mail fraud and embezzlement counts, explaining that "[a]lthough the Government is entitled to forfeiture of these amounts, it is not entitled to double count the proceeds for purposes of recovery"), *aff'd*, 285 F. App'x 637 (11th Cir. 2008) (per curiam); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) (providing set-off where defendant returned a portion of funds involved in money laundering violation, explaining that "[w]e find no support in the statute . . . for the proposition that a defendant should not be credited with returning misappropriated funds").

Regardless of how it is implemented, this approach—measuring individual forfeiture liability based on what each individual obtained, but capping total collection at the conspiracy-wide total—comports with the statute and is far more sensible than the alternative of treating dissipated money as money that was never obtained at all. In short, Bradley's concern about double-counting, which is purely hypothetical in this case, can be addressed by other means and does not require a tortured reading of the statute.

### 3. *Regardless of whether gross proceeds or net profits are used, $1,000,000 is a conservative estimate of Bradley's forfeiture liability.*

Bradley asserts that "[t]he government has not offered [an] individualized accounting" of the proceeds that Bradley obtained. (DE# 1191, Response, PageID#: 4884.) To the contrary, the government previously offered extensive evidence and argument demonstrating why $1,000,000 is a conservative estimate of Bradley's forfeiture liability, regardless of whether gross receipts or net profits are used. (DE# 1176, Pre-Hearing Mem., PageID#: 4703-09.) Nothing in Bradley's response casts doubt on that analysis now.

The $1,000,000 figure is supported by bank records and other evidence showing the extent of the money laundering. As previously noted, the bank records showed that Buchanan (or people acting at his direction) deposited $854,577 into accounts owned by either Bradley, Hawkins, or co-defendant Felicia Jones. (DE# 919, Sentencing Tr., PageID#: 3348-51.) And Jones testified under oath at the sentencing hearing that, she withdrew any money she received into those accounts and gave it to Bradley, keeping only $50 for herself. (*Id.* at PageID#: 3169-71.) That evidence is sufficient to prove that Bradley obtained the $854,577. Bradley's speculation that perhaps Buchanan transferred the money to Jones, who then took the money out of her account and transferred it back to Buchanan, is unsupported by anything in the record and defies common sense.

Other wiretap and testimonial evidence shows that the money transfers continued even after the bank transfers stopped. Ample testimony showed that Jones and others continued to meet Buchanan on a roughly weekly basis, where they exchanged pills for money. The government previously highlighted two snapshots showing exactly how much money Bradley was being given on each of these weekly trips: on January 8, 2015, Buchanan took roughly $12,000 in cash with him to give to Bradley; and on March 12, 2015, Buchanan had $24,830 in cash with him as he left his house to meet Bradley. Another sequence of intercepted calls and text messages showed that Jones and Buchanan met on January 31, 2015 to exchange pills and money. After they met, Buchanan sent a text message to Jones asking how much was in there. (TT4, Call 2253.) Jones responded, "300 Orange 300 White and 358 Blue." (TT4, Call 2254.) Buchanan clarified that he was not asking how many pills she had given him, but rather how much money was in the box he had just given her. (TT4, Call 2255.) After consulting with Bernadette Bradley (TT4, Call 2256), Jones texted Buchanan back to tell him that he had given her $11,820 (TT4, Call 2258).

In sum, there were approximately 24 additional trips between the end of the bank transfers and the arrests, with each trip averaging at least $12,000 or more in cash that was given to Bradley. When added to the $854,577 from the bank accounts, the total greatly exceeds $1,000,000. And, of course, this amount represents only what Bradley received from Buchanan between 2012 and 2015. As the Court has previously found, the conspiracy between Bradley and Buchanan began in 2009. And as the wiretap called played at the recent hearing demonstrated, Buchanan was one of "two or three" people that Bradley distributed to just in Nashville alone, with untold other customers in the Detroit area. These facts further demonstrate that $1,000,000 is a conservative estimate.

7

Case 3:15-cr-00037   Document 1192   Filed 06/21/19   Page 7 of 12 PageID #: 4902

Contrary to Bradley's suggestion, the Court can also estimate Bradley's forfeiture liability by reference to the number of pills that he sold. *See, e.g.*, *United States v. Basciano*, 649 F. App'x 42, 43 (2d Cir. 2016) ("[I]n a narcotics case, the government may sustain its burden by 'proving the quantity of [narcotics] dealt . . . multiplied by the price it could have commanded.'" (quoting *United States v. Roberts*, 660 F.3d 149, 165-67 (2d Cir. 2011)); *see also United States v. Prather*, 456 F. App'x 622, 626 (8th Cir. 2012); *United States v. Huggins*, 392 F. App'x 50, 63 (3d Cir. 2010). As the Court has already found, Bradley distributed 186,412 opioid pills. For the last year or so of the conspiracy, the most common pills were Oxymorphone pills that were either 15mg or 40mg. Bradley sold the smaller pills for $20 to $22 each and sold the larger pills for $30 to $32 each. Because the proper measure of forfeiture would multiply the sales price by the quantity sold, Bradley's true forfeiture liability likely exceeds $3,000,000, and exceeds $1,000,000 even on the implausible assumption that Bradley only sold Oxycodone pills for $9 or $10 per pill. (*See* DE# 1176, Pre-Hearing Mem., PageID#: 4706.) Indeed, given Bradley's statements on the wiretap call played at the hearing—which showed that he found the notion of making less than $4 in profit per pill "preposterous"—a $1,000,000 money judgment would be appropriate even if "proceeds" meant net profits rather than gross receipts.

