**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cr-00037-2** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BENJAMIN BRADLEY** | ) | |

## MEMORANDUM

Following the Sixth Circuit's vacatur of this court's previous order, again pending before the court are the government's forfeiture motions pertaining to defendant Benjamin Bradley, specifically the Motion for Entry of a Preliminary Order of Forfeiture (Doc. No. 858) and Motion for an Order of Forfeiture of at Least a $1,000,000 United States Currency Money Judgment (Doc. No. 861). The court having denied the defendant's post-remand Motion to Dismiss the Forfeiture Allegations and Deny the Government's Request for a Money Judgment (*see* Doc. Nos. 1125 (motion), 1154 and 1155 (Memorandum and Order)), the question before the court is not *whether* to award forfeiture, but in what amount.

For the reasons set forth herein, the government's motions will be granted.

## I.    Procedural Background

Benjamin Bradley was indicted, along with numerous co-defendants, in March 2015 on charges of conspiracy to possess with intent to distribute and conspiracy to distribute Schedule II controlled substances (oxycodone and oxymorphone pills) (Count One) and money laundering (Count Two). (Doc. No. 3.) The Indictment specifically alleged that the conspiracy began no later than November 2012 and continued until March 11, 2015. It also contained forfeiture allegations. Forfeiture Allegation One alleged that, upon conviction, all the defendants would be jointly and severally liable for forfeiting to the United States (1) any property constituting or

derived from proceeds obtained as a result of the drug conspiracy, including, but not limited to, a money judgment in an amount to be determined, representing the gross drug proceeds obtained from the drug offense, under 21 U.S.C. § 853(a)(1); and (2) under § 853(a)(2), any property used or intended to be used to facilitate the commission of the drug offense. (Doc. No. 3, at 5.) The government also gave notice that, in the event any of the proceeds or property directly related to the drug conspiracy could not be located for any reason, the government would be entitled to the forfeiture of substitute property under § 853(p). (Doc. No. 3, at 5–6.) Forfeiture Allegation Two sought the forfeiture, upon the defendants' conviction on Count Two, of any real or personal property involved in or traceable to the money laundering, "including but not limited to a money judgment in an amount to be determined, representing the property involved" in the conspiracy to commit money laundering or traceable to such property, based on 18 U.S.C. § 982(a)(1). (*Id.* at 7.) The government also gave notice of its intent to seek forfeiture of substitute property up to the value of the property actually traceable to the conspiracy, if such property could not be located, under § 853(p). (*Id.* at 7–8.)

The government filed a Bill of Particulars for Forfeiture of Property on August 17, 2015, identifying specific assets to be forfeited under Forfeiture Allegation One. These items included, among others: (1) currency in the amount of $46,300 seized from 15540 Prevost Street, Detroit, Michigan; and (2) $78,300 seized from 45669 Harmony Lane, Belleville, Michigan. (Doc. No. 279.)[1]

In May 2016, the government filed a Bill of Particulars for Forfeiture of Real Property (Doc. No. 432), giving notice that it sought the forfeiture, under Forfeiture Allegations One and Two, of certain parcels of real property, identified by street address as follows: (1) 14425 Curtis,

---

[1] Specific items of personal property were sought under Forfeiture Allegation Two as well, but the government's Memorandum in Support of its Forfeiture Motion (Doc. No. 862) does not address those items, apparently because they were never in the possession of Benjamin Bradley.

Detroit, Michigan; (2) 14427 Curtis, Detroit, Michigan; (3) 16617 Lesure, Detroit, Michigan; (4) 15355 Ohio Street, Detroit, Michigan; and (5) 45669 Harmony Lane, Belleville, Michigan. (Doc. No. 432.)

Bradley pleaded guilty to both counts in the Indictment in June 2016 before Judge Todd Campbell. (Doc. No. 478.) Sentencing was postponed several times. Following the retirement of Judge Campbell, the case was reassigned to the undersigned, and the sentencing hearing was held on February 1, 2017. Because the government did not file its forfeiture motions (Doc. Nos. 858, 861) until January 31, 2017, the court did not include forfeiture as part of the sentence at that time. Bradley was sentenced to a seventeen-year prison term, and the court ordered briefing on the forfeiture issue. (*See* Minute Entry, Doc. No. 873.)

In his original Response to the government's forfeiture motions, Bradley did not object to the forfeiture of any piece of real property other than that known as 45699 Harmony Lane, which he contended belonged to his wife and was his family's home. (*See* Doc. No. 958.) In addition, he did not object to the forfeiture of the two bundles of cash, nor did he actually contest the forfeiture money judgment or even the amount of it. Instead, he only sought clarification on the issue of whether the $1,000,000 money judgment was in addition to, or included the value of, the real property and cash that was already ordered to be forfeited. (*See id.* at 1.)

The court entered an Order and accompanying Memorandum granting the government's motions on June 22, 2017. (Doc. Nos. 1004, 1005.) The court found, based on the evidence presented at the sentencing and in the briefing on the forfeiture issue, that a preponderance of the evidence established that the foreseeable proceeds of the drug-distribution conspiracy totaled at least $1,000,000 and that the foreseeable value of the property involved in the money laundering scheme was at least $1,000,000. The court ordered that forfeiture consisting of a money judgment in the amount of $1,000,000 be taken against Bradley, "jointly and severally with any other co-conspirator against whom a similar money judgment is taken." (Doc. No. 1005, at 1.)

The court further ordered that, "insofar as some portion of the $1,000,000 derived from or connected with the crimes of conviction . . . cannot be located . . . , the United States may engage in discovery . . . in an action or claim for a debt to identify additional substitute assets having a value up to $1,000,000." (*Id.* at 2.)[2] The court also ordered the immediate forfeiture of a total of $124,600 cash seized during searches of the defendant's real property and forfeiture of the real property identified as 14425 Curtis, 14427 Curtis, 16617 Lesure, 15355 Ohio Street, all in Detroit, and 45669 Harmony Lane in Belleville, Michigan. (*Id.* at 2–3.) The court ordered that the value of the real property be applied to the money judgment, but there were no specific findings regarding the value of those properties. The court also ordered that the value of other assets forfeited to the United States by the defendant or any co-conspirator "against whom a similar money judgment is taken" be applied to reduce the amount of the money judgment. (*Id.* at 3.)[3] Following entry of the forfeiture order, the court entered Judgment, which specifically incorporated the terms of the forfeiture order. (Doc. No. 1006, at 7.)

Bradley appealed his sentence and the million-dollar forfeiture judgment. The Sixth Circuit affirmed the prison sentence but reversed the forfeiture order on the basis that it violated *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), in which the Supreme Court had held that the forfeiture statute, 21 U.S.C. § 853, bars joint and several liability for forfeiture judgments. *United States v. Bradley*, 897 F.3d 779, 783–84 (6th Cir. 2018). In particular, in rejecting the government's argument that the evidence clearly showed that Bradley himself directly received well over a million dollars during the course of the conspiracy, the Sixth Circuit noted that the

---

[2] The court determined that $1,000,000 was the maximum total to be forfeited and that this figure incorporated the value of other forfeited assets.

