No. 3:15-cr-00037-2

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

---

**UNITED STATES OF AMERICA**,

*Plaintiff*,

v.

**BENJAMIN BRADLEY**,

*Defendant.*

---

## BENJAMIN BRADLEY'S RENEWED MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO MODIFY SENTENCE

---

Defendant Benjamin Bradley, through undersigned counsel, renews his motion to modify his sentence under 18 U.S.C. § 3582(c)(1)(A) and supplements his letter dated April 20, 2020. (Dkt. 1245, Letter, PageID# 5484.) For the reasons set forth in the incorporated memorandum of law, he moves this Court to reduce his sentence to time served and convert his remaining sentence to supervised release with a condition of home confinement for a period this Court finds appropriate. In the alternative, Mr. Bradley requests this Court reduce his sentence by 80 months to a term of 124 months, giving him priority consideration for transfer to home confinement by the Federal Bureau of Prisons.

## MEMORANDUM OF LAW

## I.     INTRODUCTION

This Court can and should exercise its discretion to modify Mr. Bradley's sentence to supervised release under 18 U.S.C. § 3582(c)(1)(A)(i), just as in *United States v. Loyd*, No. 2:15-cr-20394-AJT-RSW (E.D. Mich. May 21, 2020) (slip opinion included as Ex. A). In *Loyd*, the defendant had pleaded guilty to conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846. (Ex. A at 1.) Loyd had a Criminal History Category of 1 at sentencing, and he was serving a 10-year sentence at FCI Loretto. (*Id.*) He had minimum risk of recidivism, and he had been selected for transfer to home confinement before the Department of Justice issued new guidance taking him off the priority consideration list. (*See id.* at 10–11.) And Loyd had medical conditions, including severe obesity and hypertension, placing him at a greater-than-normal risk of life-threatening complications from COVID-19. (*Id.* at 6–8.) The court found those health risks, combined with prison conditions making the spread of COVID-19 likely, extraordinary and compelling reasons to modify Loyd's sentence. (*Id.* at 9.)

The same is true, and even more so, for Mr. Bradley. Mr. Bradley is incarcerated at FCI Milan, where 130 inmates and staff members have already contracted COVID-19—and three of those inmates have died. By contrast, Loretto has not yet had any reported cases of the disease. (Ex. A at 8.) Like Loyd, Mr. Bradley was a nonviolent offender in the minimum criminal history category convicted of a drug-distribution offense. Mr. Bradley was also being considered for home confinement by the Bureau of Prisons. And Mr. Bradley suffers from both severe obesity and hypertension, just like Loyd.

Mr. Bradley satisfies the statutory requirements for modification under § 3582(c)(1)(A)(i). His heightened risk of death from COVID-19 is an extraordinary, compelling reason for release. The BOP has recognized he is not a danger to the community; indeed, he has demonstrated

exemplary conduct and rehabilitation since his conviction. And modifying his sentence to supervised release would serve the purposes of federal sentencing under 18 U.S.C. § 3553(a). For these reasons and those set forth below, this Court should exercise its discretion to modify the remainder of his sentence to supervised release with home confinement.

## II.     PROCEDURAL HISTORY AND FACTS

In June 2016, Mr. Bradley pleaded guilty to conspiracy to possess and distribute controlled substances in violation of 21 U.S.C. §§ 841(a) and 846 and to conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956. (Dkt. 1027, Plea Hr'g Tr., PageID# 4028.) In February 2017, this Court sentenced him to 204 months' imprisonment. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3432.) His prison sentence was affirmed on appeal. *United States v. Bradley*, 897 F.3d 779 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1221 (2019) (mem.).

Mr. Bradley is serving his sentence at FCI Milan, a low-security federal prison. (Ex. B at 1.) According to his official sentencing calculation, as of May 11, 2020, including credit for time in jail before his sentencing, he had served 62 months of his sentence. (Ex. C at 3.) His full term expires March 8, 2032. *Id.* While in custody, Mr. Bradley has maintained a clean disciplinary record. (Ex. D.) So, with good time credit, his projected release date is September 2, 2029. (Ex. C at 3.) Not including good time credit, he has served 30.4% of his sentence; including good time credit, he has served 35.7%. *Id.*

In March 2020, the COVID-19 pandemic began to spread rapidly through the United States. The number of confirmed cases in the United States grew from about 1,500 on March 11 to about 188,000 on March 31. *See COVID-19 Map*, Johns Hopkins Univ. Coronavirus Res. Ctr., https://coronavirus.jhu.edu/map.html (last accessed May 21, 2020).[1] Congress, recognizing

---

[1] Click "US" at the top of the left sidebar titled "Confirmed Cases by Country/Region /Sovereignty," then mouse over the graph of confirmed cases in the bottom right.

COVID-19's dangers and its potential for rapid spread through the prison system, enacted the CARES Act, which authorized the BOP to transfer prisoners to home confinement. Pub. L. No. 116-136, § 12003, 134 Stat. 281 (2020), https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (pp. 235–36).

