**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cr-00037-2** |
| | ) | |
| **BENJAMIN BRADLEY,** | ) | **Judge Trauger** |
| | ) | |
| **Defendant.** | ) | |

**RESPONSE TO MOTION FOR COMPASSIONATE RELEASE**

Benjamin Bradley has filed a motion for compassionate release, under 18 U.S.C. § 3582(c)(1)(A), on the basis of concerns about contracting COVID-19. (DE# 1256, Motion.) In it, he asks that the Court reduce "reduce his sentence to time served and convert his remaining sentence to supervised release with a condition of home confinement for a period this Court finds appropriate," or, in the alternative, to "reduce his sentence by 80 months to a term of 124 months, giving him priority consideration for transfer to home confinement" by the Bureau of Prisons ("BOP"). (*Id.* at # 5518.) The government respectfully submits that the motion should be denied.

First, Bradley has not exhausted his administrative remedies. Although he has filed a request with the warden of his prison asking to be transferred to home confinement under the BOP priority home confinement program, it does not appear that he has ever asked the warden to file a motion on his behalf for a reduction in sentence under the compassionate release statute.

Second, Bradley has not demonstrated "extraordinary and compelling reasons" within the meaning of § 3582(c)(1) and U.S.S.G. § 1B1.13. Although he appears to have moderate high blood pressure (also known as "regular hypertension" or "systemic hypertension"), there is no evidence that he suffers from "pulmonary hypertension," which is the listed CDC risk factor. In addition,

the medical records do not bear out his assertion that he has experienced a recent weight gain that puts his body-mass index just above 40%, which is the CDC cut-off for "severe obesity."

Third, even if Bradley had shown both exhaustion and extraordinary and compelling reasons, his motion should still be denied in light of the 18 U.S.C. § 3553(a) factors and other considerations. As the leader of a multi-year, interstate conspiracy that funneled tens of thousands of opioids into the community, his offense conduct was extremely serious, yielding an offense level that was higher than the top end of the sentencing table. The Court ultimately granted Bradley a substantial downward variance, but he has served only a relatively small percentage of that sentence. Any further reduction would not be sufficient to satisfy the purposes of § 3553(a). Moreover, even assuming that Bradley's body-mass index is fractionally greater than 40%, such that he could be deemed technically eligible for a reduced sentence, this is hardly a case in which he is suffering from the sort of serious or life-threatening medical conditions that warrant the extraordinary remedy of compassionate release.

## I. BACKGROUND

### A. Background of the Underlying Criminal Case and Related Post-Conviction Case

The Court is already familiar with the facts and procedural history of this case, and has set them out in detail in prior opinions. (*See* DE# 1202, Memorandum, #4925-31, 4939-44; *see also* Civ. DE# 10, Memorandum, #97-106.)[1] The Sixth Circuit has also summarized those details in *United States v. Bradley*, 897 F.3d 779 (6th Cir. 2018). In short, a wiretap investigation revealed that Bradley was at the top of a distribution chain that sent tens of thousands of diverted opioid

---

[1] The government will refer to docket entries in this case, 3:15-cr-00037, with the citation form "DE# __," and will refer to docket entries in the related 28 U.S.C. § 2255 case, 3:19-cv-000643, with the citation form "Civ. DE# __."

2

pills from the Detroit area to the Nashville area. Bradley eventually pleaded guilty to conspiracy to distribute Schedule II controlled substances and conspiracy to commit money laundering.

At sentencing, the Court found a total offense level of 45, which is two levels above the top of the sentencing table. (DE# 919, Sentencing Hearing Tr. #3410.) While that offense level would normally yield an advisory guidelines range of life imprisonment, the "guideline sentence" in this case became 480 months, given the statutory maximums on the two counts of conviction. (*Id.* at #3414-15.) After considering all the § 3553(a) factors, the Court granted Bradley "a very generous variance" and imposed a total sentence of 204 months. (*Id.* at PageID#: 3427-37.) The Court also ordered forfeiture of several pieces of real property and granted a forfeiture money judgment.

