No. 3:15-cr-00037-2
IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

**UNITED STATES OF AMERICA**,
*Plaintiff*,

v.

**BENJAMIN BRADLEY**,
*Defendant*.

**MOTION TO RECONSIDER MOTION TO MODIFY SENTENCE AND FOR LEAVE TO FILE A REPLY TO ISSUES RAISED IN THE GOVERNMENT RESPONSE**

Benjamin Bradley, through undersigned counsel, respectfully submits this motion for reconsideration of his motion to modify his sentence, and for leave to submit the tendered reply to address points raised by the government in its opposition. Undersigned counsel was prepared to file a reply today, less than eight business hours after the government filed its response. But this Court ruled on the motion to modify Mr. Bradley's sentence before counsel could do so. The tendered reply provides information disputing the government's characterization of conditions at FCI Milan and Mr. Bradley's risk factors for severe complications from COVID-19, the government's arguments regarding the § 3553(a) factors, and the government's mischaracterization of his exhaustion argument. All of these arguments are relevant to this Court's determination of the merits of Mr. Bradley's motion, For these reasons, Mr. Bradley requests reconsideration and leave to file the attached tendered reply to address these concerns.

Respectfully submitted,

*/s/ Melissa M. Salinas*
MELISSA M. SALINAS (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic

Jeffries Hall, Room 2058
701 South State Street
Ann Arbor, MI 48109
(734) 764-2724
salinasm@umich.edu
*Counsel for Benjamin Bradley*

Christopher I. Pryby
*Law School Graduate*

No. 3:15-cr-00037-2
IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

**UNITED STATES OF AMERICA**,
*Plaintiff*,

v.

**BENJAMIN BRADLEY**,
*Defendant*.

**TENDERED REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO BENJAMIN BRADLEY'S MOTION TO MODIFY SENTENCE**

## INTRODUCTION

Just as the Bureau of Prisons fails to take seriously Mr. Bradley's health and safety in prison, the government's response evinces a failure to take seriously his motion for compassionate release. The Bureau lost Mr. Bradley's request on April 20 and failed to give him a means to preserve the record of that request, and the government now blames Mr. Bradley for not providing sufficient proof of exhaustion. It recites boilerplate language identical to that in other motions before this Court, assuring in sweeping generalities that the Bureau is handling the pandemic, when conditions in FCI Milan are in fact worse than it portrays. It plays coy with Mr. Bradley's real risk factors for severe illness or death. And it conveniently forgets that *the Bureau itself already found Mr. Bradley suitable for home confinement*, changing its mind only on the basis of a blanket policy applied for internal logistical or political reasons.

This Court has the authority to release Mr. Bradley to supervised release and home confinement. There is a real danger that he will contract COVID-19 at Milan. He has a high risk

1

of dying from the disease. And the sentencing factors counsel his release. This Court should exercise its authority to reconsider and grant his motion to modify his sentence.

## ARGUMENT

**I.     The Bureau's Own Interference Prevented Mr. Bradley from Producing Direct Evidence of His April 20 Request to the Warden.**

Mr. Bradley sent a letter to the warden requesting his compassionate release on April 20, 2020. He could not make a copy of that letter for his own records because Milan denied him use of the copier. The Bureau then lost his letter. Because of the Bureau's own interference, he cannot provide this Court a copy of his letter to the warden. And now, after the Bureau has denied Mr. Bradley the opportunity to prove exhaustion with a copy of his request to the warden, the government cites out-of-circuit precedent to claim Mr. Bradley has the burden to prove exhaustion.

Circumstantial evidence proves Mr. Bradley requested compassionate release from the warden on April 20. The day he wrote the request was the same day he learned the Bureau reneged on its plan to release him to home confinement. That same day, he sent a letter to this Court requesting the same remedy: compassionate release. And Mr. Bradley told counsel—whom he would have no reason to lie to—the same thing. During a legal call on or about April 29 or 30, he told counsel he sent the warden a letter on April 20. He further wrote to counsel on May 10 saying the same thing. (Ex. at 1.)

