UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cr-00037-2 |
| | ) | |
| BENJAMIN BRADLEY, | ) | Judge Trauger |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO MOTION FOR RECONSIDERATION AND SUR-REPLY

On June 5, 2020, the Court entered an order denying Benjamin Bradley's motion for compassionate release "after complete review of the motion on the merits," which included consideration of "the applicable factors set forth in 18 U.S.C. § 3553(a) and the applicable policy statements issued by the Sentencing Commission to the extent they are relevant." (DE# 1264, Order.) Later that day, Bradley filed a motion for reconsideration and for leave to file a reply (DE# 1265, Motion), to which the Court ordered a response (DE# 1268, Order). Bradley has since filed additional medical records from a doctor's visit he had on June 5, 2020. (DE# 1270, Supplement.) Although the government will rely largely on its previous response (DE# 1262, Response), it submits this response/sur-reply to address three points.

*First*, nothing in Bradley's reply or supplemental filings materially affects the Court's analysis of either the 18 U.S.C. § 3553(a) factors or the risk that Bradley will face an unusually adverse health outcome if he contracts COVID-19. The fact remains that Bradley is a young man in reasonable health who committed a gravely serious offense that, in the view of the Sentencing Commission, warranted life imprisonment. And while the Court imposed a significantly shorter sentence, Bradley has only served roughly a third of it—a fact that it is highly relevant to the analysis of whether compassionate release is warranted. *See United States v. Kincaid*, 802 F. App'x

187 (6th Cir. 2020), *reh'g denied* 805 App'x 394 (6th Cir. 2020) (rejecting the claim that it was improper for the district court to "consider the percentage of time a person has served" and noting that this is not even "a close question that could go either way").

If the Court were to grant Bradley's motion and reduce his sentence to time served, it would represent a downward variance of roughly 87% (i.e., 63 months against a range of 480 months after application of U.S.S.G. § 5G1.1). A dramatically reduced sentence of that nature would not adequately reflect the seriousness of the offense, promote respect for the law, or provide adequate deterrence, and would create unwarranted disparities with similarly situated defendants. *See, e.g.*, *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019) ("[T]he more a sentencing court strays from the Guidelines in a mine-run case, the greater the risk that the defendant's sentence will create unfair disparities.").

Moreover, the supplemental medical records that Bradley has submitted confirm what the Court already knew: he does not have pulmonary hypertension and has a body mass index that has long hovered right around the cutoff for severe obesity. Bradley asserts that "his weight and blood pressure are increasing, likely because of the lack of healthy food available at Milan." (DE# 1265, Motion, #5846.) But the records he has submitted show that he weighed 298 pounds in February 2013 (DE# 1267, Sealed Ex., p. 11), 290 pounds in September 2016 (Initial PSR, p. 3), and 295 pounds on June 5, 2020 (DE# 1270-1, Supplement, #5889.) This is not a case in which Bradley has experienced sudden or uncontrolled weight gain while incarcerated. He has also recently received medical counselling on exercise, weight loss, and diet, making it reasonably likely that he will be able to lose the ten pounds or so necessary to get himself below the cutoff for severe obesity as defined by the CDC. (DE# 1270-1, Supplement, #5891.) Likewise, although he has previously declined to take the medication he was prescribed for high blood pressure, due to

2

concern about side effects, BOP doctors have recently put him back on medication and plan to address any side effects with him going forward. (*Id.* at #5889, 5891.) There is thus good reason to think that Bradley's blood pressure can be controlled through a typical course of medication, combined with diet and exercise.

In sum, the medical records show that Bradley's health is far from dire, and is being reasonably managed in BOP. Indeed, last week's medical visit found Bradley's pulmonary and cardiovascular systems to be "within normal limits" and observed that he "[a]ppears well, [a]lert and [o]riented." (*Id.* at #5890.) More importantly, at 37 years old, Bradley is in an age cohort with a very low mortality rate from COVID-19. According to the CDC, only 2.5% of COVID-19 deaths have been among people under 45 years old.[1]

Tellingly, Bradley has not identified a single case in which a similarly situated defendant—under 40, right at the cusp of having a single CDC risk factor, and still with nearly a decade left on his sentence—has been granted compassionate release. As the government previously noted, courts have routinely denied motions for compassionate release in cases involving inmates with similar or more serious medical issues than Bradley's. *See, e.g.*, *United States v. Peaks*, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (denying relief for inmate at Elkton with BMI of 44 and hypertension); *United States v. Gold*, 2020 WL 2197839 (N.D. Ill. May 6, 2020) (denying relief for 65-year-old with pre-emphysema, hypertension, and high cholesterol); *United States v. Godofsky*, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (denying relief for 63-year-old with hypertension, high cholesterol, and asthma, and who is taking medications that weaken his immune

---

[1] *See* https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Sex-Age-and-S/9bhg-hcku (recording 2,426 total deaths for the age cohorts of under 1, 1-4, 5-14, 15-24, 25-34, and 35-44, out of a total of 95,608).