Bradley's argument to the contrary rests primarily on an improper attempt to relitigate the findings that the Court made at the sentencing hearing. It is also entirely contradicted by the record. Bradley seeks to rely on self-serving statements that Buchanan made at his initial proffer, to suggest that the conspiracy involved the distribution of only two distributions of 200 pills each per month. Both wiretap evidence and sworn testimony showed that this suggestion is far too low:

- Pam O'Neal testified about receiving hundreds of pills per day.

- A traffic stop of Bobby Robertson on December 5, 2014 revealed 1,058 Oxymorphone pills that Robertson had received from Bradley that day, *in addition to* the pills Bradley had given to Buchanan.

- A wiretap call between Bradley and Buchanan reveals Bradley telling Buchanan that he had 700 Oxymorphone pills, and had been planning to give 300 to Buchanan and 400 to someone else, but the other person had taken 500 instead, leaving only 200 for Buchanan. When Buchanan hears that the next delivery might only consist of 200 Oxymorphone pills—i.e, the amount that Bradley now says represents a typical delivery—Buchanan responds, "That shit ain't even worth it for me." (TT1, Call 2414.)

- A January 30, 2015 call features Bradley asking Jones what he had in stock, and Jones responding that he had 345 Oxymorphones and 180 Oxycodones. When Bradley asks incredulously, "How is that all I got?" Jones replies that those totals represent what he had received *that day*, and that he had a total of 733 Oxymorphones and 448 Oxycodones in stock. (TT4, Calls 2080, 2094.)

- On March 12, 2015, Jones was arrested as she was leaving her home, and had 770 Oxymorphone pills in her car to give to Buchanan, plus an additional 304 Oxymorphone pills in her house.

Taken together, this and other evidence shows that Bradley's current estimate of only 11,200 pills is fanciful. The quantity found by the Court at sentencing is amply supported by the record, and leads to the re-entry of a $1,000,000 money judgment. Moreover, nothing in the Sixth Circuit's remand order precludes such a finding now. The Sixth Circuit was unwilling to find harmlessness on the record before it, and therefore remanded the case to allow this Court to make the requisite findings under the proper legal standard. Under that proper standard, Bradley is subject to a forfeiture money judgment of $1,000,000 (with any forfeited real or personal property credited against that total).

### 4. Bradley's reliance on 18 U.S.C. § 3553(a)(6) is unavailing.

Finally, Bradley suggests that his forfeiture liability should be reduced on discretionary grounds to avoid the possibility of unwarranted disparities amongst co-defendants. The main problem with this argument is that the § 3553(a) factors do not apply to the calculation of forfeiture. Forfeiture is mandatory not discretionary, and cannot be reduced (or increased) in order

9

to reflect the seriousness of the offense, afford adequate deterrence, or reflect other similar considerations. *See United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) ("Insofar as the district court believed that it could withhold forfeiture on the basis of equitable considerations, its reasoning was in error."); *United States v. Taggert*, 484 F. App'x 614, 615 & n.2 (2d Cir. 2012) (noting that "[i]t is not apparent that § 3553(a)(6) applies to an order of forfeiture," given that none of the criminal forfeiture statutes "incorporates or makes reference to the sentencing factors listed under § 3553(a)," while ultimately resolving the issue on other grounds). To be sure, a court may reduce a forfeiture order in the rare case when the amount would be so disproportionate to the crime that it presents an Eighth Amendment violation. *See United States v. Bajakajian*, 524 U.S. 321 (1998). But Bradley has not made that argument here. And given the conduct at issue, a $1,000,000 money judgment would plainly not constitute cruel and unusual punishment.

In addition, even if § 3553(a)(6) applied, it would not help Bradley here. It is true that at Buchanan's sentencing hearing the government argued that his culpability was comparable to Bradley's. But the Court rejected that argument and explained that Bradley was in fact significantly more culpable:

> I do believe there is quite a difference between Mr. Buchanan and Mr. Bradley. Mr. Bradley was the one amassing all of the pills in Detroit through various and sundry means. He sent people to the doctor with people to get their prescriptions. He paid people for their prescriptions.
>
> He recruited two or three middle-aged women who were—some of them related to him, to be stash houses and count pills for him. Got them in a whole lot of trouble. There's nothing like that in this case with Mr. Buchanan.
>
> Mr. Buchanan wasn't getting these pills from people. He was getting them from the main source of supply, and that was Mr. Bradley who got a whole lot of other people in trouble, who was dealing drugs from his phone at a hospital where he worked as a radiology tech. and his behavior was very, very blameworthy in many respects. That does not remotely pertain to Mr. Buchanan.

10

(DE# 948, Buchanan Sentencing Tr., PageID#: 3674-75.)

Moreover, the decision of whether to pursue forfeiture can properly include considerations such as the total amount of a defendant's forfeiture liability, whether the defendant still has substantial assets worth pursuing, and whether the defendant is willing to plead guilty pursuant to a cooperation plea agreement. Here, there was no other co-defendant who shared Bradley's combination of culpability, forfeiture liability, extant assets, and unwillingness to cooperate. As such, there is no similarly situated comparator against whom he could claim an unwarranted disparity.

* * * *

In sum, the government respectfully submits that the Court should order forfeiture of the two parcels of cash and the four real properties identified in the motion for a preliminary order of forfeiture, and should enter a forfeiture money judgment in the amount of $1,000,000.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

**s/ *Cecil W. VanDevender***
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

**CERTIFICATE OF SERVICE**

       I HEREBY CERTIFY that on June 21, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for defendant Benjamin Bradley.

                                      *s/ Cecil VanDevender*
                                      CECIL VANDEVENDER