[3] The Memorandum noted that the only two co-defendants against whom a forfeiture order of any kind had been entered were Donald Buchanan, whose Judgment specified the forfeiture of two Rolex watches (Doc. Nos. 900, 945), and Andrew Bradley Froome, whose Judgment provided for the forfeiture of a firearm and $42,244 in currency (Doc. No. 378). All co-defendants have now been sentenced, and none was subject to any kind of money judgment, other than the currency Froome forfeited.

district court "did not make any factual findings about how much money Bradley obtained." *Id.* at 783. It further concluded that "back-of-the-envelope calculations cannot justify this million-dollar order without affecting Bradley's substantial rights and the fairness of the forfeiture proceeding." *Id.*

The Sixth Circuit also observed that this court's forfeiture order was "a net, not a gross, money forfeiture judgment," specifically indicating that the value of the real property and seized currency, "as well as the assets of any co-defendant," should be subtracted from the judgment." *Id.* "That leaves just as many candidates for lessening Bradley's liability as for increasing it. Better on this record, we think, *to vacate the entire forfeiture order and remand to the district court so that it can conduct fresh factfinding and figure out 'an amount proportionate with the property [Bradley] actually acquired through the conspiracy.'" Id.* at 783–84 (quoting *United States v. Elliott*, 876 F.3d 855, 868 (6th Cir. 2017)) (emphasis added).

Following remand and issuance of the mandate, the defendant filed his Motion to Dismiss the Forfeiture Allegations, in light of the Sixth Circuit's invitation that he might want to do so. *See Bradley*, 876 F.3d at 784 (suggesting that the "parties may wish to address" the question of whether the Sixth Amendment prohibits a judge, as opposed to a jury, from finding facts that trigger mandatory forfeiture, as this is "an unanswered question in our circuit"). The undersigned denied the motion, finding that it was bound by the Supreme Court's holding in *Libretti v. United States*, 516 U.S. 29, 48–49 (1995), that "the right to a jury verdict on forfeitability does not fall within the Sixth Circuit's constitutional protection." The court also rejected the defendant's argument that money judgments are not authorized by 21 U.S.C. § 853.

Following the denial of that motion, the court scheduled an evidentiary hearing to adjudicate the amount of the money judgment to be imposed. Although the court initially signaled that the parties would not be required to present evidence regarding the forfeiture of the currency and real property identified in the original forfeiture order, as the defendant had not

expressly appealed those issues and had not contested the forfeiture of those items during the initial forfeiture proceedings, the defendant filed a Motion to Reconsider, pressing the point that the Sixth Circuit had vacated the entirety of the forfeiture order and put the parties back to square one on that issue. In light of the breadth of the remand order, the court granted the Motion to Reconsider in part,[4] clarifying that the "purpose of the evidentiary hearing will be to establish the amount of the money judgment as well as the cash and real property forfeitures sought by the government" in its original forfeiture motions. (Doc. No. 1163, at 3.) The court ordered the parties to be prepared to present "any relevant evidence in their possession concerning the forfeitures sought by the government in its Motion for Entry of a Preliminary Order of Forfeiture (Doc. No. 858) and Motion for an Order of Forfeiture of at Least a $1,000,000 United States Currency Money Judgment (Doc. No. 861)." (Doc. No. 1163, at 4.)

At the evidentiary hearing conducted on May 24, 2019, the government presented two witnesses, and both parties introduced numerous exhibits. At the court's invitation, the parties have exhaustively rebriefed the forfeiture issues, including the government's Supplemental Memorandum in Support of Motion for Forfeiture (Doc. No. 1176), Bradley's Memorandum in Opposition to the Government's Motions for Forfeiture (Doc. No. 1191), and the government's Reply Memorandum (Doc. No. 1192). The defendant, this time around, concedes nothing; he contests the forfeiture of the two bundles of cash and all parcels of real estate, as well as the money judgment and the amount of the money judgment. For its part, the government states that it no longer seeks the forfeiture of one of the real properties specified in its Bill of Particulars and original forfeiture motions, the property identified as 14425 Curtis Street, but only because it "has since been found to have a net equity . . . too low to make forfeiture worthwhile for the government." (Doc. No. 1176, at 2 n.2.) Otherwise, the government maintains that the evidence

---

[4] The court denied that portion of the motion requesting a jury determination of the forfeiture judgment amount.

supports the forfeiture of the other four parcels of real property, the bundles of cash, and a money judgment in the amount of $1,000,000, toward which the value of the other forfeited items would be credited.

In addressing the forfeiture motions, the court will first outline the governing legal standards and then consider the evidence presented in support of the money judgment and as to the forfeiture of the real property and currency sought by the government.

## II.    Legal Standards

An individual convicted of a drug-related felony or money laundering "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of such violation" and any property used or intended to be used to commit or facilitate the commission of the crime of conviction. 21 U.S.C. § 853(a)(1) & (2). Courts construe § 853 liberally in order to effectuate its remedial purpose. *United States v. Darji*, 609 F. App'x 320, 332 (6th Cir. 2015) (citing 21 U.S.C. § 853(o)).

Criminal forfeiture is part of a defendant's sentence, to be imposed as provided by statute. 21 U.S.C. § 853(a); *United States v. Hall*, 411 F.3d 651, 654 (6th Cir. 2005). If, as in this case, the government "include[s] notice of the forfeiture in the indictment or information," and "the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case," in accordance with the procedures set out in § 853. 28 U.S.C. § 2461(c). "The indictment . . . need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." Fed. R. Crim. P. 32.2(a).

The criminal forfeiture statute creates a "rebuttable presumption" that any property of a defendant convicted of a felony drug offense or money laundering is subject to forfeiture, so long as the United States establishes by a preponderance of the evidence that the defendant acquired the property "during the period of the [criminal] violation . . . or within a reasonable time after

such period" and that "there was no likely source for such property other than" the offenses of conviction. 21 U.S.C. § 853(d); *see also Honeycutt*, 137 S. Ct. at 1633. In the absence of evidence to support the presumption, the government must prove that the property is subject to criminal forfeiture under § 853(a), also by a preponderance of the evidence, either by showing that the defendant "used, or intended to . . . use[]," the property to facilitate his drug-distribution offense, *id.* § 853(a)(2), or that the property "constitute[s], or [is] derived from, any proceeds" of the defendant's drug-distribution offense, *id.* § 853(a)(1). *See United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012) (citing *United States v. Smith*, 966 F.2d 1045, 1052 (6th Cir. 1992)).

Moreover, title to property subject to forfeiture vests in the United States "upon the commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c). Consequently, if the defendant transfers the forfeitable property to a third person after commission of the offense, that property "may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing . . . that he is the bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture." *Id.*

In the event that property subject to forfeiture under § 853(a) cannot be located or has been sold or transferred to a third party, "the court shall order the forfeiture of any other property of the defendant, up to the value of any property" that has been sold or transferred or cannot be located. *Id.* § 853(p)(2).

Procedurally, as noted above, the court is without authority to enter a judgment of forfeiture unless the indictment or information contains notice to the defendant that the government intends to seek forfeiture. Fed. R. Crim. P. 32.2(a). Assuming that that requirement has been met, the next step, typically, is to enter a preliminary order of forfeiture. The determination of whether a preliminary order should enter is to be made "as soon as practical" after a jury verdict or plea of guilty, based on "whether the government has established the

required nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). That determination "may be based on evidence already in the record . . . and on any additional evidence or information . . . accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). If either party so requests, the court is to conduct a hearing after the verdict or plea.