On April 16, Mr. Bradley's case manager at Milan informed him the BOP had selected him for transfer to home confinement under the CARES Act program because he met its criteria for eligibility. (Dkt. 1245, Letter, PageID# 5484.) These criteria include being convicted only of nonviolent offenses, having a minimal risk assessment, and having no disciplinary action in the previous year. Memorandum from U.S. Attorney Gen. to Dir. of Bureau of Prisons (Mar. 26, 2020), https://www.justice.gov/file/1262731/download. Mr. Bradley and his case manager signed Mr. Bradley's summary reentry plan on April 19. (Ex. B at 4.) But the next day, April 20, the Department of Justice added an additional criterion for priority consideration, that an inmate serve half his sentence. (*See* Dkt. 1245, Letter, PageID# 5484; *see also* Ex. E, Broton Decl. ¶ 19.) As a result, Mr. Bradley's transfer to home confinement was not approved. (Dkt. 1245, Letter, PageID# 5484.) After receiving a message from Milan's warden about this policy change, Mr. Bradley sent a letter to the warden requesting compassionate release.[2]

That same day, Mr. Bradley wrote this Court a letter requesting compassionate release in light of the COVID-19 pandemic. (Dkt. 1245, Letter, PageID# 5484.) On May 6, this Court, construing Mr. Bradley's letter as a motion under 18 U.S.C. § 3582(c)(1)(A), ordered the Federal Defender to determine whether Mr. Bradley was entitled to relief. (Dkt. 1246, Order, PageID#

---

[2] Mr. Bradley is unable to provide this Court a copy of his letter to the warden because lockdown policies at Milan prevented him from making a copy before sending it. (*See* Dkt. 1245, Letter, PageID# 5484.) Undersigned counsel requested a copy from the BOP, but correspondence with Assistant U.S. Attorney Cecil VanDevender indicates the BOP has not yet located the letter.

5488.) After undersigned counsel filed an appearance in this Court for Mr. Bradley on this matter, (Dkt. 1248, Appearance, PageID# 5491), this Court vacated its appointment of the Federal Defender, (Dkt. 1249, Order, PageID# 5492). This renewed motion and supplemental memorandum of law now follows.

## III.  ARGUMENT

### A.  Mr. Bradley Has Satisfied the Statutory Exhaustion Requirement.

This Court may consider Mr. Bradley's motion because he sent a letter requesting compassionate release to Milan's warden on April 20, 2020, Part II, *supra*. Section 3582(c)(1)(A) requires a defendant to wait 30 days after the warden receives his request before moving in the district court. In accord with the statute, Mr. Bradley's letter preceded this renewed motion by at least 30 days.

### B.  Extraordinary, Compelling Reasons and the Purposes of Federal Sentencing Justify Modifying Mr. Bradley's Sentence.

COVID-19 poses a grave threat to Mr. Bradley's health. He has a high risk of infection from incarceration in prison, and he is at a greater-than-average risk of developing life-threatening complications from the disease. The pandemic and his risk of death from it are extraordinary, compelling reasons to modify Mr. Bradley's sentence. Additionally, Mr. Bradley would not be a danger to the community on supervised release. The BOP has even recognized this fact—it found him eligible for release to home confinement. And, as required by § 3582, the 18 U.S.C. § 3553(a) sentencing factors support modifying his remaining prison term.

#### 1.  COVID-19's threat to Mr. Bradley's health and safety, together with the high risk of infection from incarceration at Milan, present extraordinary, compelling reasons to modify his sentence.

COVID-19's contagiousness and the conditions inside prisons pose unprecedented threats to the health and safety of both staff members and inmates, including Mr. Bradley. Combined with

4

the risk factors increasing his chance of complications from COVID-19, his continued incarceration creates a significant chance of his severe illness or death. These circumstances are extraordinary and compelling reasons to modify Mr. Bradley's sentence.

### a. Mr. Bradley is in great danger of catching COVID-19 at Milan.

Mr. Bradley's continued custody in federal prison, and at Milan in particular, puts him at a high risk of contracting the coronavirus. COVID-19 can spread so easily in prisons because inmates live and work in close quarters and because both staff and inmates constantly move into and out of the facilities. And COVID-19's spread in southeastern Michigan, where Milan is located, makes it even more likely Mr. Bradley will be infected while imprisoned there.

### i. Prisons are, unfortunately, an ideal environment for COVID-19's spread.

COVID-19 is highly contagious. Like the flu, the coronavirus spreads primarily from one person to another through water droplets discharged when an infected person coughs, sneezes, or talks. *See How COVID-19 Spreads*, Ctrs. for Disease Control and Prevention (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. To minimize the likelihood of transmission, the CDC recommends people stay at least six feet apart from each other, but infected individuals can expel water droplets greater distances. *Id.* And some studies suggest COVID-19 remains suspended in the air for long time periods. *See* Tanya Lewis, *How Coronavirus Spreads Through the Air: What We Know So Far*, Scientific American (May 12, 2020), https://www.scientificamerican.com/article/how-coronavirus-spreads-through-the-air-what-we-know-so-far1.