On direct appeal, the Sixth Circuit affirmed Bradley's sentence of imprisonment, but vacated the forfeiture order and remanded for further proceedings. *Bradley*, 897 F.3d at 782-86. After considering additional evidence and argument on remand, this Court entered an amended forfeiture order, which is now the subject of a pending appeal.

Separately, in 2019, Bradley filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. (Civ. DE# 1, Motion.) Among the allegations he raised were various claims of ineffective assistance of counsel and the claim that he would not have pleaded guilty (and would have insisted on going to trial) had he realized that he had been charged with *knowingly* conspiring to distribute drugs. (*Id.*) The Court denied Bradley's motion to vacate and denied a certificate of appealability. (Civ. DE# 10, Memorandum.) Bradley's has sought a certificate of appealability from the Sixth Circuit, which remains pending.

**B. Background of BOP's Response to COVID-19 Generally.**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." Id. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

4

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors. Social and legal visits were stopped as of March 13, and remain suspended at this

time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. *See* https://www.justice.gov/file/1262731/download. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* https://www.justice.gov/file/1266661/download. As of this filing, BOP has transferred 3,793 inmates to home confinement, which is an increase of 133% since March 2020. *See* https://www.bop.gov/coronavirus/index.jsp.

Taken together, all of these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

7

**C. Background of Bradley's Consideration for Home Confinement.**

Bradley was admitted into BOP custody in August of 2017. (DE# 1256-3, Bradley Sentencing Information, #5562.) His current projected release date is September 2, 2029. (*Id.* at #5563.) As of May 11, 2020, Bradley had served 30.4% of his full sentence, and 35.7% of his projected sentence (including good-time credits). (*Id.*)

Bradley is serving his sentence at FCI Milan, located in Milan, Michigan. In keeping with BOP guidance, FCI Milan has adopted numerous measures to mitigate the risk that the virus will enter the prison and spread among the inmates. (*See* Ex. A, FCI Milan Memoranda.) As of April 21, 2020, FCI Milan had 57 inmates who were positive for COVID-19. (*Id.* at p. 2.) As of the date of this filing, BOP reports that five inmates and three staff members are currently positive for COVID-19, with 66 inmates and 54 staff members having recovered. *See* https://www.bop.gov/coronavirus/index.jsp. Unfortunately, three inmates there have died from COVID-19. *Id.*

On or about April 19, 2020, Bradley's case manager told him that he would be transferred to home confinement under the BOP priority home confinement program described above. (Ex. B, Administrative Request.)[2] The following day, Bradley's case manager told him that he would not, in fact, be transferred to home confinement, largely because he had not yet served 50% of his sentence. (*Id.*) On May 8, 2020, Bradley filed a request for administrative remedy—which the warden received on May 13, 2020—in which he complained of the "Bait and Switch" that he was subjected to when he was initially told that he would be transferred to home confinement only to have that plan rescinded. (*Id.*) He therefore "request[ed] the BOP/Warden release me to home

---

[2] The undersigned has not been able to independently confirm that such a conversation occurred, but for purposes of this motion, the government accepts that Bradley's case manager told him that he would be transferred to home confinement.

confinement." (*Id.*) BOP recorded this administrative request as a request to be transferred to home confinement. (Ex. C, Administrative Remedy History.) BOP has not located any separate request in which Bradley has asked the warden for a reduction in sentence under 18 U.S.C. § 3582(c)(1).