Notably, the government's opposition fails to dispute—or even acknowledge—Mr. Bradley's asserted compassionate release request to the warden on April 20. It instead builds a straw man out of his May 8 administrative request.

Equity requires that the burden of proof shift to the government here. *Cf.* Fed. R. Civ. P. 37(b)(2)(A) (providing that a court may sanction a failure to comply with discovery by directing that "designated facts be taken as established for purposes of the action"). The Bureau's own

policies prevented Mr. Bradley from making a copy of his request to the warden. It now fails to produce his letter, and the government uses that failure to claim Mr. Bradley has not satisfied the statutory requirements. That is unfair. This Court should not condone it.

II. **Contrary to the Government's Assurances, Milan Does Not Have COVID-19 Under Control.**

COVID-19 is rampant in the federal prison system. *BOP: COVID-19 Update*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last accessed June 5, 2020) (acknowledging 6,380 total cases of COVID-19 among inmates and staff). Milan has already had one severe outbreak, and another is likely.

The conditions in Milan remain highly conducive to COVID-19 transmission. As Mr. Bradley and two other inmates have attested, the prison is overcrowded and unsanitary. Mr. Bradley's block has 30 or more bunks in an open dorm-like environment. (Ex. at 3.) Each bunk is separated by just four feet, (*id.*), preventing compliance with CDC-recommended social distancing practices, *Social Distancing, Quarantine, and Isolation*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed June 5, 2020). In the bathroom, there are four adjacent shower stalls, three adjacent toilet stalls and a urinal with minimal separation, and often no soap or disinfectant. (Ex. at 3, 6.) The showers go "days & even weeks without being cleaned." (*Id.* at 6.) Neither the bathrooms nor the prison floors are cleaned routinely. (*Id.* at 5.) And the sink rooms are not routinely sanitized, either. (*Id.*)

As for the supposed mitigation responses Milan has adopted, they are inadequate to prevent another outbreak, one which might already be in progress. Milan has not tested its entire population for the coronavirus—only inmates with severe cases requiring hospitalization or isolation. (Ex. at 3.) Inmates' temperatures are taken, but only once a week. (*Id.*) Some staff have even discouraged

3

inmates from reporting symptoms until they got worse. (*Id.*) Not all prisoners have masks. (*Id.* at 3, 6.) Prisoners are not provided gloves—only staff. (*Id.*) In fact, some staff refuse to wear masks and gloves. (*Id.* at 6.) In sum, from these conditions, the BOP's claim that just five inmates and three staff are COVID-positive likely undercounts the extent of the virus at Milan.

The government's response does not seriously engage with the nature of this virus. It downplays the ever-increasing number of infections in federal prisons by directing this Court to a canned statement of BOP's response to the pandemic. The government even cuts and pastes nearly verbatim across cases—insensitive and unresponsive to the individualized nature of every compassionate release motion. *Compare* (Dkt. 1262, Gov't Response, PageID# 4–7) *with, e.g.*, *United States v. Quintanilla Navarro*, No. 3:17-cr-00167, Dkt. 42, United States' Response, PageID# 230–33 (M.D. Tenn. June 4, 2020). "Unfortunately and inevitably," the government mechanically concedes, "inmates have become ill, and more likely will in the weeks ahead." (Dkt. 1262 at PageID# 232). The three "unfortunate" inmates who have already died at Milan and the 72 other inmates who have died in federal custody are simply the price society must pay. There is the gesture at the slippery slope of a "mass release"—which Mr. Bradley simply does not advocate. (*Id.*) And, with a straight face, the government asks this Court to accept that staying isolated in a room at his parents' house will not put Mr. Bradley at a "dramatically reduced" risk of contracting COVID-19. (*Id.* at PageID# 5824–25.) This is not a serious argument considering that Mr. Bradley is presently incarcerated in a dorm-style prison block with dozens of other prisoners and staff, abysmal hygiene practices, and confirmed cases of infection within the prison.