3

system); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denying relief for 66-year-old who is obese and has heart disease and hypertension).

Bradley also takes umbrage at two points from the government's discussion of his health. He describes the government's view that the Court should refrain from expressly relying on race as an independent factor in the analysis under U.S.S.G. § 1B1.13 as "insensitive," and tantamount to a request that the Court "perpetuate the severe disparities African-Americans suffer in the criminal justice system and beyond." (DE# 1265, Motion, #5849.) But as the CDC has explained, an individual's race and ethnicity do not independently effect how a person reacts to the virus if infected; rather, race and ethnicity tend to correlate with "economic and social conditions" that do effect health outcomes, such as the individual's "living conditions," "work circumstances," and "underlying health conditions and lower access to health care."[2] The Court can and should consider those factors when evaluating a compassionate release motion. But when considering motions from two defendants who are otherwise similarly situated with regard to living conditions, health conditions, and access to health care, the Court should not expressly treat one differently from the other solely on the basis of race, as Bradley appears to suggest.

Bradley also dismisses as "not a serious argument" (*id.* at #5845) the government's point that Bradley has not shown that he would be at a dramatically lower risk of a poor health outcome if he were released to live with his parents. As other courts have explained, however, there are certain aspects of BOP custody (such as dorm-style living) that make the risk of infection higher, while other aspects (such as limitations and screening of visitors, central quarantine of infected or symptomatic inmates, and on-site medical staff) that reduce those risks. *See United States v.*

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

*Wright*, 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020) ("[D]espite the close proximity of inmates, the BOP is able to impose restrictions on visitors and restrictions on internal movements that are more difficult to impose outside prison walls. There is no reason to believe at this juncture that Wright would be at any less of a risk from contracting COVID-19 if he were to be released."); *see also United States v. Seng*, 2020 WL 2301202, at *6-7 (S.D.N.Y. May 8, 2020); *United States v. Miles*, 2020 WL 1989290 (S.D.N.Y. Apr. 27, 2020); *United States v. Feiling*, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020). If Bradley were released, it is difficult to know, for example, how many people he would come into close contact with and whether he would have access to health care that would be comparable to what he receives at Milan. Moreover, it is worth noting that the city of Detroit (where Bradley proposes to live) has reported 1,416 confirmed deaths, and 87 probable deaths, from COVID-19.[3] In a city of approximately 670,000 people,[4] this works out to one death for every 446 people. In comparison, BOP has reported 80 deaths from COVID-19 out of an inmate population of 133,882, *see* https://www.bop.gov/coronavirus, which is one death for every 1,673 people. At Milan specifically, there have been three deaths from COVID-19 out of an inmate population of 1,342, which is one death for every 447 people. Given these considerations, it remains true that Bradley has not shown that his release would dramatically reduce his risk of an adverse health outcome.

**Second**, Bradley errs in suggesting that the Court's decision to grant compassionate release should be dictated by home confinement decisions made by BOP (or BOP case managers) in this case and others. For example, Bradley asserts that any argument against compassionate release based on the § 3553(a) factors "flatly contradicts [BOP's] previous determination that he was

---

[3] *See* https://www.michigan.gov/coronavirus/0,9753,7-406-98163_98173---,00.html.

[4] *See* https://www.census.gov/quickfacts/fact/table/detroitcitymichigan,MI/PST045219.

eligible for home confinement." (DE# 1265, Motion, #5849.) This assertion misapprehends the nature of the two remedies. When BOP exercises its designation authority to transfer an inmate to home confinement, that decision is based on a number of discretionary factors set out in memoranda, rather than the factors listed in § 3553(a). Indeed, the fact that the Attorney General supplemented his initial guidance to BOP to include consideration of the percentage of time the inmate had served demonstrates that the initial list of factors failed to account for the § 3553(a) factors. Here, Bradley's case manager advised him that he met the initial factors for transfer to home confinement, but later rescinded that advice when the factors were amended to include the percentage of the sentence that the inmate has served. Nothing about that sequence of events should be deemed controlling of the Court's analysis of Bradley's health or of the § 3553(a) factors.

Moreover, if BOP had transferred Bradley to home confinement, he would still have nearly a decade to serve on his sentence; the designated place of service would, for now, be his home, but BOP would have authority to rescind that designation in the future and return him to custody. By contrast, Bradley is asking the Court to reduce his sentence to time served, which is an extraordinarily different remedy, subject to different considerations.