Ordinarily, if the court finds that property is subject to forfeiture, it should "promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A). Unless "impractical," the order is to be entered "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32(b)(4)." Fed. R. Crim. P. 32.2(b)(2)(B). Further, "[t]he court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Fed. R. Crim. P. 32.2(b)(2)(A).

## III.    Analysis

From the beginning, this case was procedurally irregular insofar as the government did not file its forfeiture motions until the day before sentencing, and it filed the motion for a preliminary order on the same day that it filed the motion for a final order of forfeiture. Recognizing these irregularities, the court postponed ruling on the issue of forfeiture and ordered additional briefing. Post-remand, the parties have submitted a new round of briefing. The defendant, in short, maintains that the government has not established a rebuttable presumption under § 853(d) that the property or cash at issue is subject to forfeiture nor established by a preponderance of the evidence that these items were derived from, or used to facilitate, the drug-distribution conspiracy. He also argues that the government has failed to meet its burden of

showing that it is entitled to a money judgment in any amount.

**A.     The Money Judgment**

The government has moved for a money forfeiture judgment under 21 U.S.C. § 853(a)(1), which, as set forth above, authorizes the forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result" of the drug-distribution conspiracy. The government argues that the amount sought, $1,000,000, represents a very conservative estimate of the amount of funds the defendant actually obtained, directly or indirectly, during the course of his participation in the conspiracy, as required by 21 U.S.C. § 853(a)(1). In response, the defendant argues that: (1) *Honeycutt* and the Sixth Circuit's remand opinion establish that the amount of the money judgment is limited to the defendant's net profit from the conspiracy; (2) the government has not carried its burden of proof to establish that the defendant actually obtained $1,000,000 through his participation in the conspiracy; and (3) permitting a $1,000,000 money judgment against Bradley would result in an unreasonable sentencing disparity, a factor the court may consider under 18 U.S.C. § 3553(a)(6).

*1.     Net Versus Gross Proceeds*

In *Honeycutt*, the Supreme Court analyzed the meaning of the phrase "obtained, directly or indirectly" in § 853(a)(1). There, the issue was "whether, under § 853, a defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Honeycutt*, 137 S. Ct. at 1630. The defendant and his brother were part of a conspiracy to sell large quantities of iodine, knowing that it would be used to manufacture methamphetamine. *Id.* The government sought forfeiture of the net profits from the sales of the iodine—$269,751.98. *Id.* The defendant's brother eventually pleaded guilty and agreed to forfeit $200,000. The defendant went to trial and was subsequently convicted of several drug charges, including conspiring to distribute iodine. *Id.* Following the defendant's conviction, the government sought forfeiture against him in the amount of the outstanding net

profits derived from the conspiracy, $69,751.98. *Id.* at 1631. Although the defendant had no "controlling interest in the store" and "did not benefit personally," the Sixth Circuit held that the brothers were "jointly and severally liable for any proceeds of the conspiracy." *Id.* (quoting *United States v. Honeycutt*, 816 F.3d 362, 380 (6th Cir. 2016)).

The Supreme Court reversed on the basis that joint and several liability is contrary to the plain language of § 853. *Honeycutt*, 137 S. Ct. at 1632–34. The Court found that the language of the statute limits forfeiture to property that was actually "obtained" by the individual, and "neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else." *Id.* at 1632. The Court stated:

> Section 853(a)(1) further provides that the forfeitable property may be "obtained, directly or indirectly." The adverbs "directly" and "indirectly" modify—but do not erase—the verb "obtain." In other words, these adverbs refer to how a defendant obtains the property; they do not negate the requirement that he obtain it at all. For instance, the marijuana mastermind might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately "obtains" the property—whether "directly or indirectly."

*Id.* at 1633. Ultimately, the Court concluded that "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635. Because the defendant did not have an ownership interest in the store and did not "personally benefit" from the iodine sales, forfeiture was not appropriate. *Id.*

The defendant argues that *Honeycutt* requires that forfeiture be limited to Bradley's "net share" of the proceeds actually acquired by him, which requires deducting the distributions made to other members of the conspiracy. (Doc. No. 1191, at 10.) As suggested above, however, *Honeycutt* did not actually address the issue of net versus gross proceeds, because the government only sought forfeiture based on net profits. Nor does *Honeycutt* suggest that the calculation of the forfeiture amount based on gross proceeds obtained by a particular defendant is improper. To the contrary, *Honeycutt* indicates that a defendant "obtains" the payments he

receives through an intermediary and thus may be liable for forfeiture of funds thus received, suggesting that forfeiture may be based on gross proceeds.

The Sixth Circuit's remand decision is somewhat more ambiguous on the topic of whether the forfeiture amount must be a "net" amount, but, because the issue was not squarely presented, the court did not squarely address it. It stated only:

> The district court did not make any factual findings about how much money Bradley obtained. It found only that the proceeds of the conspiracy amounted to a million dollars. That Jones delivered Buchanan's payments to Bradley tells us nothing about what happened to the money after that. The evidence says nothing about whether Bradley kept all of this money—an improbable development in an eighteen-member conspiracy.

*Bradley*, 897 F.3d at 783. The court does not read this dictum as an actual holding that forfeiture is limited to the "net" amount *re*tained, as opposed to *ob*tained, by a defendant.

Although the Sixth Circuit has not addressed the question directly in a reported opinion, it has held in an unreported opinion that the term "proceeds" as used in § 853(a) must mean gross and not net proceeds. *United States v. Logan*, 542 F. App'x 484, 498 (6th Cir. 2013) (citing *United States v. Olguin*, 643 F.3d 384, 400 (5th Cir. 2011); *United States v. Heilman*, 377 F. App'x 157, 211 (3d Cir. 2011); *United States v. Bucci*, 582 F.3d 108, 123 (1st Cir. 2009)). The court found "persuasive" these courts' determinations, based largely on "the plain language of 21 U.S.C. § 853." *Logan*, 542 F. App'x at 498. For example, the court noted that § 853 "also uses the phrase 'profits or proceeds,' and '[t]o interpret the term "proceeds" in the phrase "profits or other proceeds" to mean profits would render the word "profits" redundant.'" *Id.* (quoting *Bucci*, 582 F.3d at 123).

Post-*Honeycutt*, other circuit court decisions have continued to recognize, albeit without much discussion, that § 853(a) "contemplates the [forfeiture of] gross proceeds and not merely profits." *United States v. Purify*, 743 F. App'x 187, 191 n.5 (10th Cir. 2018); *see also United States v. Leyva*, 916 F.3d 14, 29–30 (D.C. Cir. 2019) (noting that, even following *Honeycutt*, it is "far from clear that property acquired by an organization cannot qualify as property 'obtained,

directly or indirectly' by a leader of that organization" since, in the case of a defendant who is the leader of a criminal enterprise, "property obtained 'indirectly' might include 'property received by persons or entities that are under the defendant's control,' such as 'an employee or other subordinate of the defendant'").

Several district courts, as well, have rejected arguments that *Honeycutt* must mean that a defendant can only be liable for the forfeiture of his net proceeds from the criminal conduct. In particular, this court is persuaded by the analysis in *United States v. Carey*, 267 F. Supp. 3d 29 (D.D.C. 2017), which analyzed in depth the issue. The defendant there, like Bradley here, argued that the term "proceeds" as used in § 853(a) must mean the net profit to the particular defendant against whom forfeiture is sought. The court disagreed:

> Carey's primary argument is that the term "proceeds" as used in § 853(a)(1) refers to net profit (that is, all of the income from the crime minus the expenses) not gross proceeds (simply all of the income). . . . However, the text of the statute and the weight of relevant precedent convince the Court that "proceeds" as used in § 853(a) means gross proceeds . . . .