COVID-19 poses an ongoing threat to everyone living and working in prisons. *See United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. Apr. 20, 2020). The disease spreads swiftly in prisons because they are "ideal transmission grounds for the virus." *See United States v. Doshi*, No. 13-cr-20349, 2020 WL 1527186, at *2 (E.D. Mich. Mar. 31, 2020). With

many inmates and limited space, prisons are "highly congregational environment[s]." *Atwi*, 2020 WL 1910152, at *4.

Furthermore, inmates have "limited ability . . . to exercise effective disease prevention measures." *Atwi*, 2020 WL 1910152, at *4. There is not enough physical space in the facilities for meaningful social distancing. *See, e.g.*, *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) ("At [FCI] Otisville, '120 inmates eat elbow-to-elbow at the same time, share one large bathroom with a handful of stalls and a handful of showers, and sleep together in bunks beds only a few feet apart that are divided principally between two dormitories (as opposed to individual cells).'"). (*See also* Ex. F, depicting current living conditions at Milan.) There are often inadequate supplies to maintain hygienic practices like handwashing and disinfecting surfaces. (*See* Ex. G at 9, noting that inmates at Michigan's Oakland County Jail "pass materials, such as food, hygiene items, and the DMQ used to clean their cells from one cell to the next" and "share showers, toilets, sinks, brooms, and cleaning supplies"; *id.* at 23 (highlighted portions).) And prisons have "potentially limited onsite healthcare services," *Atwi*, 2020 WL 1910152, at *4, restricting their ability to quarantine infected individuals effectively from the general population.

And prisons cannot be adequately cordoned off from their surrounding communities. According to the CDC, "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention /guidance-correctional-detention.html. These opportunities include staff members' daily movements into and out of the facility, inmates' movements between facilities and systems, court

appearances, medical visits, and "visits from family, legal representatives, and other community members." *Id.*

Even more alarming, those with COVID-19 can be contagious but asymptomatic. It can take up to two weeks for symptoms to develop, so infected individuals can spread the virus before they know they are sick. *See* Brian Resnick, *COVID-19 Is Way, Way Worse than the Flu*, Vox (May 5, 2020), https://www.vox.com/science-and-health/2020/5/5/21246567/coronavirus-flu-comparisons-fatality-rate-contagiousness. Many infected individuals never exhibit any symptoms at all. *Id.* These traits allow the virus to spread quickly and, in some circumstances, virtually undetected. Although measures can be taken to reduce the risk the virus will enter a facility, such as eliminating transfers and visits or quarantining new arrivals, there is simply no way to prevent infected yet asymptomatic staff members from spreading the virus to inmates. And eliminating visits would be untenable in the long-term because it would significantly reduce inmates' contact with family and friends—severely diminishing their quality of life—and inhibit effective communication with counsel.

The difficulty of containing COVID-19 in federal prisons is real, not theoretical. Federal prisons around the country are dealing with outbreaks. At FCI Lompac, a facility similar in size to Milan, 792 prisoners were infected with COVID-19 on May 9, with the number cases ballooning by more than 300 within just a few days. Richard Winton, *70% of Inmates Test Positive for Coronavirus at Lompoc Federal Prison*, L.A. Times (May 9, 2020), https://www.latimes.com /california/story/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates. And at FMC Fort Worth, the number of individuals with COVID-19 nearly doubled from 131 to 241 in five days. Kaley Johnson, *Coronavirus Cases at Fort Worth Prison Nearly Double Again, 2 More Reported Dead*, Fort Worth Star-Telegram (Apr. 27, 2020), https://www.star-telegram.com/news

/coronavirus/article242330651.html. The experiences at Lompac and Fort Worth vividly illustrate the virus's destructive potential in federal prisons.

In sum, until an effective, safe vaccine is available, COVID-19 will continue to spread rapidly in prisons. But a vaccine is still in testing, and it will likely be unavailable for at least 12 to 18 months. *COVID-19 (Coronavirus) Vaccine: Get the Facts*, Mayo Clinic, https://www .mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-vaccine/art-20484859 (last accessed May 20, 2020).

### ii. COVID-19's spread in Southeastern Michigan puts Milan in an especially perilous position.

Milan's location in southeastern Michigan makes it particularly susceptible to another wave of infections. This region is one of the country's major hotspots for COVID-19. *See How Washtenaw County Became an Early Michigan Hotspot for Coronavirus*, MLive (Apr. 28, 2020), https://www.mlive.com/news/ann-arbor/2020/04/how-washtenaw-county-became-an-early-michigan-hotspot-for-coronavirus.html (describing COVID-19's spread in Washtenaw County, where Milan is located). In Detroit alone, over 10,500 have contracted the virus, and 1,295 have died from it. *Coronavirus – Michigan Data*, State of Mich., https://www.michigan.gov /coronavirus/0,9753,7-406-98163_98173---,00.html (last accessed May 21, 2020). At Milan, the virus has infected 129 inmates and staff. *BOP: COVID-19 Update*, Fed. Bureau of Prisons (May 21, 2020), https://www.bop.gov/coronavirus (above the map of the U.S., click the hyperlink "Full breakdown and additional details," then sort the table by "Inmate Deaths"). And it has killed three

inmates, all with preexisting health risks,[3] putting Milan in the top seven deadliest federal prisons in the country for COVID-19 patients. *Id.*

While the number of active cases at Milan has declined from its peak, that does not mean Mr. Bradley is safe there. Even one infected inmate or staff member poses a risk to the rest of the prison population. Furthermore, the BOP's website does not have information about the number of inmates it has tested. Without comprehensive and repeated testing of the entire population, there are likely a significant number of asymptomatic, unreported inmates with COVID-19. (*See* Ex. A at 8, stating "zero confirmed cases [at FCI Lorretto] is likely more a result of lack of testing than a lack of the virus' presence in the prison.")