## II. APPLICABLE LAW

In general, a "court may not modify a term of imprisonment once it has been imposed except" in certain narrow circumstances. 18 U.S.C. § 3582(c). These circumstances include a motion for a reduction in sentence on the basis of compassionate release. *Id.* The First Step Act of 2018 modified 18 U.S.C. § 3582(c)(1)(A) to permit individual defendants (rather than solely the Director of BOP) to file such a motion in the district court. A court may only grant such a motion, however, "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

As the Sixth Circuit recently held, this exhaustion requirement is a mandatory-claims processing rule that cannot be disregarded or excused on the basis of equitable exceptions such as futility. *See United States v. Alam*, -- F.3d --, 2020 WL 2845694 (6th Cir. June 2, 2020). Thus, when a defendant files a motion for compassionate release without first requesting compassionate release from the warden and then either waiting 30 days or exhausting administrative remedies, the motion must be denied without prejudice. *Id.* at *5. As the proponent of the motion, the defendant bears the burden of showing that he has exhausted his administrative remedies. *United States v. Van Sickle*, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (collecting cases).

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds,

9

as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the

possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).[3]

### III. Discussion

#### A. Bradley Has Not Demonstrated Exhaustion.

As noted, a court must deny a compassionate release motion without prejudice unless the defendant has shown that he has filed a request for compassionate release with the warden and either exhausted his administrative remedies or waited for 30 days to lapse. *Alam*, 2020 WL 2845694, at *4-5. Here, it is clear that the warden of FCI Milan received an administrative request from Bradley on May 13, 2020 (just under 30 days ago). But that administrative request did not ask BOP to file a motion in the district court to reduce his sentence under § 3582(c)(1). Instead, Bradley's request asked BOP to abide by the statement previously made by Bradley's case manager, advising him that he would soon be transferred to home confinement.

But "[i]t is important to understand that a request for home confinement under the CARES Act is different than a reduction-in-sentence (RIS) request based upon compassionate release." *United States v. Allen*, 2020 WL 2199626, at *1 (S.D. Ga. May 6, 2020) (Wood, J.). "The BOP is utilizing its authority under 18 U.S.C. § 3623(c)(2) and 34 U.S.C. § 60541—not the compassionate release provision of 18 U.S.C. § 3582(c)—to effectuate the Attorney General's directive to the BOP regarding home confinement in connection with the CARES Act." *Id.* Thus, a defendant's

---

[3] As the Court is aware, there is disagreement among courts over the scope of application note 1(D), and whether it authorizes individual judges to identify "other reasons" beyond those listed elsewhere in the policy statement or set out in the BOP program statement. *Compare United States v. Mollica*, 2020 WL 1914956, at *3-4 (S.D. AL Apr. 20, 2020) (collecting cases); *United States v. Medlin*, 3:09-cr-204, DE# 105 (M.D. Tenn. May 7, 2020) (Richardson, J.) *with United States v. Young*, 2020 WL 1047815 (M.D. Tenn. Mar. 4, 2020) (Trauger, J.). There is no need to reach that issue here, however, since Bradley appears to rely only on application note 1(A) and does not suggest that there are "other reasons" for his release beyond his medical condition when combined with the risk of an adverse outcome if he were to contract COVID-19.

request for transfer to home confinement, under the CARES Act and the Attorney General's memoranda, does not necessarily qualify as a request for compassionate release and does not automatically begin the running of the 30-day clock. *Id.*; *see also United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020) ("Simply put, the Court cannot consider a motion for compassionate release that is based on evidence or arguments that weren't presented to the Bureau of Prisons first."); *United States v. Mogavero*, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden.").

To be sure, there may be some requests that could reasonably be read to encompass both remedies. And the government does not suggest that a request must formally cite 18 U.S.C. § 3582(c)(1) or use any specific magic words. But here it is clear that Bradley's May 8 administrative request was based solely on the BOP's home confinement program. (Ex. B, Administrative Request.) It did not identify any medical conditions that would make Bradley particularly vulnerable to COVID-19 or otherwise attempt to establish extraordinary and compelling reasons warranting a reduction in sentence. As such, even if it had been received by the warden more than 30 days ago, Bradley's claim has not been properly exhausted, and it should be denied without prejudice. *Alam*, 2020 WL 2845694, at *4-5.

### B. Bradley Has Not Shown Extraordinary and Compelling Reasons.

Even if Bradley had demonstrated exhaustion, he has not shown extraordinary and compelling reasons warranting a reduction in sentence. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and

compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

At the present time, it is apparent that, but for the COVID-19 pandemic, Bradley would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment.