### III. Mr. Bradley Will Likely Become Severely Ill or Die If He Contracts COVID-19.

Even the government agrees that severe obesity alone qualifies as a sufficient medical condition to release Mr. Bradley in light of the pandemic, as it is a CDC-recognized risk factor for severe complications of COVID-19. (Dkt. 1262, Gov't Response, PageID# 5820.) It only objects

4

that Mr. Bradley has not provided sufficient documentation that he has reached the BMI threshold. (*Id.* at PageID# 5822.) Unfortunately, Milan has him on lockdown, so the only evidence he can provide is his own assertion of being 300 pounds as of May 18, 2020. (Ex. at 3.) Of course, if the government is truly interested in Mr. Bradley's BMI, it could have the Bureau itself weigh Mr. Bradley.

In any case, the government fundamentally misunderstands the nature of COVID-19's threat to Mr. Bradley. His severe obesity alone puts him at a high risk of complications. His systemic stage 2 hypertension—even though it is not a separate risk factor listed by the CDC—makes it more likely Mr. Bradley will suffer severe complications. And his weight and blood pressure are increasing, likely because of the lack of healthy food available at Milan. (Ex. at 3.) To the government's objection that Mr. Bradley has not proven he has systemic stage 2 hypertension, medical records from Mr. Bradley's former pulmonologist indicate continued hypertension from 2009 through 2014. (*See* Ex. at 7, 9, 11, 15, 17, indicating blood pressure readings of 148/82; 130/82; 160/90, dropping to 130/80 after a recheck; 158/92; and 130/80.) Today, in fact, he had his blood pressure checked twice, with readings of 178/100 and 186/104, both squarely above the stage 2 hypertension threshold. The fact that he was prescribed blood pressure medication while in custody means that a doctor on the Bureau's payroll thought it serious enough to treat. (*See* Dkt. 1261, BOP Medical Records, PageID# 5726.) And on top of all that, both sides of his family have high blood pressure, including an immediate family member who takes medication for it. (Ex. at 29.)

Moreover, Mr. Bradley and his family have a history of several medical conditions that signal he may have even more CDC-recognized risk factors than just severe obesity. Mr. Bradley had asthma or a similar condition as a child, (Ex. at 29), and asthma may never fully resolve,

5

Anthony L. Komaroff, *By the Way, Doctor: Does Asthma Go Away?*, Harv. Med. Sch. (May 2007), https://www.health.harvard.edu/newsletter_article/By_the_way_doctor_Does_asthma_go_away. Mr. Bradley continued to suffer coughing, wheezing, and chest pain, the classic symptoms of asthma, *id.*, from 2009 to 2014. (*See* Ex. at 7, stating "chest pain," "wheezing," and "SOB," short for "shortness of breath"; *id.* at 9, stating "coughing," "wheezing," and "SOB"; *id.* at 17, stating "coughing"; *see also id.* at 19–23, indicated repeated complaints of cough.) His former pulmonologist was apparently concerned enough at his most recent visit in May 2014 to order a six-minute walk test, (*id.* at 24–28), commonly ordered for patients to assess functional status in patients with cardiopulmonary disease. Vera Bittner & Siddharth Singh, *The 6 Minute Walk Test*, CardiologyAdvisor, https://www.thecardiologyadvisor.com/home/decision-support-in-medicine/cardiology/the-6-minute-walk-test (last accessed June 5, 2020). Mr. Bradley's children also have asthma and allergies, (Ex. at 29), further evidence that Mr. Bradley himself has a genetic predisposition to the condition that he passed on. *See* World Health Org., *Genetics and Asthma* 2, https://www.who.int/genomics/about/Asthma.pdf (last accessed June 5, 2020). Faced with COVID-19, which notoriously causes long-lasting damage to the lungs, any latent asthmatic condition could trigger and put Mr. Bradley at a great risk of death. See *Adult Onset Asthma*, Asthma & Allergy Found. of Am., https://asthmaandallergies.org/asthma-allergies/adult-onset-asthma (last accessed June 5, 2020).