Bradley also makes baseless allegations of disparate treatment when he asserts that "the government supported relief for rich, white, well-heeled defendants such as Paul Manafort . . . and Michael Cohen." (*Id.* at #5849.) Bradley's argument on this point rests on a misleading characterization of those cases. He suggests that Manafort and Cohen were both granted compassionate release, with support of "the government," by which he evidently means the U.S. Attorney's Office, given that he refers to BOP as "the Bureau." In fact, neither Manafort nor Cohen was granted compassionate release, much less compassionate release that "the government supported." Indeed, Manafort never moved for compassionate release at all. *See United States v.*

*Manafort*, 1:18-cr-00083-TSE (E.D. Va.) (last docket entry May 13, 2019); *United States v. Manafort*, 1:17-cr-00201-ABJ (D.D.C.) (last docket entry Sep. 27, 2019). And while Cohen moved for compassionate release, that motion was denied by the court after the government adamantly opposed it. *United States v. Cohen*, 1:18-cr-00602-WHP (S.D.N.Y. Mar. 24, 2020) (Doc. No. 72, Memorandum ("As the government points out, [Cohen] is 'manifestly ineligible' for compassionate release and has not exhausted his administrative remedies.")).

It is true that both men were reportedly transferred to home confinement under the BOP's priority transfer program.[5] And while the government cannot speak to BOP's reasons for doing so, both cases seem readily distinguishable from Bradley's. According to the reporting, Manafort "is 71 years old and suffers from several preexisting health conditions, including high blood pressure, liver disease, and respiratory ailments"; had recently been hospitalized for health problems; had also recently contracted influenza and bronchitis; and was due to be released in 2024.[6] Meanwhile, Cohen's sentence was set to expire in late 2021.[7] As noted, Bradley's sentence is set to expire in 2029. It is certainly reasonable to ask whether BOP made the right decision in transferring either Manafort or Cohen to home confinement. But nothing about those decisions suggests that the

---

[5] *See* Rachel Weiner, et al. *Paul Manafort Released from Prison, Granted Home Confinement Due to Coronavirus Fears*, WASH. POST (May 13, 2020), *available at* https://www.washingtonpost.com/national-security/paul-manafort-granted-home-confinement-due-to-coronavirus-fears/2020/05/13/7746835c-8320-11ea-ae26-989cfce1c7c7_story.html; Benjamin Weiser, et al., *Michael Cohen, Ex-Trump Lawyer, Leaves Prison Early Because of Virus*, N.Y. TIMES (May 20, 2020), *available at* https://www.nytimes.com/2020/05/20/nyregion/michael-cohen-coronavirus-prison-release.html (noting that "[i]t is possible the prison system might end his furlough and require him to return to Otisville").

[6] Weiner, et al., *supra*.

[7] Weiser, et al., *supra*.

7

government is basing its opposition to or support of compassionate release motions on the defendant's race, wealth, or political connections, as Bradley baselessly alleges.

***Third***, although the Court did not rely on exhaustion in denying Bradley's motion, the government maintains that Bradley has not complied with the mandatory exhaustion requirement set out by statute. Bradley appears to suggest that it is not his burden to prove exhaustion, but rather the government's burden to *disprove* it. The case law on this point appears to be uniform, however, and it holds that "[t]he defendant bears the burden of showing he has exhausted his administrative remedies." *United States v. Evans*, 2020 WL 2549964, at *2 (W.D. Tenn. May 19, 2020); *see also, e.g.*, *United States v. Van Sickle*, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020); *United States v. Johnson*, 2020 WL 1434367, at *1 (W.D. Ark. Mar. 24, 2020).

Bradley also suggests that the Court should rely on the circumstantial evidence from his letter to the Court, dated April 20, 2020 (DE# 1245, Letter), to infer that he filed an administrative request with BOP around that same time requesting compassionate release. It may well be true that Bradley filed some sort of letter or informal request with BOP around that time. But, if anything, Bradley's letter to the Court supports the inference that what Bradley sought from BOP was transfer to home confinement, rather than a request that BOP move to reduce his sentence on the basis of his medical conditions. In the letter, Bradley describes how his case manager told him that he was "selected to go on home confinement under the Care Act," because he "fit all the criteria that the warden posted on a memo." (*Id.* at #5484.) Although he asked the Court to reduce his sentence by enough "to make [him] eligible for the Care Act home confinement," he makes no reference to his own medical conditions, and at no point suggests that he has asked BOP to file a motion to reduce his sentence to time-served on the basis of those medical conditions. His letter therefore supports the conclusion that while Bradley has asked BOP to transfer him to home

confinement under the CARES Act, he has not asked BOP to move the Court for a sentence reduction on the basis of his medical conditions. As such, he has not complied with the statutory exhaustion requirements. *United States v. Alam*, -- F.3d --, 2020 WL 2845694 (6th Cir. June 2, 2020); *United States v. Allen*, 2020 WL 2199626, at *1 (S.D. Ga. May 6, 2020).

* * *

In sum, the Court has already thoroughly considered Bradley's request for compassionate release and denied it on the merits. The Court was right to do so, given Bradley's offense conduct, the amount of time left on his sentence, his health, and his age. Nothing in Bradley's subsequent filings should change that analysis. The government therefore respectfully submits that the Court should adhere to its prior decision and deny the motion for compassionate release.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

*s/ Cecil W. VanDevender*
Cecil W. VanDevender
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 12, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for defendant Benjamin Bradley.

*s/ Cecil VanDevender*
CECIL VANDEVENDER