> The Court first looks to the statute's text and context to understand its meaning. Section 853 does not explicitly state which meaning of "proceeds" it employs. As the Supreme Court has explained, the term "'[p]roceeds' can mean either 'receipts' or 'profits' . . . in ordinary usage." [*United States v. Santos*, 553 U.S. 507, 511 (2008) (plurality opinion).] Thus, "[r]ecognizing the word's inherent ambiguity, Congress has defined 'proceeds' in various criminal provisions, but sometimes has defined it to mean 'receipts' and sometimes 'profits.'" *Id.* at 512 (citations omitted).

> Here, however, "since context gives meaning," the word "proceeds" as used in the context of § 853 is not ambiguous. *See id.* at 512. The section repeatedly uses language that indicates its scope is as broad as possible. It emphasizes that "any property constituting, or derived from, any proceeds" is included, whether obtained "directly or indirectly." 21 U.S.C. § 853(a)(1). The expansive definition of covered property—that is, any property "used, or intended to be used, in any manner or part" to commit the crime, *id.* § 853(a)(2), including "tangible and intangible personal property, including rights, privileges, interests, claims, and securities," *id.* § 853(b), underscores the point. As the Supreme Court has remarked regarding § 853(a), "Congress could not have chosen . . . broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989). The majority of circuit courts to consider whether "proceeds" in § 853 means net profits or gross receipts have reached the same conclusion.

Neither of the two cases relied on by the defendant convince[s] the Court that this interpretation based on the statute's plain text is incorrect. Recently, the D.C. Circuit considered whether a single conspirator could be ordered to forfeit proceeds gained by all co-conspirators that were reasonably foreseeable to him, rather than the proceeds that he alone acquired. The court held that the phrase "any proceeds the person obtained" in § 853(a)(1) limited the permissible forfeiture amount to the defendant's proceeds alone. [*United States v. Cano–Flores*, 796 F.3d 83, 90–95 (D.C. Cir. 2015).] The court provided extensive reasoning, but as relevant here, it explained that even if the statute "permit[ed] the government's construction, '[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.'" *Id.* at 93–94 (quoting *Santos*, 553 U.S. at 514) (second alteration original). The court further explained that the rule of lenity carried more weight than § 853(o)'s instruction to construe the forfeiture statute liberally. *Id.* at 94. . . . But [the rule of lenity] only applies when the statutory text is ambiguous. Here, as explained above, the text is clear: proceeds means gross receipts, not net profits. The rule of lenity is thus inapplicable.

The Supreme Court's decision in *Santos* has even less bearing on this case. In *Santos*, the court held that the term "proceeds" in the statute defining predicate offenses for money-laundering crimes, 18 U.S.C. § 1956(a)(1), was ambiguous and therefore under the rule of lenity must mean only net profits, not gross receipts. That ruling concerned a different statute than the one at issue here, with different statutory text. Moreover, the Court (in both the plurality and the concurring opinions) was concerned with the "merger" problem that would arise if the same underlying conduct—paying the expenses of running an illegal gambling operation—sufficed for both the gambling offense and the money-laundering offense. That problem is not relevant here, because § 853 is only a forfeiture provision; it does not define a substantive offense. For these reasons, multiple circuits have concluded that, despite *Santos*, "proceeds" as used in § 853 refers to gross receipts, not net profits. This Court finds the reasoning of those circuits to be persuasive, and adopts it here. Thus, the Court reads the term "proceeds" as used in § 853(a)(1) to mean gross proceeds.

*United States v. Carey*, 268 F. Supp. 3d 29, 31–33 (D.D.C. 2017) (footnotes and some internal citations omitted); *accord United States v. Ward*, No. 2:16-CR-6, 2017 WL 4051753, at *3 (W.D. Mich. Aug. 24, 2017) (report and recommendation) ("Moreover, *Honeycutt* does not suggest that calculating forfeiture based on gross proceeds is improper. . . . [T]he amount of forfeiture in this case is properly calculated based on gross proceeds."), *report & recommendation adopted*, No. 2:16-CR-06-01, 2017 WL 3981160 (W.D. Mich. Sept. 11, 2017), *aff'd*, 757 F. App'x 507 (6th Cir. 2019) (finding right to appeal waived by the failure to object to report and recommendation).

Given the direct opportunity, the Sixth Circuit may conclude otherwise, but at this juncture, this court is persuaded by the existing precedent from the Sixth Circuit and elsewhere that the statutory term "proceeds" means gross proceeds, not net. Thus, in particular because Bradley was at the head of the conspiracy, the question of what he might have done with the money after "obtaining" it is largely irrelevant. This is true, whether he spent the money to pay his employees or on Nike Air Jordan shoes and weekend trips to Las Vegas.

### 2. What "Proceeds" Did the Defendant "Obtain" in this Case?

The government bears the burden of proving the amount of the proceeds subject to forfeiture by a preponderance of the evidence. *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010); *United States v. Smith*, 966 F.2d 1045, 1052 (6th Cir. 1992). Applying that standard, and regardless of how narrowly the terms are construed, the court finds that the government has established that Bradley obtained well in excess of $1,000,000 during the course of the conspiracy and that it is entitled to a forfeiture judgment in the amount of $1,000,000.

In this case, the defendant concedes that the government has established that Bradley "acquired" $268,007 in "illicit proceeds—the total value of cash deposited from Tennessee into Bradley's and his wife's bank accounts." (Doc. No. 1191, at 10.)[5]  However, in addition to that sum, co-defendant Felicia Jones testified under oath at Bradley's sentencing that co-defendant Donald Buchanan paid for the pills he was buying from Bradley by depositing funds into an account held in Jones' name. Once Buchanan deposited the funds, Jones would "withdraw the money and . . . give it to Mr. Bradley." (Doc. No. 919, at 17.) That is, Bradley obtained this money. This practice started in 2012 and continued until the bank closed the account in approximately June 2014. (*Id.* at 19.) Agent William DeSantis, Special Agent with the IRS Criminal Investigation Unit, testified that the amount deposited into Jones' Bank of America account, the one she testified she held for the purpose of depositing funds that she would later

---

[5] He argues that Bradley should not be responsible for that gross amount, however.

transfer to Bradley, from 2012 through 2014, was $530,618.[6] That figure, added to the amount deposited by Buchanan directly into Bradley's and his wife's accounts during the same time frame, adds up to $798,624.

DeSantis also testified about $55,953 deposited into an account held in Jones' name at Fifth Third Bank. However, Jones never testified that she held the funds in that account for or on behalf of Bradley. In addition, Jones testified that Buchanan had her pick up pills from other people and deliver them to him at the same time that she delivered pills from Bradley and that Bradley had nothing to do with this side endeavor. Thus, she apparently had income from Buchanan that Bradley never in any sense "obtained." Accordingly, the court finds that the government has not established by a preponderance of the evidence that Bradley "obtained" the $55,953 deposited into Jones' Fifth Third Bank account, regardless of whether that figure is nonetheless attributable to the conspiracy as a whole.