And another wave of cases is still likely. Despite Michigan Governor Gretchen Whitmer's measures to limit the virus's community spread, political pressure to reopen Michigan is growing. *See* Craig Mauer & Beth LeBlanc, *Whitmer: Thursday Protests Make Reopening Economy 'More Precarious,'* Det. News (May 13, 2020) https://www.detroitnews.com/story/news/local/michigan /2020/05/13/groups-mobilize-more-protests-michigan-capitol-over-govs-restrictions /5181975002. And Governor Whitmer's current measures are due to expire June 12. *Whitmer Extends Stay-at-Home Order Through June 12*, Det. News (May 22, 2020), https://www .detroitnews.com/story/news/local/michigan/2020/05/22/whitmer-extends-stay-home-order-through-june-12/5247671002. Based on public reaction to reopening in states such as neighboring Wisconsin, people—from Michigan and from out-of-state—are likely to flock to bars and restaurants, disregarding safety measures such as masks. *See* Elliot Hughes, *As Wisconsin*

---

[3] See the three press releases issue by the BOP, all entitled *Inmate Death at FCI Milan*, dated April 24, April 27, and May 1, 2020. https://www.bop.gov/resources/news/pdfs/20200424_press _release_mil.pdf; https://www.bop.gov/resources/news/pdfs/20200427_press_release_mil.pdf; https://www.bop.gov/resources/news/pdfs/20200501_press_release_mil.pdf.

9

*Reopens, Resort Town Fills with People Who Appear to Be 'Just Kind of Done with It All,'* Milwaukee Journal Sentinel (May 16, 2020), https://www.jsonline.com/story/news/2020/05/16 /coronavirus-hundreds-flock-lake-geneva-downtown-most-without-masks/5207663002. Experts warn reopening "without adequate testing and without adequate contact tracing" will likely lead to secondary waves that will not be recognized "until they start appearing in the emergency room." Jorge L. Ortiz, *'They're Playing Russian Roulette': As States Reopen amid Coronavirus, Experts Warn of Risks*, USA Today (Apr. 28, 2020), https://www.usatoday.com/story/news/nation/2020 /04/28/coronavirus-states-reopening-carries-risks-akin-russian-roulette/3041298001. The virus does not respect prison walls, so it will continue to spread at Milan.

Warmer weather will not likely reduce the danger, either. To be sure, the flu and other respiratory illnesses are seasonal because increased humidity in warmer months hinders their spread. *See* Jason Beaubien, *Will Summer Slow the Spread of COVID-19? Scientists Try to Figure It Out*, NPR (Apr. 9, 2020), https://www.npr.org/sections/goatsandsoda/2020/04/09/830297538 /scientists-try-to-figure-out-if-summer-will-slow-the-spread-of-covid-19. But recent research has suggested COVID-19 may not be similarly affected by changes in humidity. *See* James Gorman, *Summer Is Coming but the Virus Won't Be Going*, N.Y. Times (May 8, 2020), https://www .nytimes.com/2020/05/08/health/virus-summer-pandemic.html (noting findings that "variations in heat and humidity had little to no effect on the spread of the pandemic"). Regardless, inmates at facilities like Milan spend most hours indoors, so changes in outdoor humidity will not reduce the risk of transmission inside. And even if COVID-19 is seasonal, Milan will likely experience a resurgence of cases come fall and winter.

**b. Mr. Bradley has a high risk of developing severe, life-threatening symptoms if he contracts COVID-19.**

COVID-19 threatens Mr. Bradley's life. Having infected over 1.5 million Americans, the coronavirus is known to have claimed over 93,000 lives in this country, yielding a 6% fatality rate overall. *COVID-19 Map*, *supra* (click "US" at the top of the left sidebar titled "Confirmed Cases by Country/Region/Sovereignty"). The actual death rate is likely higher. *See* Josh Katz et al., *U.S. Coronavirus Death Toll Is Far Higher Than Reported, C.D.C. Data Suggests*, N.Y. Times (Apr. 28, 2020), https://www.nytimes.com/interactive/2020/04/28/us/coronavirus-death-toll-total.html. Indeed, COVID-19 may be ten times deadlier than the flu. *See* Resnick, *supra*.

And the reported 6% death rate does not take into account specific factors increasing the disease's severity and deadliness. Although some people develop only mild symptoms from COVID-19, many require hospitalization. In serious cases, the lungs become inflamed and filled with fluid, making breathing difficult. Mika Gröndahl et al., *In the Fight to Treat Coronavirus, Your Lungs Are a Battlefield*, N.Y. Times (May 8, 2020), https://www.nytimes.com/interactive /2020/05/08/health/coronavirus-covid-lungs-ventilators.html. COVID-19 can also attack the heart, kidneys, and nervous system and lead to lethal blood clots. Lenny Bernstein & Ariana Eunjung Cha, *Doctors Keep Discovering New Ways the Coronavirus Attacks the Body*, Wash. Post (May 10, 2020), https://www.washingtonpost.com/health/2020/05/10/coronavirus-attacks-body-symptoms.