As an initial matter, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not provide a freestanding basis for a sentence reduction. The categories set out in the policy statement encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[4] To classify the threat of COVID-19

---

[4] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with

13

itself as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement.

Nevertheless, the government acknowledges that if a defendant has a chronic condition that the CDC has identified as heightening the risk of severe injury or death were the inmate to contract COVID-19, that chronic condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n. 1(A)(ii). Such chronic conditions include:

- Asthma (moderate to severe);

- Chronic kidney disease being treated with dialysis;

- Chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis;

- Diabetes, including type 1, type 2, or gestational;

- Hemoglobin disorders, such as sickle cell disease and thalassemia;

- Immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications;

---

no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

- Liver disease, including cirrhosis;

- Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and

- Severe obesity, defined as a body mass index (BMI) of 40 or above.[5]

Here, Bradley asserts that he has two such medical conditions: hypertension and severe obesity. But Bradley has not provided sufficient documentation to support these assertions.

With regard to hypertension, it is important to note that the applicable CDC risk factor is "pulmonary hypertension," which is classified as a type of "serious heart condition."[6] Pulmonary hypertension is "a type of high blood pressure that affects the arteries in your lungs and the right side of your heart." *See* https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697. It is not the same thing as simple high blood pressure, which is known as "regular hypertension" or "systemic hypertension."[7]

---

[5] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions.

[7] *See* https://phassociation.org/patients/aboutph/ ("Pulmonary hypertension (PH), is a complex and often misunderstood disease. The term PH means high blood pressure in the lungs. In 'regular' hypertension (also known as high blood pressure or 'systemic['] hypertension) the pressure in the arteries throughout the body is higher than it should be. This can be measured with a blood pressure cuff. In PH, the blood vessels specifically in the lungs are affected. They can become stiff, damaged or narrow, and the right side of the heart must work harder to pump blood through."); https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system ("Unlike systemic blood pressure, which represents the force of your blood moving through the blood vessels in your body, pulmonary blood pressure reflects the pressure the heart exerts to pump blood from the heart through the arteries of the lungs. In other words, it focuses on the pressure of the blood flow in your lungs."); https://www.webmd.com/lung/pulmonary-arterial-hypertension ("Having pulmonary arterial hypertension (PAH) means that you have high blood pressure in the arteries that go from your heart to your lungs. It's different from having regular high blood pressure.").

15

Here, Bradley's medical records show that, on June 17, 2019, his blood pressure was recorded as 140 over 90. (DE# 1261, Sealed Medical Records, p. 81.) That reading appears to put him right at the threshold for Stage 2 hypertension. *See* https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines ("A reading of 140/90 mm Hg or higher is considered Stage 2 hypertension . . . ."). Other medical records confirm that Bradley does not suffer from any sort of severe, debilitating, or life-threatening form of high blood pressure. For example, records from August 9, 2017, August 17, 2017, September 12, 2017, and July 17, 2019 all say: "Hypertension: Denied." (DE# 1261, Sealed Medical Records, pp. 1, 8, 28, 62.) In the record from June 17, 2019, the "health history" section indicates that Bradley has no history of "Heart disease/Hypertension." (*Id.* at p. 81.) The notes from August 9, 2017 (when he arrived at FCI Milan) further state: "Patient denies prior blood pressure medication use. He arrived with a prescription for amlodipine 10 mg take one tab by mouth daily. Patient reports 'I was never prescribed that...I never took that, my blood pressure was fine.'" (*Id.* at p. 5.) Thus, it appears that Bradley suffers, at most, from a relatively mild form of systemic or regular hypertension. There is no indication that he suffers from pulmonary hypertension, which is the CDC risk factor.