One of Mr. Bradley's immediate family members has been treated for sleep apnea. (Ex. at 29.) Sleep apnea has a genetic component, and Mr. Bradley is also at risk of it because of his severe obesity. Susan Redline & Peter V. Tishler, *The Genetics of Sleep Apnea*, 4 Sleep Med. Rev. 583 (2000); *see* Abel Romero-Corral et al., *Interactions Between Obesity and Obstructive Sleep Apnea*, 137 Chest 711 (2010). Although not on the CDC's list, many courts have concluded that sleep

apnea, especially when combined with CDC-recognized risk factors such as severe obesity, forms an extraordinary and compelling reason to grant relief in the wake of the pandemic. *See, e.g.*, *United States v. Hunt*, No. 2:18-cr-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Amarrah*, No. 5:17-cr-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020).

Mr. Bradley also has family history of autoimmune disease. One immediate family member has colitis, and his deceased cousin had lupus from a young age. (Ex. at 29.) That family history puts Mr. Bradley at a greater risk of autoimmune disease himself. See Corinne Richard-Miceli & Lindsay A. Criswell, *Emerging Patterns of Genetic Overlap Across Autoimmune Disorders*, 4 Genome Med., no. 6, 2012, at 1, https://genomemedicine.biomedcentral.com/track/pdf/10.1186/gm305. Indeed, asthma itself is hypothesized to have an autoimmune mechanism. Alberto Tedeschi & Riccardo Asero, *Asthma and Autoimmunity: A Complex but Intriguing Relation*, 4 Expert Rev. Clinical Immunology 767 (2008). And courts have found autoimmune diseases such as lupus, especially in conjunction with other conditions, sufficient to order compassionate release. *See, e.g.*, *United States v. Handy*, No. PJM 04-0559, 2020 WL 2041666 (D. Md. Apr. 28, 2020); *United States v. Sanchez*, No. 18-CR-00140, 2020 WL 1933815 (D. Conn. Apr. 22, 2020).

Other potential risk factors Mr. Bradley faces are the possibility of a heart murmur from his family history, (Ex. at 29), liver damage from his past alcohol use, (*see* Dkt. 1261, BOP Medical Records, PageID# 5724), and type-2 diabetes from his severe obesity, see Ann Smith Barnes, *The Epidemic of Obesity and Diabetes*, 38 Tex. Heart Inst. J. 144 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3066828/pdf/20110400s00010p142.pdf.

Last, the government astonishingly relegates to a *footnote* the undisputed fact that African-Americans suffer disproportionately from COVID-19. (Dkt. 1262, Gov't Response, PageID# 5823 n.8.) By asking this Court to disregard that African-Americans are more likely to die from COVID-

19, *see* Maggie Fox, *Blood Clots Fill Lungs of Black Coronavirus Victims, Study Finds*, CNN (May 28, 2020), https://edition.cnn.com/2020/05/27/health/coronavirus-african-americans-new-orleans, the government asks this Court to ignore and perpetuate the severe disparities African-Americans suffer in the criminal justice system and beyond. To disregard this racial disparity is to disregard the underlying socioeconomic inequalities accounting for the gap. And the government's response is especially insensitive in light of ongoing protests against systemic police mistreatment of African-Americans. Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. Times (June 3, 2020), https://www.nytimes.com/article/george-floyd-protests-timeline.html.