Despite that finding, the amount of money that Bradley actually obtained during the course of the drug-distribution conspiracy is not limited to those funds that were part of the money-laundering conspiracy. The court found at sentencing that the government had established by a preponderance of the evidence that the conspiracy began no later than 2009. (Doc. No. 919, at 218–19.) Bradley obviously obtained funds from the conspiracy before the money laundering began in 2012. In addition, following the closure of Jones' Bank of America account in 2014, after the bank apparently began to suspect money laundering, the defendant continued distributing prescription opioids for an additional eight to ten months and continued to profit from that endeavor.

In particular, Jones testified that, after her bank account was closed in mid-2014, Bradley

---

[6] Notably, if forfeiture had been sought against Felicia Jones, the fact that the money from Buchanan was deposited into her account, for Bradley's benefit, and that she conveyed the money to Bradley after Buchanan made the deposits would likely not have been sufficient to establish that Jones herself "obtained" this money. Rather, it was through her that Bradley obtained the money, indirectly, from Buchanan.

had her drive to Cincinnati to deliver pills in exchange for money. She initially made two trips with "a guy named Eric," and then ten to twelve trips on her own. (Doc. No. 919, at 34–35.) She delivered anywhere from 300 to more than 1000 pills per trip, which she exchanged for money that she delivered to Bradley. (*Id.* at 36.)

The government points to two "snapshots" that it claims are revelatory of how substantial each of the hand-deliveries was and how much money each generated in return. First, on January 8, 2015, agents learned through wiretap interceptions that Buchanan would be flying from Nashville to Detroit to meet with Bradley and had enlisted a friend who worked at the airport to help him get a large sum of cash through security. Buchanan later told agents that he had roughly $12,000 in cash with him that day, with some of it hidden in his shoes. Second, on March 12, 2015, Buchanan was arrested as he left his house in Antioch to drive to Cincinnati to meet Jones. Inside his car, he had $24,830 in cash that he was planning to hand to Jones to deliver to Bradley. The government asks the court to "extrapolate" these two snapshots over the "eight-plus months between June 2014 and March 2015," arguing that it supports a conclusion that Bradley personally obtained somewhere between $288,000 and $595,920 during that time frame.

The court has no difficulty in construing the testimony presented during the sentencing hearing as adequate to establish by a preponderance of the evidence that Bradley obtained at least another $202,000 during that time, from Buchanan alone, based on Jones' approximately fourteen trips to Cincinnati (counting the initial two with McEwen), the fact that Jones was not the only person making such trips, and the reasonable presumption that Jones and others brought back a minimum of approximately $12,000 to Bradley after each trip. The evidence presented at sentencing established that, at a minimum, Jones or another co-conspirator made a trip to deliver pills from Bradley to Buchanan at least two to three times per month over the course of at least eight or nine months. Seventeen trips multiplied by $12,000 is $204,000. That figure, when combined with the $798,624 deposited into bank accounts for Bradley's benefit, means that he

personally obtained a gross amount of more than $1,000,000 during the course of the conspiracy.

Alternatively, as summarized in the Presentence Report ("PSR"), co-conspirators Donald Buchanan and Pamela O'Neal provided statements about the number of pills Bradley actually obtained, directly or indirectly, during the course of the conspiracy:

> In making a conservative estimate, based on Buchanan's statements, the defendant is responsible for at least 50 OxyContin (80 mg) pills and 60 Roxicodone (30 mg) pills, both [of] which are oxycodone pills. In addition, the defendant is responsible for 1 Opana (15 mg) pill and 1 Opana (40 mg) pill, both of which are oxymorphone pills.

> 15. Further Pamela O'Neal . . . stated that in 2012, she moved into a residence owned by the defendant located at 14425 Curtis Street, Detroit, Michigan. Beginning in approximately July 2013, the defendant had individuals "drop off" pills at the residence in which she resided. O'Neal stated the main pills she received were oxycodone (30 mg) pills and reported that she received 300 pills per day from July 2013 to March 2012, 2015. In making a conservative estimate of the additional quantity for which the defendant is responsible based on Pamela O'Neal's statements, one can estimate 300 pills per day from July 31, 2013, to March 12, 2015, for a total of 621 days and 186,300 pills (300 x 621). . . .[7]

> 16. In regard to Count One, the total amount of controlled substances for which the defendant is being held accountable is 50 oxycodone (80 mg) pills, 1 oxymorphone (15 mg) pill, 1 oxymorphone (40 mg) pill, and 186,360 (60 + 186,300) oxycodone (30 mg) pills.

(Doc. No. 1019, at 8–9.)

O'Neal's testimony at the sentencing hearing was largely consistent with the information given at her proffer and used by the Probation Office in drafting the PSR. She testified that, to the best of her recollection, she began driving people to the doctor for Bradley "to get their prescriptions." (Doc. No. 919, at 84.) She would drive three to six people a day, three or four days a week. (*Id.* at 85.) This arrangement continued for approximately a year. (*Id.* at 86.) She "got tired" of driving people so, instead, people began dropping pills off at the house owned by Bradley in which O'Neal lived for free. She collected these pills for Bradley. She estimated that,

---

[7] At the sentencing hearing, O'Neal testified that she received five to ten bags of pills per day, and each bag contained from 60 to 90 pills (Doc. No. 919, at 90), so an estimate of 300 pills per day appears to be very conservative.

beginning in August or September 2012, at least ten people were dropping off baggies of pills at the house on a daily basis. She would receive five to ten bags of pills per day, and she estimated that each bag contained from 60 to 90 pills. (Doc. No. 919, at 88–90.) This arrangement continued until she was arrested in March 2015.

Based on the information in the PSR and the testimony presented at the sentencing hearing, the court found that the government established that Bradley himself is responsible for distributing at least 186,412 opioid pills. The court finds that Bradley, as the leader of the conspiracy, obtained, directly or indirectly, that number of pills. As the government argues, the government may, in a narcotics case, sustain its burden of proof as to the amount of a forfeiture by multiplying the number of pills sold by the price for which the defendant sold them, and not merely the net profit pocketed by the defendant from the sale of each pill. *See, e.g.*, *United States v. Basciano*, 649 F. App'x 42, 43 (2d Cir. 2016) ("[I]n a narcotics case, the government may sustain its burden by proving the quantity of [narcotics] dealt . . . multiplied by the price it could have commanded." (internal quotation marks and citation omitted)); *United States v. Prather*, 456 F. App'x 622, 626 (8th Cir. 2012) (holding that a personal money judgment was correctly calculated based on the defendant's cocaine sales and that "[t]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture" (quoting *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011)); *United States v. Huggins*, 392 F. App'x 50, 63 (3d Cir. 2010) (upholding a district court's determination of a forfeiture amount based on statements the defendant made about the amount of cocaine he possessed and law enforcement officers' statements regarding the price of cocaine at the time of the conspiracy).

Here, multiplying the number of pills sold by $10, a very conservative estimate in light of the evidence that many of the pills sold for as much as $32 each, Bradley personally obtained at

least $1,864,120 from the sale of these pills.[8] Bradley likely "obtained" substantially more than this estimate.

In sum, the court finds that the government has established by a preponderance of the evidence that the defendant personally obtained, directly or indirectly, at least $1,000,000 from his participation in the opioid distribution and money laundering conspiracies to which he pleaded guilty.