Mr. Bradley has at least three risk factors making it likely he will suffer potentially deadly complications from COVID-19. One, severe obesity, is a medical condition recognized by the CDC as a risk factor for severe complications. Mr. Bradley stands 5'11" tall and weighs about 295

pounds, (Ex. H at 1),[4] with a body mass index around 41.1, *Calculate Your BMI – Standard BMI Calculator*, Nat'l Heart, Lung & Blood Inst., U.S. Dep't of Health & Hum. Servs., https://www .nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last accessed May 20, 2020). A BMI of 40 or greater characterizes severe obesity. *Defining Adult Overweight and Obesity*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/obesity/adult/defining.html (last accessed May 21, 2020). As the CDC has explained, "[s]evere obesity increases the risk of a serious breathing problem called acute respiratory distress syndrome," which "can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients." *People Who Are at Risk for Severe Illness*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed May 20, 2020).

Second, Mr. Bradley's blood pressure has been consistently around 130/70 to 140/80, which is stage 1 hypertension, *High Blood Pressure (Hypertension) – Diagnosis and Treatment*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417 (last accessed May 20, 2020).[5] The CDC has stated that COVID-19 "can damage the respiratory system and make it harder for [the] heart to work" for people with "serious heart conditions" including high blood pressure. *See People Who Are at Risk for Severe Illness*, *supra*. And even though high blood pressure is not separately listed on the CDC list of risk factors,

---

[4] Mr. Bradley has told counsel he is currently about 295 pounds. The most recent measurement in the medical records the BOP has provided is from June 2019, at 284 pounds. (Ex. H at 1.) Even 284 pounds yields a BMI of 39.6 for Mr. Bradley, *Calculate Your BMI*, *supra*, just shy of the cutoff for severe obesity. (*See* Ex. A at 8, "dismiss[ing] as unpersuasive" "medical minutiae" the government's argument that a BMI of 39.7 is not a risk factor for severe complications from COVID-19.)

[5] Mr. Bradley informed counsel of his usual range of 130/70 to 140/80. The BOP has not provided medical records for June 2019, but his blood pressure measurement in June 2019 was 140/90 (Ex. H at 1.) If his blood pressure is consistently at or above that level, he in fact would have the "[m]ore severe" stage 2 hypertension. *High Blood Pressure (Hypertension) – Diagnosis and Treatment*.

medical experts believe that people with hypertension "also face a higher risk of experiencing severe COVID-19 outcomes." (Ex. G at 11–12; *see also* Ex. A at 7, finding hypertension to be a risk factor for severe complications.)

Additionally, Mr. Bradley is African American. African Americans have been overrepresented in the COVID-19 patient population relative to other racial groups. *COVID-19 in Racial and Ethnic Minority Groups*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov /coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last accessed May 20, 2020) (describing both differences in socioeconomic conditions and disparate rates of chronic medical conditions and "chronic and toxic stress" as contributing factors).

The confluence of these three factors makes a COVID-19 infection more deadly for Mr. Bradley than the average American—who already faces at least a 6% chance of death. (*See* Ex. A at 8, finding that even if BMI slightly less than 40, hypertension, and immunosuppression from corticosteroids did not "perfectly fit the definition of severity, as outlined by the CDC, all of [these] conditions compounded still place [the defendant] in a much more vulnerable position than a healthy person, if he were to get COVID-19" (citing Jennifer Lighter et al., *Obesity in Patients Younger than 60 Years Is a Risk Factor for COVID-19 Hospital Admission*, Infectious Diseases Soc'y of Am. (Apr. 9, 2020), https://academic.oup.com/cid/advance-article/doi/10.1093/cid /ciaa415/5818333).) One expert has opined that "medically-vulnerable individuals are probably at double or triple the risk of experiencing severe COVID-19 outcomes as compared to the general population." (Ex. G at 12.) Eighteen percent is about a one-in-six chance. If Mr. Bradley caught COVID-19 at Milan, his life would be in the hands of a roll of the dice.

13

**2. Mr. Bradley's model postconviction conduct demonstrates that, far from posing a risk of further crimes, he is truly rehabilitated and would be an asset to his community.**

Aside from the extraordinary circumstances justifying modifying his sentence to home confinement, modifying Mr. Bradley's sentence would overall benefit the community. The BOP has recognized explicitly that he has a "minimum" risk of reoffending. (Ex. I.) And Congress has recognized implicitly through the First Step Act that he should be extended an opportunity for a reduced sentence. Moreover, his upstanding conduct in custody, his acceptance of responsibility, and his desire to right his wrongs demonstrate both his rehabilitation and his reentry's value to the community. Therefore, he more than satisfies the requirement that he not pose a danger to the community to qualify for relief under § 3582.