Turning to the question of obesity, medical records indicate that on June 17, 2019, Bradley's height was measured as 5'11" and his weight was measured as 284 pounds. (*Id.* at p. 81.) As Bradley notes, this puts his BMI at 39.6, just below the cutoff for "severe obesity," the listed CDC risk factor. Bradley has told defense counsel that he now "weighs about 295 pounds." (DE# 1256, Motion, #5529-30.) But he has not substantiated that assertion with any medical records, and has therefore failed to carry his burden to show the existence of a CDC risk factor. *See, e.g.*, *United States v. Cooper*, 2020 WL 2064066, at *4 (D. Nev. Apr. 29, 2020) ("Cooper has not demonstrated that his medical situation presents extraordinary and compelling circumstances for compassionate release because he offers no records to support these diagnoses" of asthma and chronic sleep apnea); *United States v. Crouch*, 2020 WL 1963781, at *2 (W.D. Ky. Apr. 23, 2020) ("Crouch has not provided any medical records indicating a lung condition or any other factors that would make him at a greater risk for the virus."); *United States v. Aguila*, 2020 U.S. Dist.

16

LEXIS 62826 (E.D. Cal. Apr. 9, 2020) (the defendant "claims he has high blood pressure, high cholesterol, sleep apnea, and diabetes, [but] fails to provide evidence to verify these claims"); *United States v. Lotts*, 2020 WL 835298, at *2-3 (D.N.M. Feb. 20, 2020) (denying motion alleging "substantial health problems, including 'stage two diabetes,' chronic asthma, congestive heart failure (which required angioplasty), high blood pressure, and severe arthritis," where "Defendant has not provided the Court with any evidence substantiating these conditions, much less their severity").

Because Bradley has not demonstrated that he has any CDC risk factor, he has not shown the existence of any extraordinary and compelling reason for a reduction in sentence, as required by § 3582(c)(1) and § 1B1.13.[8]

### C. Even if Extraordinary and Compelling Reasons Existed, Bradley's Motion Should Still Be Denied.

Finally, even if the Court were to find that extraordinary and compelling reasons exist, Bradley has not shown that a sentence reduction is warranted under the 18 U.S.C. § 3553(a) factors and other relevant considerations. As part of its analysis, the Court should consider the severity of the inmate's underlying condition, how well that condition is being managed in custody, whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated, and whether the inmate would receive adequate medical treatment if he were to contract the virus after being released. These considerations will often depend, in part, on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution. *Cf.* 28 C.F.R. § 571.61(a)(2) (requiring inmates seeking compassionate release to include, among other things, "[p]roposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's

---

[8] Bradley also asks the Court to find that his race qualifies as an extraordinary and compelling reason warranting compassionate release. While it is unfortunately true that deaths from COVID-19 have disproportionately impacted African-Americans, the Court should resist the suggestion to treat race as a "medical condition" under § 1B1.13, or to make eligibility for compassionate release expressly dependent on the race of the defendant.

health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment").

Here, it appears that Bradley's medical conditions are not severe and are being well managed in prison. As noted, he has shown one blood pressure reading that is right on the cutoff for moderate hypertension. His records do not otherwise indicate any history of hypertension, and he expressly denied having any problem with high blood pressure when he first arrived at FCI Milan. Likewise, his PSR states that he "is in good health, is not under the care of a physician, and has no history of serious health issues." (DE# 1019, PSR, #3974.) And while his weight is either just below or just above the cutoff for severe obesity, there is no indication that it has resulted in any health problems, or that it could not be controlled through changes to diet and exercise. He is also a fairly young man, at 37 years old.

Courts have routinely denied motions for compassionate release in cases involving inmates with similar or more serious medical issues than Bradley's. *See, e.g.*, *United States v. Peaks*, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (denying relief for inmate at Elkton with BMI of 44 and hypertension); *United States v. Gold*, 2020 WL 2197839 (N.D. Ill. May 6, 2020) (denying relief for 65-year-old with pre-emphysema, hypertension, and high cholesterol); *United States v. Godofsky*, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (denying relief for 63-year-old with hypertension, high cholesterol, and asthma, and who is taking medications that weaken his immune system); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denying relief for 66-year-old who is obese and has heart disease and hypertension).