Indeed, the government supported relief for rich, white, well-connected defendants such as Paul Manafort (who had served about a quarter of a 7.5-year sentence) and Michael Cohen (who had served about a third of a 3-year sentence). Josh Gerstein, *Paul Manafort Released from Prison Because of Virus Concerns*, Politico (May 13, 2020), https://www.politico.com/news/2020/05/13/paul-manafort-released-from-prison-due-to-virus-concerns-254532; Brakkton Booker, *Michael Cohen Released from Prison Due to Coronavirus Concerns*, NPR (May 21, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/21/860204544/michael-cohen-released-from-prison-due-to-coronavirus-concerns. Yet its canned opposition to Mr. Bradley's motion, with minor changes, could apply equally well to those defendants.

**IV.     The Bureau of Prisons Has Already Recognized That Mr. Bradley Is Fit for Release.**

The government's argument that modifying Mr. Bradley's sentence does not serve the § 3553(a) factors flatly contradicts the Bureau's previous determination that he was eligible for home confinement. The only reason Mr. Bradley had to request compassionate release in the first place is that the DOJ made a blanket decision to impose a 50% sentence completion threshold before the Bureau could consider inmates for transfer to home confinement under the CARES Act.

There was no indication that Mr. Bradley *individually* had not served enough of his sentence that home confinement was an improper punishment.

The Department of Justice's 50% sentence-completion threshold is not a good measure for this Court to consider in deciding Mr. Bradley's motion. That measure is based on DOJ's internal logistical and political reasons not to release so many prisoners at once. But mass release is not the issue here. Rather, the issue is whether Mr. Bradley's home confinement would be consistent with § 3553(a). And as Mr. Bradley noted in his original memorandum, the Bureau's initial determination that he was fit for release to home confinement is strong evidence of that fact.

Tellingly, besides a generalized discussion about the length of Mr. Bradley's sentence, the government fails to dispute most of Mr. Bradley's arguments about the sentencing factors, and its remaining arguments are weak. For one, the government implies Mr. Bradley might revert to a life of crime if he moves in with his parents. (Dkt. 1262, Gov't Response, PageID# 5826.) But the fact that the BOP already approved this release plan and concluded that Mr. Bradley's risk of recidivism was "minimal"—the lowest he could achieve—completely undercuts the government's insinuation. (Dkt. 1256-2, Summary Reentry Plan, PageID# 5686, 5689.)

The government also faults Mr. Bradley for an argument he made in his *pro se* § 2255 motion. (Dkt. 1262, Gov't Response, PageID# 5826.) Because he lacked the benefit of counsel in that action, this Court should forgive his ill-chosen argument and not attribute it to a lack of remorse or failure to accept responsibility. *Cf. Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint . . . must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))). Especially in light of numerous testaments to the contrary. (Dkt. 1256-10, Letters of Support, PageID# 5692–96, 5701–02, 5704–05.)

The government's newfound concern with "unwarranted disparities" among defendants, (Dkt. 1262, Gov't Response, PageID# 5825), is itself incredible given the release of inmates such as Paul Manafort and Michael Cohen. And the government's reliance on § 3553(a)(6) merely begs the question—presuming his disparity is unwarranted without proving it. To the contrary, the change in Mr. Bradley's sentence *is* warranted by his likelihood of contracting COVID-19 at Milan and suffering severe complications or dying.

## CONCLUSION

For the reasons above and those in his original motion, this Court should modify Mr. Bradley's sentence as he has requested.

Respectfully submitted,

*/s/ Melissa M. Salinas*
MELISSA M. SALINAS (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic
Jeffries Hall, Room 2058
701 South State Street
Ann Arbor, MI 48109
(734) 764-2724
salinasm@umich.edu
*Counsel for Benjamin Bradley*

Christopher I. Pryby
*Law School Graduate*

James W. Randall
*Federal Appellate Litigation Clinic Fellow*

## CERTIFICATE OF SERVICE

I hereby certify this document was filed on June 5, 2020, using the Court's ECF system, which will send notice of this filing to all counsel of record indicated on the electronic receipt.

*/s/ Melissa M. Salinas*
MELISSA M. SALINAS (MI-P69388)
University of Michigan Law School
Federal Appellate Litigation Clinic