### 3.     Section 3553(a)(6) Does Not Apply to Forfeiture Determinations

Forfeiture under § 853 is mandatory rather than discretionary. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited."). Moreover, "the statute provides that all right, title, and interest in property subject to forfeiture 'vests in the United States upon the commission of the act giving rise to forfeiture under this section.' This means that '[a]fter the commission of the criminal acts, title to the forfeitable property, by operation of the relation-back clause, actually belongs to the government.'" *United States v. Galemmo*, 661 F. App'x 294, 296 (6th Cir. 2016) (quoting 21 U.S.C. § 853(c) and *United States v. Huntington Nat'l Bank*, 682 F.3d 429, 433 (6th Cir. 2012)). No part of § 853 suggests that courts are to take into account the equitable factors enumerated in § 3553(a) in calculating the amount to be forfeited. *Accord United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) ("Insofar as the district court believed that it could withhold forfeiture on the basis of equitable considerations, its reasoning

---

[8] Moreover, even if only his net profit on the sale of each pill is considered to have been "obtained" by Bradley—that is, the price at which he sold each pill minus the amount he paid for each pill—the evidence supports a presumption that this net figure was at least an average of $6.00 per pill. The Government's Exhibit 1b consists of a transcript of TT9–Call 3192 Line Sheet of a March 2, 2015 telephone call between Bradley and co-defendant Eric McEwan. During this call, McEwen appears to be asking for a break in the sale price. Bradley scoffs that he "can't just make two dollars, three dollars, that's preposterous." Instead, he appears to be insisting on a profit of $6.00 per pill. A profit of $6.00 per pill yields a net profit of at least $1,118,472, still more than the $1,000,000 sought by the government.

was in error."); *United States v. Taggert*, 484 F. App'x 614, 615 n.2 (2d Cir. 2012) (noting that it is "not apparent that § 3553(a)(6) applies to an order of forfeiture," given that both 18 U.S.C. § 3554 and 21 U.S.C. § 853(a) mandate forfeiture where they apply, and neither "incorporates or makes reference to the sentencing factors listed under § 3553(a)"); *United States v. Fleet*, 498 F.3d 1225, 1229 (11th Cir. 2007) ("The word 'shall' [in § 853(p)(2)] does not convey discretion. It is not a leeway word, but a word of command." (internal quotation marks and citation omitted)).

Moreover, as the court found during Donald Buchanan's sentencing hearing, where the government argued that his conduct was comparable to Bradley's, Bradley is significantly more culpable than Buchanan. Bradley was "the one amassing all of the pills in Detroit," sending people to the doctor to obtain prescriptions, and paying them for those prescriptions; he recruited three middle-aged women, Felicia Jones, Pam O'Neal, and his own sister, to run stash houses and store and transport money and drugs, and he generally got them into a "whole lot of trouble." (Doc. No. 948, at 109–10.) None of the other defendants is remotely comparable to Bradley in terms of the seriousness of the conduct. Thus, there are no similarly situated comparators against whom Bradley can claim an unwarranted disparity.

Section 3553(a) does not authorize the court to reduce the amount of forfeiture to be ordered.

### B. The Bundles of Cash

The government seeks the forfeiture of two parcels of cash that were discovered during the execution of search warrants on March 12, 2015 at Bradley's parents' home at 15540 Prevost in Detroit ($46,300) and at Bradley's home on Harmony Lane ($78,300).

Regarding the first parcel, Bradley's sister, Bernadette Bradley, testified at the sentencing hearing in February 2017 that she assisted her brother in distributing money and prescription bottles of pills to people, both of which she would retrieve from their parents' house at his

direction. (Doc. No. 919, at 134–40.) She specifically testified that, at one point, Bradley called her to tell her that their mother wanted him to "move some money because [their] dad was dipping in it." (*Id.* at 139.) Bernadette moved a bundle of money from inside a piano bench to the bar at their parents' house. (*Id.* at 140.) DEA Task Force Officer Frank DeRiggi testified that he assisted in the execution of the search warrant at the house on Prevost and that the evidence seized from that location included a "large sum of currency, firearms and narcotics." (Doc. No. 919, at 150.) Narcotics were found hidden, for instance, inside an ottoman in a poolroom area. Currency in the amount of $46,300 was found hidden behind a bar in the kitchen area of the house, "where Mr. Bradley, the defendant, told his sister to put it." (*Id.* at 152.) DeRiggi was personally involved in locating the money. (*Id.* at 150–52.).

DEA Special Agent John Krieger testified at the sentencing hearing that he was present at the search of Bradley's house on March 12, 2015, when approximately $78,000 in cash was found. (*Id.* at 177.) "[S]ome of the cash was vacuum sealed. The other cash was in bundles." (*Id.* at 178.) Krieger testified regarding the other items found at the house that were "indicative of large sums of money being spent," including expensive jewelry, three Rolex watches, a receipt from the Marquee Nightclub in Las Vegas, Nevada for $11,108.76, and "60-plus pairs of Nike Air Jordans." (*Id.* at 177, 183.)

In his initial Response to the forfeiture motions, as indicated above, the defendant did not object to or even address the forfeiture of the parcels of cash. (Doc. No. 958, at 1.) Now, while he does not dispute that the funds at issue were obtained during the course of the conspiracy, he argues that the government is not entitled to the presumption provided by 21 U.S.C. § 853(d), because it cannot show that "there was no likely source for such property other than" the drug conspiracy. Specifically, he contends that he had "substantial legitimate income before and during the conspiracy," earning "over $292,000 through pension distributions, real estate sales, and his work at Sinai Grace Hospital" between 2010 and 2014. (Doc. No. 1191, at 3 (citing Hr'g

Tr., Doc. No. 1185, at 62–74, and Exhibits 1A, 2A, 3A, 5A, and 6A (Bradley's tax returns for 2010–14)).) Bradley also contends that the amounts reflected on his tax returns "understate" the total amount of funds at his disposal, because he also received almost $100,000 from the sale of eleven investment properties, although he reported a gain of only $23,529 from those sales. In other words, Bradley says, he collected an additional $76,171 in "legitimate funds not reflected" in his tax returns. (Doc. No. 1191, at 3.) He also claims that he received $90,465 in sales from his event promotion business in 2014, but none of that amount is reflected in his gross income for the year, because the business operated at a loss. (*Id.* (citing Exhibit 6A).) He claims that this evidence shows that he had sufficient income from legitimate sources to rebut the presumption in § 853(d). (Doc. No. 1191, at 4.)

Regarding the $46,300 found at Bradley's parents' house, the government, through Bernadette Bradley's testimony, clearly carried its burden of establishing by a preponderance of the evidence that that parcel of cash directly constituted or was derived from proceeds obtained through the sale of drugs, 21 U.S.C. § 853(a)(1), without the need to resort to § 853(d).