**a. As the BOP and Congress have recognized, Mr. Bradley poses little danger to the community.**

Consistent with 18 U.S.C. § 3553(a)(2)(C), converting Mr. Bradley's remaining prison sentence to home confinement would not threaten the public. Mr. Bradley was in Criminal History Category I, the lowest category, before his arrest for the crimes he is serving time for. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3431.) He has committed no misconduct throughout his five years of custody. (Ex. D); *cf. United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at *8 (S.D. Miss. May 1, 2020) (granting compassionate release to a defendant convicted of a "serious, violent crime" yet who "kept a clean conduct record absent one offense at the beginning of his incarceration"). And Mr. Bradley's offenses were nonviolent. Although this Court found a sentencing enhancement appropriate for firearm possession "[u]nder the technicalities of the enhancement," this Court found "no evidence [Mr. Bradley] ever used . . . guns" or "went armed." (Dkt. 919, Sent'g Hr'g Tr., PageID# 3431.) Indeed, Congress included his crimes of conviction among those eligible for reduced sentences under the First Step Act. *See* 18 U.S.C.

§ 3632(d)(4)(D). That reflects its legislative judgment Mr. Bradley's crimes are not so severe to preclude extending him a chance at a lesser sentence.

Even the BOP has recognized Mr. Bradley is not a risk to the community. It keeps him in a low-security facility. (Ex. I.) It has classified Mr. Bradley as having the lowest possible recidivism risk, "minimum." (*Id.*) Mr. Bradley has at least a high-school education. (PSR ¶¶ 59–60; Ex. B at 1.) He has complied with his financial obligations in prison. (Ex. B at 2–3.) He has completed over 10 programs in custody. (Ex. B at 1–2.) All of these facts indicate Mr. Bradley has a low risk of recidivism. *See* U.S. Dep't of Justice, *The First Step Act of 2018: Risk and Needs Assessment System – UPDATE* 37–39 (2020), https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf. And the BOP has deemed him a "candidate for referral for Home Confinement" under the CARES Act. (Ex. B at 3.) All of these factors indicate that the BOP believes Mr. Bradley is unlikely to commit future crimes.

Further, Mr. Bradley would have adequate supervision and resources, both from his family and his community, to satisfy the conditions of his home confinement. *Cf. Kelly*, 2020 WL 2104241, at *8 (granting compassionate release to a defendant who was a "model prisoner" with a "verified reentry plan" and who "plan[ned] to live with his brother, who is a police officer"). Mr. Bradley's case manager has already signed off on his reentry plan. (Ex. B at 4.) He would live with his parents, Cheryl and Ben, in Detroit, who prepared a room for him when they heard the BOP was initially planning to transfer Mr. Bradley to home confinement. (Dkt. 1254, Letter, PageID# 5514.) His parents, retired health-care workers, (*id.*), are the chief administrative officer and pastor of Grace New Covenant Church in Detroit, *Leaders*, Grace New Covenant Church, https://gracenewcovenant.org/leaders (last accessed May 20, 2020). Mr. Bradley plans to

participate in several of the church's numerous outreach programs,[6] and he has an opportunity for work at a downtown Detroit business, along with youth and community outreach through that business, (Ex. J, Caputo Letter at 3).[7]

### b. Mr. Bradley has demonstrated not only exemplary conduct but also true rehabilitation since his conviction.

Mr. Bradley has fulfilled the promise to better himself that he made at his sentencing. In his more-than-five years in custody, Mr. Bradley has been a model prisoner. He has no history of misconduct in prison. (Ex. D.) He has paid his $200 mandatory special assessment in full. (Ex. B at 2–3.) He has taken at least 17 different educational courses since September 2017, including drug education, a parenting program, an American history class, and leatherworking. (*Id.* at 1–2.) Mr. Bradley is especially proud of his leatherwork, particularly a handcrafted bag he made for his niece. (Ex. J, David Bradley Letter, at 2.) As he said at sentencing, he continually improves himself by "regularly attend[ing] church," "read[ing] a lot of books," and "buil[ding] a stronger relationship with God." (Dkt. 919, Sent'g Hr'g Tr., PageID# 3366; *see also* Dkt. 1223, Letter, PageID# 5439.)

Mr. Bradley has reflected on his crimes and understands the harmful consequences of his past behavior. He recognizes his actions were motivated by greed—"to make some quick and easy money to buy things" he did not need. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3363.) He has a new appreciation for what really matters—his family—and the blessings he took for granted by choosing to sell drugs. He acknowledges the pain he caused others: both his family, who lost a husband, father, and son; and his victims, users who ultimately bought the opioids he sold. (*Id.* at

---

[6] In any outside-the-home activity, Mr. Bradley would use appropriate protective equipment and social distancing measures until a vaccine is available.

[7] The pagination used here for the letter from Matthew Caputo is based on his handwritten page numbers, not the page numbers generated by the facsimile service.

PageID# 3363–64.) He accepts responsibility for his actions, and he strives to atone for them. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3362.) His letters of support—from people who have spoken to him and visited him regularly throughout the last five years—demonstrate Mr. Bradley's remorse and yearning to turn his life around. (*See* Ex. J, Williams Letter at 2; Moore Letter at 2; Watson Letter; Caputo Letter at 4–5; David Bradley Letter at 1–2.)