In addition, although FCI Milan initially suffered an outbreak of COVID-19, it appears that the facility has adopted measures that have successfully brought that outbreak under control. As noted, there are currently five inmates there who are positive for COVID-19, out of a total inmate population of 1,343. To be sure, Milan may have additional cases in the future. But given the relatively low current infection rate, and the various measures Milan has adopted to mitigate the risk of further introduction and spread, this is not a case in which Bradley is at a severely heightened risk of contracting COVID-19. Nor is it a case in which Bradley's risk of infection

would be dramatically reduced if he were to be released and allowed to live with his parents in Detroit. Indeed, as Bradley notes, the Detroit area has seen a very high infection rate, with even higher rates possible in the future as restrictions on movement and commercial activity end. Under those circumstances, the potential risk of future infection does not weigh heavily in favor of Bradley's release. *See, e.g.*, *United States v. Seng*, 2020 WL 2301202, at *6-7 (S.D.N.Y. May 8, 2020) ("[S]tatistics support the inference that Ng would be more at risk of contracting COVID-19 where he released and required to stay in his apartment in Manhattan than he would be by remaining in FCI Allenwood Low[.]"); *United States v. Miles*, 2020 WL 1989290 (S.D.N.Y. Apr. 27, 2020) (noting that defendant's release "will in fact place him at a higher risk of contracting COVID-19, effectively undoing the very reason for his compassionate release"); *United States v. Wright*, 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020) ("There is no reason to believe at this juncture that Wright would be at any less of a risk from contracting COVID-19 if he were to be released."); *United States v. Feiling*, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) ("Defendant fails to demonstrate how his release on home confinement will significantly reduce his likelihood of contracting COVID-19.").

Granting Bradley's motion would also be inconsistent with the § 3553(a) factors. If Bradley were released now, he would have served only about 63 months—less than a third of his 204-month sentence. *See United States v. Kincaid*, -- F. App'x --, 2020 WL 2521303, at *1-2 (6th Cir. May 18, 2020) (order) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions). Given the serious and prolonged nature of Bradley's criminal conduct—which yielded an offense level higher than the top of the sentencing table—a reduction to time served (or, alternatively, a reduction of 80 months) would not be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence; it would also create unwarranted disparities among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(2), (6).

Finally, although Bradley heavily emphasizes his rehabilitation and acceptance of responsibility, it is worth noting that he has shown a worrying tendency to assert his acceptance of

responsibility when it is convenient to do so, while taking the opposite approach at other times. As noted, Bradley's § 2255 motion asserted that he would not have pleaded guilty and would have insisted on going to trial if he had only been told by his attorney or the Court that he was being charged with *knowingly* conspiring to distribute opioids. As the Court previously noted in denying his motion, "it smacks of incredulity for Bradley to now suggest that he would have insisted on going to trial when he has repeatedly insisted that his acceptance of responsibility is full, sincere, and consistently maintained since the day of his arrest." (Civ. DE# 10, Memorandum, #122.) Given Bradley's shifting claims about accepting responsibility for his actions, it is hard to feel confident that Bradley would not be at a risk of reoffending if he were to be released now. This is particularly true given that, under his release plan, he would live at his parents' home, where he previously stored drugs, guns, and money during the underlying offense.

## IV. CONCLUSION

Because Bradley has not complied with the statutory exhaustion requirements, his motion for compassionate release must be denied without prejudice. If the Court were to reach the merits, Bradley has not shown that the extraordinary remedy of compassionate release is warranted, given that he is a young person who is generally in good health and who has served a small percentage of his overall sentence—which was imposed on the basis of serious and prolonged offense conduct. His motion should therefore be denied.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

**s/ *Cecil W. VanDevender***
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for defendant Benjamin Bradley.

*s/ Cecil VanDevender*
CECIL VANDEVENDER