Regarding the other parcel of cash, the court finds that the evidence is sufficient to give rise to the § 853(d) presumption and that Bradley has not rebutted it. Bradley pleaded guilty to participation in a multi-year conspiracy to distribute controlled substances including Oxycodone and Oxymorphone. As set forth above, the government has established that Bradley personally obtained at least $1,000,000 in the course of his participation in this conspiracy. From 2010 through 2014, his income from his legitimate job averaged about $58,000 annually. While Bradley suggests that this figure understates his actual income, the evidence to which he points does not support that conclusion. First, although Bradley states that he received over $90,465 in sales from his event-planning business in 2014, the same tax return upon which he relies for that figure also reflects direct overhead expenses of $90,892 and an operating loss for the business. (Hr'g Ex. 6A (2014 Tax Return).) There is no evidence that this business contributed positively

to his cash flow or income. He also states that he received approximately $100,000 from the sale of eleven pieces of property during that relevant time frame, but the actual gains on the properties he purchased was very modest. (*See, e.g.*, Def.'s Exs. 4A and 5A; Doc. No. 1191, at 3.) Moreover, it also appears that he used whatever funds were generated from the sale of property to buy other properties. (*See* Doc. No. 919, at 200 (IRS Special Agent William DeSantis's testimony that the defendant at one time owned 21 pieces of property and, at the time of his arrest, still owned 17).) And his income from his legitimate job, with which he supported a wife and two children, generally would not have allowed him to spend thousands of dollars on investment real estate in the first place, but for the fact that he was also making a substantial amount of money from selling prescription pills.

His legitimate annual income from his job, while sufficient to support his family, was nonetheless modest. A package of cash in the amount of $78,300—substantially more than his annual income—cannot be explained except by his participation in the drug conspiracy. The defendant attempts to avoid this conclusion by citing to various court opinions that support the general proposition that "oddly packaged" currency, "without more, . . . does not suggest a connection to drug trafficking." (Doc. No. 1191, at 9 (quoting *United States v. Mondragon*, 313 F.3d 862, 866 (4th Cir. 2002)).) *See also United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 452 (7th Cir. 1997) ("[T]he mere existence of currency, even a lot of it, is [not] illegal. . . . Absent other evidence connecting the money to drugs, the existence of money or its method of storage are not enough to establish probable cause for forfeiture . . . ."); *United States v. One Lot of U.S. Currency Totaling $14,665*, 33 F. Supp. 2d 47, 49 (D. Mass. 1998) ("The possession of cash, even in large amounts, does not create a rebuttable presumption that one is engaged in criminal activity."). Courts do recognize, however, that "the presence of large quantities of cash reasonably raises suspicions as to its origins and the intent of its holder." *One Lot of U.S. Currency Totaling $14,665*, 33 F. Supp. 2d at 53 (citing *United States v. $150,660*, 980 F.2d

1200, 1206 (8th Cir. 1992)). And in this case, unlike most of those cited by the defendant, the person from whom the cash was seized was actually convicted of participating in a drug-distribution conspiracy, and many other factors beyond simply the existence of a large sum of money contribute to the conclusion that the money is linked to that conspiracy. Moreover, as the court previously found, the location, manner of storage and packaging of the currency constitutes further evidence that the cash was not obtained through legitimate activity.

The court finds that the government has established by a preponderance of the evidence that the cash found at Bradley's house, too, was acquired during the conspiracy and that there was no likely source for the cash—which substantially exceeded his annual income from legitimate sources—other than the drug conspiracy. The motion for forfeiture of both of the cash parcels, therefore, will be granted. The total of the two parcels, $124,600, will be credited against the $1,000,000 money judgment.

### C. The Real Properties

#### a. *45669 Harmony Lane*

Bradley contested the forfeiture of this property prior to the remand. Agent DeSantis testified at the sentencing hearing that he had conducted a title search but never found a recorded deed that transferred ownership of the property to Bradley, though he did find a recorded deed that transferred the property from Bradley to his wife, Kareema Hawkins, on April 23, 2015, six weeks after Bradley was indicted. (Doc. No. 919, at 201–02.)

DeSantis submitted an Affidavit in May 2017 that included additional information. Specifically, he had discovered that Krikor Holding Company ("KHC") owned the Harmony Lane property in 2012 and that Majid Krikor was the owner of KHC. KHC had purchased the property from Wayne County, Michigan in 2012 for $87,499. (Doc. No. 986-1 ¶ 1.) Majid Krikor had further told DeSantis that he sold the property to Benjamin Bradley in 2014 for "approximately $105,000 in gold coins and scrap gold." (*Id.* ¶ 2(b).) Krikor did not remember

the exact date of the transaction but recalled signing a deed and giving it to Bradley. (*Id.*) Krikor had been able to locate a Tax Form 1120s that he had filed with his 2014 tax return, reflecting that he had sold the property on January 1, 2014. Krikor stated that he did not recall the exact date of the transaction but believed that it had taken place in early 2014. (*Id.* ¶ 2(d).) Benjamin Bradley was listed as the taxpayer for the property at the Wayne County Treasurer's Office in 2014. (*Id.* ¶ 3 & Ex. 2.)

DeSantis's Affidavit also indicated that Bradley had been arrested on March 12, 2015 and remained in custody continuously after that time. Nonetheless, DeSantis had located a deed, purporting to show Bradley's signed and notarized signature, conveying the Harmony Lane property to Kareema Hawkins. The visitor logs for the jail where Bradley was detained did not reflect a visit from the notary, Sonja Halton. (Doc. No. ¶¶ 4–9.)

At the May 2019 hearing, DeSantis testified that he had done additional research since the sentencing hearing and the submission of his affidavit. He had spoken again with Krikor, who told DeSantis that he had sold the property to Bradley "probably a couple months after he purchased the house" for "[a]round a hundred thousand dollars. He wasn't sure of the exact amount." (Doc. No. 1185, at 47.) Bradley paid for the property "in gold coins [and] scrap gold," "including some watches," in installment payments over the course of "a year or so." (*Id.* at 47, 48.) DeSantis had also obtained a tax document from Krikor that reflected the sale of 45669 Harmony Lane on January 1, 2014 for $91,350. (*Id.* at 9 & Gov't Ex. 3A.) DeSantis explained that that figure would reflect the "proceeds from the sale. So if . . . there were some expenses that were paid, then that would come off the top line." (Doc. No. 1185, at 50.)

Although DeSantis searched for a deed reflecting the transfer from Krikor to Bradley, he was unable to find one, but he did receive a document from the tax division of the Wayne County clerk's office. The document reflects that the property was sold by Krikor Holding, LLC to Benjamin Bradley on October 31, 2012 for $100,000. (Doc. No. 1185, at 51 and Gov't Ex.

4A.) It was signed by Ben Bradley on February 3, 2014. According to DeSantis, the purpose of submitting this document would have been to ensure that the property tax bill was sent to Bradley instead of Krikor. (Doc. No. 1185, at 50.)

DeSantis had also done additional research into the question of whether the deed conveying the property to Kareema Hawkins was forged. Besides having established that the jail records did not reflect that the notary, Sonja Halton, had visited Bradley in jail, DeSantis tracked down Halton, who told him she had not notarized the deed and, in fact, had never notarized a real estate document. Finally, DeSantis noted that he had researched the current status of the Harmony Lane property and discovered that, as of January 2019, it was listed for sale for $449,000. (Doc. No. 1185, at 55–56.)