Far from trying to avoid responsibility, Mr. Bradley aspires to make amends by contributing to his community. His top priority is to be available for his children, who are having trouble in school and would benefit from his presence in their lives. (Dkt. 1245, Letter, PageID# 5485.) He would be a positive influence on them, helping to keep them on a path to success. *See, e.g.*, Jeffrey Rosenberg & W. Bradford Wilcox, U.S. Dep't of Health & Hum. Servs., *The Importance of Fathers in the Healthy Development of Children* 12 (2006), https://www.childwelfare.gov/pubPDFs/fatherhood.pdf (reporting "an active and nurturing style of fathering is associated with better verbal skills, intellectual functioning, and academic achievement among adolescents"). He would help his elderly parents around the house and support their church's numerous outreach programs, including programs distributing food and facemasks to those in need. (*See* Dkt. 1254, Letter, PageID# 5514.) And, fulfilling the wish he expressed at his sentencing, Mr. Bradley would work with youth through his opportunity with a downtown Detroit business. (Ex. J, Caputo Letter at 3.) Specifically, he would "educate [at-risk youth in his community] about the system from [his] experience firsthand because a lot of them don't really know" how their choices will affect both their lives and those around him. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3367; *see also* Ex. J, Williams Letter at 1.)

### 3. The remaining applicable § 3553(a) sentencing factors weigh in favor of reducing Mr. Bradley's sentence.

Upon consideration of the § 3553(a) sentencing factors, as required by § 3582(c)(1)(A), this Court should find that those factors support exercising its discretion to modify Mr. Bradley's sentence. As explained in Section II.B above, modifying Mr. Bradley's sentence would satisfy the need to protect the public from further crimes by Mr. Bradley, per 18 U.S.C. § 3553(a)(2)(C). It would also satisfy the other purposes of federal sentencing under § 3553(a). And in performing this analysis, this Court can and should consider Mr. Bradley's postconviction conduct. *Cf. Pepper v. United States*, 562 U.S. 476 (2011); *see also United States v. Al-Jumail*, No. 12-20272, 2020 WL 2395224, at *4 (E.D. Mich. May 12, 2020) (finding "*Pepper*'s use of positive post-sentencing evidence instructive" in the analysis for granting compassionate release).

#### a. Nature and circumstances of the offense.

First, modifying Mr. Bradley's sentence would be consistent with his offenses' nature and circumstances, per 18 U.S.C. § 3553(a)(1). Mr. Bradley's crimes were serious and he had a serious role in them, (Dkt. 919, Sent'g Hr'g Tr., PageID# 3428), and he fully acknowledges that fact. Even so, as discussed above, his offenses were nonviolent. And Congress saw fit to allow defendants convicted of his offenses to receive early release credit under the First Step Act. *See* Section II.B.1, *supra*.

#### b. Mr. Bradley's history and characteristics.

Modification to home confinement is also the most appropriate sentence for Mr. Bradley in light of his history and personal characteristics, per 18 U.S.C. § 3553(a)(1). Mr. Bradley's health conditions and race mean that the COVID-19 pandemic puts him at a significant risk of death in prison. Part I, *supra*. And, like the defendant in *Kelly*, he would be adequately supervised during home confinement by his parents and church community.

18

Another relevant personal characteristic is that, including his projected First Step Act credit, Mr. Bradley has served over half his sentence. The BOP classified him as having a "minimum" recidivism risk level. (Ex. I.) So long as he maintains a minimum risk level and satisfactorily participates in programming under the First Step Act, Mr. Bradley is eligible to receive an effective reduction of his remaining sentence by one-third. *See* 18 U.S.C. § 3632(d)(4)(A) (awarding 15 days of time credits to prisoners with a minimum risk of recidivism for every 30 days of successful program participation). And Mr. Bradley's offenses do not disqualify him from receiving time credits. *See* 18 U.S.C. § 3632(d)(4)(D) (listing the offenses ineligible for First Step Act credit). His sentence computation start date is February 1, 2017, and his projected release date (with good time credit) is September 2, 2029. (Ex. C at 3.) From now until that projected release date is about 111 months. Under the First Step Act, Mr. Bradley would therefore be eligible for up to approximately 37 additional months (about one-third of 111 months) of credit. That would make his release date about August 2026. The difference between his sentence start date, February 1, 2017, and the August 2026 release date is approximately 114 months, and the 62 months Mr. Bradley has already served constitutes about 54% of that expected sentence.

### c. The need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct.

Moreover, Mr. Bradley's sentence after modification would still reflect his offenses' seriousness, promote respect for the law, and provide just punishment under 18 U.S.C. § 3553(a)(2)(A). A period of home confinement is an unusually strict form of supervised release: except for preapproved outside activities, he could not leave his home. Yet Mr. Bradley welcomes these strict conditions because he knows he is capable of abiding by them, and most importantly, he will not reoffend. (Dkt. 1245, Letter, PageID# 5485.)