On cross-examination, defense counsel attempted, essentially, to impeach Krikor through DeSantis and to highlight inconsistencies regarding the sale price and the lack of specificity regarding when, exactly, the sale had taken place. DeSantis agreed that, when he first spoke to Krikor in 2017, Krikor had told him he sold the Harmony Lane property to Bradley for $105,000. (Doc. No. 1185, at 57.) Questioned again in 2019, he remembered the sale price as being "around $100,000." (*Id.* at 59.) The tax document reflected a sale price of around $91,000. DeSantis conceded that any major expenses and capital improvements would have been reflected in the cost basis and not the sales proceeds but maintained that any sales expenses would be deducted from the sales price. (Doc. No. 1185, at 58.) Counsel asked whether Krikor had originally told him that Bradley had paid for the property in one lump sum. DeSantis explained that he probably had not asked how Bradley had paid: "I don't know that I asked him how it was paid until yesterday. . . . I just assumed at the beginning maybe that he paid it in one lump sum. . . . I asked him how much [Bradley] paid for it." (*Id.* at 60.) DeSantis reiterated that he was not aware until his conversation with Krikor just before the May 2019 hearing that Bradley had paid in installments over time and that there was no actual documentation reflecting how or when the

sale took place:

> I don't know that the actual sale took place in 2012 or 2013 or 2014. There's no documentation regarding the actual date.
>
> The only dates that we know that are recorded are the deed when Mr. Krikor purchased the property and the time [Bradley] transferred it to Kareem Hawkins.
>
> His statement on the property tax bill is the statement that was submitted to the clerk's office. I don't have any way to verify that date. I don't know if October 31st was the date.
>
> I have a . . . range of time when the transaction could have occurred. That's October 18th of 2012 when Mr. Krikor bought it and then ultimately sold it to Mr. Bradley, and he started receiving tax bills.

(Doc. No. 1185, at 61–62.)

In his post-remand Response to the government's forfeiture motions, Bradley argues that (1) the government's evidence does not show that Bradley paid for the Harmony Lane house with funds drawn from an account where he stored illicit proceeds; (2) the government's evidence does not establish any direct link between payments Bradley received through the conspiracy and funds used to purchase the Harmony Lane property; (3) payment in gold over an approximately fourteen-month period is insufficient to establish that the property was purchased with funds derived from the drug-distribution offense, particularly since no evidence was presented to establish the source or origin of the gold supposedly used to pay for the house; (4) Bradley's tax records establish that he had sufficient funds to pay for the purchase of the Harmony Lane house, whether in gold or otherwise; and (5) Krikor's statements are not reliable.[9]

---

[9] Bradley also asserts, in a footnote, that "[t]he government has never reconciled Krikor's contentions with the auction sheet introduced at Bradley's sentencing hearing (Def.'s Ex. 3), which indicates that Bradley purchased Harmony Lane through an auction." (Doc. No. 1191, at 7 n.6.) The exhibit to which he refers, however, simply shows that someone purchased the property at a tax auction for $87,499 on September 20, 2012. At the sentencing hearing, the court agreed to accept the exhibit but noted that no foundation had been laid for it and that it constituted hearsay. Nothing in the record remotely suggests that Bradley purchased the property at auction in 2012. The tax record signed by Bradley states that he purchased the house in October 2012 from Krikor Holding, LLC for $100,000. (Gov't Ex. 4A.) Moreover, DeSantis testified that he had ascertained that KHC had purchased the property in 2012 for $87,499. The defendant's Exhibit 3 is entirely consistent with DeSantis's testimony.

Most of the defendant's arguments are beside the point. The government's evidence is sufficient to establish by a preponderance of the evidence that the Harmony Lane house was purchased during the course of the conspiracy and that it was purchased for approximately $100,000 over the course of just over a year. Bradley's income from legitimate sources was not sufficient to have allowed him to pay cash to purchase the house within such a short time frame irrespective of whether payment was in the form of gold coins and jewelry or U.S. dollars. The § 853(d) presumption in favor of forfeitability therefore arises, and Bradley has not rebutted that presumption.

In particular, while Bradley asserts that he "took home roughly $290,000 in post-tax, legitimate income between 2010 and 2014" (Doc. No. 1191, at 3), suggesting that this sum somehow would have been enough to fund the purchase of the home, this figure, divided by five years, amounts to an average annual income of $58,000—a significant but nonetheless modest salary. Annual income in the amount of roughly $58,000 would certainly have been sufficient to permit Bradley to provide for his family's needs, but it is not enough to allow him to purchase a home for $100,000 in cash in one year, particularly in the absence of any evidence that he had been setting aside savings from his legitimate income over the course of several years (at a minimum).[10]

Bradley also asserts that the more reasonable assumption is that he purchased the property by "reinvesting" funds he obtained from selling other properties. As set forth above, however, the evidence introduced by the government indicates that the net income from Bradley's real estate business—like the net income from his event-planning business—was minimal. Moreover, it appears that Bradley used the funds obtained from selling investment

---

[10] As William DeSantis testified at the May 2019 hearing, an income of $60,000 annually yields approximately $5,000 per month, but paying off a $100,000 house over the course of fourteen months would mean payments of roughly $7,000 per month. (Doc. No. 1185, at 86.) Bradley's legitimate work income was clearly not sufficient to afford these payments.

properties to buy other investment properties. The only realistic source of the funds used to purchase the Harmony Lane house was the drug-dealing conspiracy.

The court has no need to consider the circumstances of Bradley's conveyance of the property to Kareema Hawkins, which took place after he had been arrested. If she believes that she is a bona fide purchaser for value or otherwise has a legal claim to the property, she may assert a claim to establish her entitlement to the property by following the procedure set out in the accompanying Order.

**b.**     ***14427 Curtis, 16617 Lesure, and 15355 Ohio***

At the sentencing hearing in February 2017, IRS Special Agent William DeSantis testified that Bradley purchased 16617 Lesure on November 18, 2011 for $3,000. (Doc. No. 919, at 200–01.) He purchased 14427 Curtis and 15355 Ohio Street on November 16, 2012 for $1,800 and $900. (*Id.* at 201.) Regarding these properties, Bradley argues that the government has not established that the § 853(d) presumption arises and that the government has not carried its burden of establishing that these properties were used for or purchased with funds derived from the drug distribution conspiracy.

In particular, he claims that he purchased all of the properties for "very modest sums" and that his income, whether from his job or from selling other properties, was more than sufficient to cover the purchase prices. The court finds, again, that, while Bradley's income was sufficient to support his family, it was not so great that he would likely have had cash on hand to begin purchasing investment properties in 2011, but for his participation in the drug-distribution conspiracy. Moreover, although the purchase prices of each of the properties individually was relatively small, Bradley at one point owned as many as twenty-one properties. In other words, the total he spent on real estate added up, and his income from his job was not sufficient to support the purchase of these properties and his family as well. Specifically, given that Bradley's legitimate income was less than $5,000 per month, pulling together $3,000 to pay for a piece of

real estate (and he actually bought two pieces of real estate in November 2011, each for about $3,000) from that salary is not realistic. There is no evidence that the defendant had a savings account in which he had been stashing away a few hundred dollars per month from his salary over a long period of time to make these purchases, nor is there evidence of any real estate loans. The court therefore finds that the government has established that "there was no likely source [of funds for the purchase] for such property other than" the offenses of conviction, 21 U.S.C. § 853(d), and Bradley has not come forward with any actual evidence to rebut the presumption that the properties are subject to forfeiture.

## IV.  Conclusion

For the reasons set forth herein, the government's Motion for Entry of a Preliminary Order of Forfeiture (Doc. No. 858) and Motion for an Order of Forfeiture of at Least a $1,000,000 United States Currency Money Judgment (Doc. No. 861) will be granted. To be clear, the $1,000,000 forfeiture judgment is the maximum total to which the government is entitled, and the value of the forfeited real estate and cash by Bradley shall be credited toward the $1,000,000. An appropriate Order is filed herewith.

ENTER this 20th day of August 2019.


ALETA A. TRAUGER
United States District Judge