19

Because home confinement would continue to impose a burden on Mr. Bradley's liberty, modifying Mr. Bradley's sentence would still serve federal sentencing's deterrent purpose, per 18 U.S.C. § 3553(a)(2)(B). Certainly Mr. Bradley would be deterred from criminal conduct— breaching his home confinement conditions would send him back to prison. He has already indicated that nothing would be worth losing his family and freedom again. (Dkt. 1245, Letter, PageID# 5485.)

And home confinement would also serve the public's general deterrent interest. A sentence modification would be understood as resulting from a once-in-a-lifetime, extraordinary circumstance: the health threat posed by COVID-19. No one would consider Mr. Bradley's five to ten years of home confinement a license to break the law—anyone who committed a crime like his would still expect to receive a stiff prison sentence. And the strictness and length of Mr. Bradley's home confinement conditions would remain a strong disincentive to potential offenders.

### d. The need to provide Mr. Bradley with needed training, medical care, or other correctional treatment in the most effective manner.

Mr. Bradley would receive needed training, medical care, and other correctional treatment more effectively on supervised release than in prison. *See* 18 U.S.C. § 3553(a)(2)(D). By definition, incarceration limits an inmate's liberty. And by limiting Mr. Bradley's liberty, prison limits his opportunities for continued rehabilitation. (Dkt. 919, Sent'g Hr'g Tr., PageID# 3427, stating "rehabilitation is not a purpose of sentencing in federal court.") While the COVID-19 pandemic continues, prison medical resources will necessarily be diverted from other inmate wellness programs. Therefore, in home confinement, Mr. Bradley would be able to take advantage of more comprehensive medical, fitness, and dietary regimens to lose weight and control his blood pressure. While Mr. Bradley has taken advantage of coursework and programming at Milan, those

opportunities are still necessarily limited by incarceration and the pandemic. Mr. Bradley would more effectively receive needed rehabilitative treatment in home confinement than prison.[8]

### e. Pertinent policy statements by the Sentencing Commission.

Last, there are no applicable Sentencing Commission policy statements counseling against converting Mr. Bradley's sentence to home confinement. Both 18 U.S.C. §§ 3553(a)(5) and 3582(c)(1)(A) require this Court to consider the commission's relevant policy statements. As the court noted in *Kelly*, because the commission has not amended its policy statements since Congress enacted the First Step Act, it "does not have a policy position applicable to motions for compassionate release" under the First Step Act." 2020 WL 2104241, at *7 (quoting *United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322, at *2 (E.D. La. Apr. 2, 2020)).

In fact, courts have recognized an extension of the Sentencing Guidelines policy statement for medical release. Specifically, that "health issues or an advanced age that place[s] the prisoner under a . . . 'heightened risk of severe illness' given what we now know about who is most susceptible to the virus" forms a sufficient reason to warrant sentence reduction or modification. *Kelly*, 2020 WL 2104241, at *7 (quoting *United States v. Colvin*, Criminal No. 3:19cr179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020)) (collecting cases). And because Mr. Bradley "is not a danger to the safety of any other person or to the community," Section II.B.1, *supra*, he satisfies the second prong of § 1B1.13's policy statement.

## IV. CONCLUSION

On May 12, 2020, Dr. Anthony Fauci warned the Senate Health Committee that prematurely halting social distancing measures could lead to "little spikes" of coronavirus

---

[8] Mr. Bradley's treatment outside of prison would also serve the public fisc. Federal taxes would no longer support his health care, and more prison resources would be available for those still incarcerated at Milan.

infection "that might turn into outbreaks." *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript*, Rev.com (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12. With a population of over 1,400 inmates and limited space, Milan cannot effectively implement social distancing. *See* Press Release, Fed. Bureau of Prisons, Inmate Death at FCI Milan (May 1, 2020), https://www.bop.gov/resources/news/pdfs/20200501_press_release_mil.pdf (stating Milan houses 1,430 inmates). Absent a vaccine, another outbreak at the facility is almost inevitable. Mr. Bradley, suffering from at least two CDC risk factor for severe complications, is at risk of an effective death sentence in prison. He is not a danger to the community—to the contrary, his rehabilitation would make him an asset to the community. And modifying his sentence would not undermine its need to reflect his crimes' seriousness and to deter wrongdoing.

For these reasons, this Court should modify Mr. Bradley's sentence by converting his remaining prison term to supervised release, with home confinement for a period this Court considers appropriate. In the alternative, this Court should reduce his term by 80 months, which would increase his time served to 50% of his maximum sentence and allow him priority consideration for transfer to home confinement.

Respectfully submitted,

*/s/ Melissa M. Salinas*
MELISSA M. SALINAS (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic
Jeffries Hall, Room 2058
701 South State Street
Ann Arbor, MI 48109
(734) 764-2724
salinasm@umich.edu
*Counsel for Benjamin Bradley*

Christopher I. Pryby

22

*Law School Graduate on Motion*

James W. Randall
*FALC Fellow on Motion*

Lucyanna V. Burke
Sophia W. Montgomery
*Law Students on Motion*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify this document was filed on May 22, 2020, using the Court's ECF system,

which will send notice of this filing to all counsel of record indicated on the electronic receipt.

*/s/ Melissa M. Salinas*
MELISSA M. SALINAS (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic